## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA and the STATE OF MICHIGAN, | ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | Civil Action No. |
| BLUE CROSS BLUE SHIELD OF MICHIGAN, a Michigan nonprofit healthcare corporation, | ) ) ) ) | COMPLAINT |
| Defendant. | ) ) |  |

The United States of America, acting under the direction of the Attorney General of the United States, and the State of Michigan, acting under the direction of the Michigan Attorney General, bring this civil antitrust action to enjoin defendant Blue Cross Blue Shield of Michigan ("Blue Cross") from including "most favored nation" clauses ("MFNs") in its contracts with hospitals in Michigan, to enjoin the enforcement of such clauses by Blue Cross, and to remove those clauses from existing contracts.

Blue Cross' use of MFNs has reduced competition in the sale of health insurance in markets throughout Michigan by inhibiting hospitals from negotiating competitive contracts with Blue Cross' competitors. The MFNs have harmed competition by (1) reducing the ability of other health insurers to compete with Blue Cross, or actually excluding Blue Cross' competitors in certain markets, and (2) raising prices paid by Blue Cross' competitors and by self-insured employers. By reducing competition in this manner, the MFNs are likely raising prices for health

insurance in Michigan.  The MFNs unreasonably restrain trade in violation of Section 1 of the

Sherman Act, 15 U.S.C. § 1, and Section 2 of the Michigan Antitrust Reform Act, MCL 445.772.

## I.   NATURE OF THIS ACTION

1.  Blue Cross is by far the largest provider of commercial health insurance in Michigan

and has been for many years.  Blue Cross competes with for-profit and nonprofit health insurers.

Blue Cross' commercial health insurance policies cover more than three million Michigan

residents, more than 60% of the commercially insured population.  Blue Cross insures more than

nine times as many Michigan residents as its next largest commercial health insurance

competitor.  Blue Cross had revenues in excess of $10 billion in 2009.  Blue Cross has market

power in the sale of commercial health insurance in each of the relevant geographic markets

alleged below.

2.  Blue Cross is also the largest non-governmental purchaser of health care services,

including hospital services, in Michigan.  As part of its provision of health insurance, Blue Cross

purchases hospital services on behalf of its insureds from all 131 general acute care hospitals in

the state.  Blue Cross purchased more than $4 billion in hospital services in 2007.

3.  Over the past several years, Blue Cross has sought to include MFNs (sometimes

called "most favored pricing," "most favored discount," or "parity" clauses) in many of its

contracts with hospitals.  Blue Cross currently has agreements containing MFNs or similar

clauses with at least 70 of Michigan's 131 general acute care hospitals.  These 70 hospitals

operate more than 40% of Michigan's acute care hospital beds.  Unless enjoined, Blue Cross is

likely to enter into MFNs with additional Michigan hospitals.

4.  Blue Cross generally enters into two types of MFNs, which require a hospital to provide hospital services to Blue Cross' competitors either at higher prices than Blue Cross pays or at prices no less than Blue Cross pays.  Both types of MFNs inhibit competition:

(A)  "MFN-plus."  Blue Cross' existing MFNs include agreements with 22 hospitals that require the hospital to charge some or all other commercial insurers *more* than the hospital charges Blue Cross, typically by a specified percentage differential. These hospitals include major hospitals and hospital systems, and all of the major hospitals in some communities.  These 22 hospitals operate approximately 45% of Michigan's tertiary care hospital beds.  (A tertiary care hospital provides a full range of basic and sophisticated diagnostic and treatment services, including many specialized services.)  Blue Cross' MFN-plus clauses require that some hospitals charge Blue Cross' competitors as much as 40% more than they charge Blue Cross.  Two hospital contracts with MFN-plus clauses also prohibit giving Blue Cross' competitors better discounts than they currently receive during the life of the Blue Cross contracts.  Blue Cross' MFN-plus clauses guarantee that Blue Cross' competitors cannot obtain hospital services at prices comparable to the prices Blue Cross pays, which limits other health insurers' ability to compete with Blue Cross.  Blue Cross has sought and, on most occasions, obtained MFN-plus clauses when hospitals have sought significant rate increases.

(B)  "Equal-to MFNs."  Blue Cross has entered into agreements containing MFNs with more than 40 small, community hospitals, which typically are the only hospitals in their communities, requiring the hospitals to charge other commercial health

insurers at least as much as they charge Blue Cross.  Under these agreements, Blue Cross agreed to pay more to community hospitals, which Blue Cross refers to as "Peer Group 5" hospitals, raising Blue Cross' own costs and its customers' costs, in exchange for the equal-to MFN.  A community hospital that declines to enter into these agreements would be paid approximately 16% less by Blue Cross than if it accepts the MFN.  Blue Cross has also entered into equal-to MFNs with some larger hospitals.

5.  Blue Cross has sought and obtained MFNs in many hospital contracts in exchange for increases in the prices it pays for the hospitals' services.  In these instances, Blue Cross has purchased protection from competition by causing hospitals to raise the minimum prices they can charge to Blue Cross' competitors, but in doing so has also increased its own costs.  Blue Cross has not sought or used MFNs to lower its own cost of obtaining hospital services.

6.  Blue Cross' MFNs have caused many hospitals to (1) raise prices to Blue Cross' competitors by substantial amounts, or (2) demand prices that are too high to allow competitors to compete, effectively excluding them from the market.  By denying Blue Cross' competitors access to competitive hospital contracts, the MFNs have deterred or prevented competitive entry and expansion in health insurance markets in Michigan, and likely increased prices for health insurance sold by Blue Cross and its competitors and prices for hospital services paid by insureds and self-insured employers, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 2 of the Michigan Antitrust Reform Act, MCL 445.772.

## II.  DEFENDANT, JURISDICTION, VENUE, AND INTERSTATE COMMERCE

7.  Defendant Blue Cross is a Michigan nonprofit healthcare corporation headquartered in Southfield, Michigan.  Blue Cross is subject to federal taxation but is exempt from

state and local taxation under Michigan law.  Directly and through its subsidiaries, Blue Cross provides commercial and other health insurance products, including preferred provider organization ("PPO") health insurance products and health maintenance organization ("HMO") health insurance products.

8.   Plaintiff the United States brings this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, to prevent and restrain Blue Cross' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Plaintiff the State of Michigan, by and through its attorney general, brings this action in its sovereign capacity and as parens patriae on behalf of the citizens, general welfare, and economy of Michigan under its statutory, equitable and/or common law powers, and pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain Blue Cross' violation of Section 2 of the Michigan Antitrust Reform Act, MCL 445.772.

9.   The State of Michigan purchases group health insurance for approximately 52,000 employees and 180,000 retirees and dependents, including residents of each of the areas directly affected by Blue Cross' conduct.  In particular, the State purchases health insurance for its employees from Blue Cross and others, and 60% of State employees and nearly all State retirees are covered by Blue Cross health plans.  State employees covered by Blue Cross are self-insured by the State, as described in paragraph 15 below, and increases in hospital costs are borne directly by the State and its employees.  The State has been injured, and is likely to be injured, in its business and property as a result of Blue Cross' violations.

10.   This Court has subject matter jurisdiction over this action and jurisdiction over the defendant pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4 (as to claims by the United

States), Section 16 of the Clayton Act, 15 U.S.C. § 26 (as to claims by the State of Michigan),

28 U.S.C. §§ 1331, 1337(a) and 1345, and principles of pendent and ancillary jurisdiction.

11.   Blue Cross is engaged in interstate commerce and in activities substantially affecting

interstate commerce, and the conduct alleged herein substantially affects interstate commerce.

Among other things, increased prices for hospital services caused by Blue Cross' MFNs are, in

some cases, paid by health insurers and self-insured employers across state lines.  Blue Cross

provides commercial health insurance that covers Michigan residents when they travel across

state lines, purchases health care in interstate commerce when Michigan residents require health

care out of state, and receives payments from employers outside Michigan on behalf of Michigan

residents.

12.   Blue Cross maintains its principal place of business and transacts business in this

District, and is subject to the personal jurisdiction of this Court.  Venue is proper in this District

under Section 12 of the Clayton Act, 15 U.S.C. § 22.  Blue Cross developed its MFN policy in

substantial part in this District, and entered into contracts containing MFNs with hospitals in this

district and elsewhere.  Blue Cross' conduct has raised and threatens to raise hospital prices and

has likely raised health insurance prices in this District and elsewhere.

## III.   COMMERCIAL HEALTH INSURANCE IN MICHIGAN

13.   In Michigan, as throughout the United States, individuals who are not disabled,

elderly, or indigent, and therefore eligible for Medicare or Medicaid, typically obtain health

insurance from commercial health insurance companies.  Employed individuals most often

obtain health insurance through their employers, which typically pay the greater share of

insurance premiums.  In 2008, approximately 53% of Michigan residents obtained employer-

provided or other group health insurance.  About 7% obtained individual insurance directly from commercial insurance companies, including Blue Cross.

14.   Commercial health insurers compete to be chosen by employers and employees based on the quality and breadth of their health care provider networks, the level of benefits provided to employees (including employees' out-of-pocket costs in the form of deductibles, co-payments, and coinsurance), price, customer service, reputation, and other factors.  Employers and some other groups typically select the insurance plan or plans they offer to their employees or group members.  Employees or group members then choose whether to enroll in the group health insurance coverage offered to them and, if multiple health insurance plans are offered, choose among the plans offered.

15.   Employers provide group health insurance on either a "fully insured" or a "self-insured" (sometimes called "self-funded") basis.  Under fully insured health insurance policies, the insurer bears the risk that health care claims will exceed anticipated losses.  Under self-insured health insurance policies, the employer pays its employees' insured medical costs itself, so a large portion of that risk is borne by the employer (often subject to stop-loss insurance).  Self-insurance is a viable option primarily for large employers.  Employers that self-insure usually contract with a health insurance company to obtain access to a health care provider network, including hospitals and physicians, at favorable prices, and for administrative services such as claims processing.  The health insurers that provide these network access and administrative services, known in the industry as "administrative services only" ("ASO") arrangements, for self-insured employers with employees in a particular region are generally the same insurers that provide fully insured health insurance in that region.  Blue Cross is the largest

provider of ASO services in Michigan, including to plaintiff State of Michigan, as alleged in paragraph 9 above.  Blue Cross processed almost $11 billion in health care claims for self-insured employers in 2009.  Approximately half of Blue Cross' commercial health insurance business is self-insurance business.  Blue Cross earned more than $750 million in ASO fees in 2009.

16.  Most commercial health insurance plans provide insureds with access to a health care provider network including hospitals and physicians.  Under these plans, insureds receive greater benefits when obtaining health care services from providers that participate in the insurer's provider network.  When an insured receives service from a provider in the insurer's network, the insurer or self-insured employer pays the health care provider at prices and terms negotiated between the insurer and the provider, and the patient often pays a co-pay, a deductible, or a portion of the cost specified in the insurance policy.  Network contracts between insurers and providers typically prohibit the provider from "balance billing" (charging the patient more than the allowable amount agreed to between the insurer and the provider).  In contrast, if there is no network or participation agreement between the insurer and the provider, the insurer typically provides a smaller "out-of-network" insurance benefit, if any, and the insured is often responsible for paying the balance of the provider's full charges.  The costs of medical care are typically 80% or more of insurers' costs, and hospital costs are a substantial portion of medical care costs. Accordingly, insurers' hospital costs are an important element of insurers' ability to offer competitive prices and attract employers.

17.  Hospitals and commercial health insurers generally negotiate a discount to be applied to a standardized hospital fee schedule.  The standardized schedule could be set forth as a

master list of hospital fees for services (referred to in the industry as a "chargemaster"), a schedule of fees for treatment of a particular illness (typically based on "diagnosis-related groups" or "DRGs" as defined by Medicare and Medicaid), or on another basis.  Blue Cross' equal-to MFNs typically require that hospitals not grant other commercial health insurers better discounts from the fee schedules than Blue Cross receives.  Blue Cross' MFN-pluses typically require that hospitals not grant other commercial health insurers discounts within a specified percentage of Blue Cross' discounts.

18.   The price of hospital services at individual hospitals directly affects health insurance premiums for the customers that use those hospitals.  Under Michigan law, Blue Cross is allowed to base large employers' group premiums on the group's own health care cost experience, so increases in local hospital prices can lead directly to increased premiums.  Blue Cross is allowed to base its insurance premiums for individuals and small employers (with 50 or fewer employees) on Blue Cross' health care expense experience within geographic areas defined by Blue Cross, among other factors.  As a result, an increase in the price of local hospital services directly increases the premiums that Blue Cross charges to purchasers of individual or small-group policies in that area.  As Blue Cross recognizes, "any increase in our hospital reimbursement rates would have to be passed on in the form of higher premiums for our insured customers, and dollar for dollar increases for those that are self-insured."  Some other health insurers in Michigan also adjust premiums based on the employer's past and anticipated health care costs – which incorporate local hospital costs.  Self-insured employers bear the burden of higher hospital prices directly.

## IV.      RELEVANT MARKETS

19.  As alleged below, Blue Cross has market power in the sale of commercial health insurance to groups and individuals in relevant geographic markets throughout Michigan. Commercial health insurance excludes government programs such as Medicare and Medicaid, and other products offered by health insurers such as Medicare Advantage that are not available to individuals who do not qualify for Medicare or Medicaid.  Commercial health insurance includes self-insurance arrangements described in paragraph 15 above.

### A.      **Relevant Product Markets**

20.  The sale of commercial group health insurance, including access to a provider network, is a relevant product market.  Health insurers compete on the breadth and quality of their provider networks, on premiums, and on the customer's cost of using providers, among other factors.  Group health insurance sold in Michigan usually includes access to a provider network, and most employers and insureds consider an insurer's provider network to be an important element of a health insurance product because the network specifies the physicians and hospitals to which patients can turn for service with substantially lower costs to themselves.

21.  There are no reasonable alternatives to group health insurance, including access to a provider network, for employers or for most employees.  Individual health insurance typically is significantly more expensive than group health insurance, in part because employer contributions to group health insurance premiums are not taxable to the employee and are tax-deductible by the employer.  Virtually all individual health insurance is purchased by persons who do not have access to employer-sponsored group health insurance.

22.  The sale of commercial individual health insurance, including access to a provider

-10-

network, is also a relevant product market.  Some Michigan residents without access to group
health insurance purchase individual health insurance from commercial health insurers.
Individual health insurance is the only product available to individuals without access to group
coverage or government programs that allows them to reduce the financial risk of adverse health
conditions and to have access to health care at the discounted prices negotiated by commercial
health insurers.  There are no reasonable alternatives to individual health insurance for
individuals who lack access to group health insurance or government programs such as Medicare
and Medicaid.

23.  Purchasing hospital services directly, rather than through a commercial insurer, is
typically prohibitively expensive and is not a viable substitute for group or individual
commercial health insurance.  Patients without health insurance almost never purchase hospital
services directly from hospitals at prices comparable to prices paid by Blue Cross.

24.  Blue Cross' MFNs apply to hospital services procured for both group and individual
commercial health insurance plans, and the anticompetitive effects alleged below have affected
and will continue to affect purchasers of both group and individual commercial health insurance.
Group and individual commercial health insurance are referred to herein as "commercial health
insurance."

**B.**   **Relevant Geographic Markets**

25.  Markets for commercial health insurance, including access to a provider network,
are local.  As alleged in paragraph 16 above, one key component of commercial health insurance
is access to a provider network, including primary and tertiary care hospitals.  Because patients
typically seek medical care close to their homes or workplaces, they strongly prefer health

insurance plans that provide access to networks of hospitals and physicians close to their homes and workplaces.  Employers offering group health insurance to their employees therefore demand insurance products that provide access to health care provider networks, including primary and tertiary care hospitals, in the areas in which substantial numbers of their employees live and work.  Individuals purchasing individual health insurance likewise demand insurance products that provide access to health care provider networks, including hospitals, in the areas in which they live and work.

26.  The relevant geographic market for the purpose of analyzing the effect of an MFN between Blue Cross and a hospital on the sale of commercial health insurance is the area in which the seller operates and in which the purchaser can practicably turn for supplies or services. Because an insurer is selling access to a provider network, among other things, the relevant geographic market for analyzing the effect of an MFN between Blue Cross and a hospital on the sale of commercial health insurance is the area in which the hospital subject to the MFN operates and in which employers and insureds can practicably turn for hospitals included in the provider network offered for sale as part of a commercial health insurance product.

27.  For example, the relevant geographic market for analyzing the effect of the MFN between Blue Cross and Edward W. Sparrow Hospital ("Sparrow"), in Lansing, is the Lansing Metropolitan Statistical Area ("MSA").  Lansing area employers and insureds cannot practicably turn to commercial health insurers that do not offer network access to hospitals in the Lansing MSA.  (MSAs and Micropolitan Statistical Areas are geographic areas defined by the U.S. Office of Management and Budget.)

28.  The following geographic areas are relevant geographic markets for the sale of

-12-

commercial health insurance:

    a.  The western and central Upper Peninsula (Alger, Baraga, Delta, Dickinson,

Gogebic, Houghton, Iron, Keweenaw, Marquette, Ontonagon, and Schoolcraft

Counties), where Blue Cross has more than 65% of commercially insured lives;

    b.  The Lansing MSA (Ingham, Clinton and Eaton Counties), where Blue Cross

has approximately 70% of commercially insured lives;

    c. The Alpena area (Alpena and Alcona Counties), where Blue Cross has more

than 80% of commercially insured lives;

    d.  The Traverse City Micropolitan Statistical Area (Benzie, Grand Traverse,

Kalkaska and Leelanau Counties), where Blue Cross has more than 60% of

commercially insured lives;

    e.  The "Thumb" area (Huron, Sanilac and Tuscola Counties), where Blue Cross

has more than 75% of commercially insured lives;

    f.  Each of the Detroit, Flint, Kalamazoo, and Saginaw MSAs, and the Alma and

Midland Micropolitan Statistical Areas, in each of which Blue Cross has more than 50%

of commercially insured lives;

    g. The Grand Rapids MSA, where Blue Cross has more than 45% of

commercially insured lives; and

    h.  Each of Allegan, Iosco, Montcalm, Osceola and St. Joseph Counties, in each

of which Blue Cross has more than 40% of commercially insured lives.

    29.  Blue Cross has an MFN with at least one significant hospital in each geographic

market identified in paragraph 28 above.  In the western and central Upper Peninsula, and in the

-13-

Lansing, Detroit, Flint, Grand Rapids, Kalamazoo and Saginaw MSAs and the Alma and Midland Micropolitan Statistical Areas, Blue Cross has MFN-pluses with at least one significant tertiary care hospital.  In the Thumb and in Allegan, Iosco, Montcalm, Osceola and St. Joseph counties, Blue Cross has MFNs with all of the hospitals, all of which are community hospitals, in the market.

30.  The geographic markets identified in paragraph 28 above approximate the areas served by the hospitals currently subject to Blue Cross' MFNs, and approximate the areas in which a commercial health insurer requires a provider network, including primary and tertiary care hospitals, in order to be an effective competitor in that area.  Most employed residents of each of these areas work within the area.  Residents of these areas generally tend to use the tertiary care hospitals, if any, within these areas for tertiary care hospital services.  Therefore, commercial health insurers believe they must include in their networks tertiary care hospitals in these areas in order to compete effectively in the sale of commercial health insurance to employers and residents of these areas.

31.  In addition, commercial health insurers believe they must include community hospitals within these areas in order to be able to compete effectively in the sale of commercial health insurance to employers and residents of these areas.  Blue Cross' competitors have paid higher prices at community hospitals in these areas as a result of Blue Cross' MFNs, rather than drop the community hospitals from their networks.  In particular, commercial health insurers that offer any HMO product are required by Michigan insurance regulations to include in their HMO networks nearby hospitals for any location in which an HMO product is offered.  Those hospitals include community hospitals that are the only hospitals in certain of the areas identified in

paragraph 28 above.  Several of the health insurers seeking to compete with Blue Cross primarily offer HMO products, and approximately 40% of Michigan insureds covered by non-Blue Cross commercial health insurance participate in HMOs.

32.  The residents of the markets identified in paragraph 28 above, and their employers, are the customers most likely to be affected by Blue Cross' MFNs.  Employers and individuals likely would not reduce purchases of commercial health insurance from commercial health insurers with provider networks in the geographic markets alleged in paragraph 28 above in response to prices above competitive levels by a sufficient amount to make prices above competitive levels over a sustained period of time unprofitable for a monopoly supplier of commercial health insurance in those markets.  Therefore, the sale of commercial health insurance, including a provider network, in each of the geographic markets alleged above is a properly defined relevant market for the purpose of analyzing the effects of Blue Cross' MFNs under the antitrust laws.

## V.    BLUE CROSS' MARKET POWER

33.  Blue Cross has market power in the sale of commercial health insurance in each of the alleged relevant geographic markets.  Blue Cross is far and away the largest provider of health insurance in Michigan, with more than 60% of commercially insured lives (including lives covered under self-insurance arrangements administered by Blue Cross).  Market shares of the magnitude alleged in paragraph 28 above create an inference of market power.

34.  The inference of Blue Cross' market power arising from its market share is corroborated by Blue Cross' demonstrated ability to exercise that market power by, among other things, raising prices, restricting output, erecting barriers to entry, and excluding competitors, as

alleged below.

35.  Blue Cross' market power in each of the alleged markets is durable because entry into the alleged markets is difficult.  Effective entry into or expansion in commercial health insurance markets requires that a health insurer contract with broad provider networks and obtain hospital prices and discounts at least comparable to the market's leading incumbents.  As alleged below, the purpose and effect of Blue Cross' MFNs is to prevent competing insurers and potential entrants from obtaining discounts from hospitals that would allow them to compete more effectively with Blue Cross.

## VI.    BLUE CROSS' MFNs AND THEIR ANTICOMPETITIVE EFFECTS

### A.    The MFNs and their Terms

36.  Since at least 2007, Blue Cross has sought to include MFNs or similar clauses in many of its agreements with Michigan hospitals.  In some contracts, Blue Cross requires the hospital to contract with any other commercial insurer at rates at least as high as the hospital contracts with Blue Cross – an equal-to MFN.  In others, Blue Cross demands even more and requires the hospital to contract with other insurers at rates *higher* than those paid by Blue Cross, typically by a specified percentage differential – an MFN-plus.  Some Blue Cross MFNs contain very limited exceptions, most notably an exception for commercial health insurers with a *de minimis* presence, as discussed in paragraph 47 below.

37.  Blue Cross currently has MFNs in its contracts with more than half of Michigan's general acute care hospitals.  Very few hospitals have refused Blue Cross' demands for an MFN. Other hospitals' contracts have not been renegotiated in recent years, but Blue Cross is likely to seek MFNs when its contracts with those hospitals come up for renegotiation, especially if the

hospital requests a price increase.

38.  Most of Blue Cross' MFNs require the hospital to "attest" or "certify" annually to Blue Cross that the hospital is complying with the MFN, and they often give Blue Cross the right to audit compliance.  Insurers pay hospitals under different formulas, as discussed in paragraph 17 above.  These varying payment methodologies can cause uncertainty for a hospital comparing Blue Cross' effective payment rates with anticipated payment rates from different insurers.  Therefore, a hospital seeking to avoid a payment reduction by Blue Cross – generally its largest commercial payer – sometimes contracts with Blue Cross' competitors at prices even higher than the MFN requires, to avoid being penalized if Blue Cross audits the hospital's compliance with the MFN.

39.  Blue Cross' agreements with at least 22 Michigan hospitals contain MFN-plus clauses.  These hospitals are among the most important providers of hospital services in their respective areas.  The following hospitals or hospital systems have agreements with Blue Cross with MFN-plus clauses:

a.  Marquette General Hospital, the largest hospital in the Upper Peninsula and the only Upper Peninsula hospital providing tertiary care, where Blue Cross' contract requires the hospital to charge Blue Cross' competitors at least 23% more than the hospital charges Blue Cross.

b.  Sparrow Hospital, the largest hospital in Lansing, where Blue Cross' contract requires the hospital to charge some of Blue Cross' significant competitors at least 12.5% more than the hospital charges Blue Cross.

c.  Ascension Health, Michigan's largest hospital system, which owns nine

general acute care hospitals subject to an MFN-plus, including the St. John Providence Health System in the Detroit MSA (five hospitals), Borgess Health in the Kalamazoo MSA, Genesys Regional Medical Center in the Flint MSA, St. Mary's Medical Center in Saginaw, and St. Joseph Health System in Tawas City.  Blue Cross' contract with Ascension requires that Ascension's hospitals charge Blue Cross' competitors at least 10% more than the hospitals charge Blue Cross.  Blue Cross agreed to pay Ascension higher rates for hospital services, resulting in Blue Cross' paying an additional $2.5 million annually for this MFN-plus.

d.  Both hospitals in Saginaw – Covenant, where Blue Cross' contract requires the hospital to charge most of Blue Cross' competitors at least 39% more than the hospital charges Blue Cross, and St. Mary's, identified in subparagraph c. above.

e.  Three Beaumont Hospitals in the Detroit MSA (Royal Oak, Troy and Grosse Pointe), where Blue Cross' MFN requires the hospital to charge Blue Cross' significant competitors at least 25% more than they charge Blue Cross.

f.  Two Mid-Michigan Health Hospitals (Midland and Gratiot), where Blue Cross' MFN requires the hospitals to charge Blue Cross' competitors at least 14% more than the hospital charges Blue Cross.

g.  Metro Health Hospital in Grand Rapids, where Blue Cross' MFN requires the differential between Blue Cross and other payers to increase over time, to 5% for HMOs and 10% for PPOs.

h.  Alpena Regional Medical Center in Alpena, Botsford Hospital in Farmington Hills, Dickinson Memorial Hospital in Iron Mountain, and Munson Medical Center in

Traverse City.

40.  In 2007, Blue Cross entered into a "Participating Hospital Agreement" ("PHA") containing an equal-to MFN with each of more than 40 hospitals it classifies as "Peer Group 5" hospitals: small, rural community hospitals, which are often the only hospital in their communities.  Under that agreement, Blue Cross committed to pay more to those community hospitals that agreed to charge all other commercial insurers rates that would be at least as high as those paid by Blue Cross.  Any community hospital that failed to attest compliance with the MFN would be penalized by payments from Blue Cross at least 16% less than if it complied with the MFN.

### B.  Anticompetitive Effects of Blue Cross' MFNs

41.  Blue Cross' existing MFNs, and the additional MFNs that Blue Cross is likely to seek to include in future agreements with Michigan hospitals, have unreasonably lessened competition and are likely to continue to lessen competition by:

a.  Maintaining a significant differential between Blue Cross' hospital costs and its rivals' costs at important hospitals, which prevents those rivals from lowering their hospital costs and becoming more significant competitive constraints to Blue Cross;

b.  Raising hospital costs to Blue Cross' competitors, which likely reduces those competitors' ability to compete against Blue Cross;

c.  Establishing a price floor below which important hospitals would not be willing to sell hospital services to other commercial health insurers and thereby deterring cost competition among commercial health insurers;

d.  Raising the price floor for hospital services to all commercial health insurers

-19-

and, as a result, likely raising the prices for commercial health insurance charged by Blue Cross and its competitors; and

> e.  Limiting the ability of other health insurers to compete with Blue Cross by raising barriers to entry and expansion, discouraging entry, likely raising the price of commercial health insurance, and preserving Blue Cross' leading market position.

42.  Blue Cross often receives substantially better discounts for hospital services than other commercial health insurers receive.  Blue Cross knows that its discounts provide a competitive advantage against other health insurers.  Blue Cross noted in April 2009 that its "medical cost advantage, delivered primarily through its facility [*i.e.*, hospital] discounts, is its largest source of competitive advantage," and earlier stated that its advantages in hospital discounts "have been a major factor in its success in the marketplace."

43.  In recent years, Blue Cross became concerned that competition from other insurers was eroding its hospital discount advantage – as it was.  Blue Cross therefore sought to preserve its discount advantage by obtaining MFN-plus clauses, with the "expectation . . . that we would not have any slippage in our differential from what we experience today."  In other words, rather than seeking lower prices from hospitals, Blue Cross negotiated MFN-plus clauses to maintain its discount differential and prevent potential competitors from obtaining hospital services at prices close to Blue Cross' prices and thereby becoming more significant competitive constraints on Blue Cross.  During negotiations in 2008 with one hospital in Grand Rapids, Blue Cross wrote that "we need to make sure they [the hospital] get a price increase from Priority if we are going to increase their rates."

44.  In most cases, Blue Cross obtained an MFN from a hospital by agreeing to increase

its payments to the hospital.  Blue Cross has sought and, on most occasions, obtained MFN-plus

clauses when hospitals have sought significant rate increases.  Blue Cross also agreed to increase

rates to Peer Group 5 hospitals as part of the Peer Group 5 PHA, which included an equal-to

MFN.  Had a hospital not agreed to an MFN, Blue Cross likely would not have agreed to pay the

higher rates sought by the hospital.  Thus, the likely effect of the MFN has been to raise the

prices of hospital services paid by both Blue Cross and its competitors, and by self-insured

employers, and to increase health insurance prices charged by Blue Cross and its competitors.

45.  Blue Cross' MFNs have resulted and are likely to continue to result in these

anticompetitive effects in each of the relevant markets because they effectively create a large

financial penalty for hospitals that do not accept them.  Blue Cross patients are a significant

portion of these hospitals' business, and Blue Cross patients typically are more profitable than

Medicare and Medicaid patients, the hospitals' other most significant sources of business.  A

hospital that would otherwise contract with a competing insurer at lower prices than it charges

Blue Cross would have to lower its prices to Blue Cross pursuant to the MFN if it sought to

maintain or offer lower prices in contracts with other commercial insurers.  The resulting

financial penalty discourages a hospital with a Blue Cross MFN from lowering prices to health

insurers competing with Blue Cross.  Blue Cross' MFNs have caused hospitals to raise prices

charged to other commercial health insurers, rather than lower prices to Blue Cross.

46.  Prior to Blue Cross' obtaining MFNs, some hospitals gave greater discounts to some

other commercial health insurers than they gave to Blue Cross.  Without Blue Cross' MFNs,

some hospitals had an incentive to offer lower prices to other insurers seeking to enter or expand

in the hospital's service area and increase competition in the sale of commercial health insurance.

47.  Some Blue Cross MFNs allow for *de minimis* exceptions to the MFN.  For example, Blue Cross' MFN with Sparrow Hospital applies to a "significant non-governmental payor . . . whose charges exceed 1.0% of [Sparrow's] total gross patient service charges."  The hospital can charge lower prices to an insurer that does not cross the *de minimis* threshold.  An increase in that insurer's business at the hospital, however, would trigger the MFN and subject the prices the insurer pays Sparrow to the MFN's threshold.  Blue Cross' contract with Beaumont Hospitals has similar provisions.  A clause of this type is likely to have the anticompetitive effect of limiting the growth of commercial health insurers with small shares and more favorable discounts than Blue Cross.

48.  Blue Cross' use of MFNs has caused anticompetitive effects in the markets for commercial health insurance in the geographic markets discussed below, among others.  Hospitals in these markets have raised prices to some commercial health insurers, and declined to contract with other commercial health insurers at competitive prices.  As a result, commercial health insurers that likely would have entered local markets to compete with Blue Cross have not done so, or have competed less effectively than they would have without the MFNs.  Blue Cross' MFNs therefore have helped Blue Cross maintain its market power in those markets.  The actual anticompetitive effects alleged below illustrate the types of competitive harm that have occurred and are likely to occur where Blue Cross obtains MFNs from hospitals throughout Michigan.

### 1.  *Marquette and the Upper Peninsula*

49.  In 2008, Blue Cross entered into a provider agreement with Marquette General Hospital that contained an MFN-plus requiring Marquette General to charge other insurers at least 23% more than it charges Blue Cross – a cost differential that would severely limit a

competitor's ability to compete with Blue Cross.  Blue Cross agreed to pay significantly higher prices for hospital services at Marquette General in exchange for an MFN-plus.

50.  Blue Cross is by far the largest commercial health insurer in the Marquette area and in the Upper Peninsula, with more than 65% of the commercially insured population of the eleven counties of the western and central Upper Peninsula (identified in paragraph 28.a above). Blue Cross views the Upper Peninsula as a strategically important region, and believes that "no competitor of size exists in the UP as of today."  Blue Cross raised its health insurance premiums in the Upper Peninsula by 250% from 1999 to 2004, "well out of proportion to the rest of the state," according to a Blue Cross document.

51.  Marquette General, a 315-bed tertiary care hospital, is the largest hospital and the only tertiary care hospital in Michigan's Upper Peninsula.  Marquette General offers more complex surgeries (such as neurosurgery and cardiac surgery), trauma care, and other services that are not available at any other hospital in the Upper Peninsula.  The closest tertiary care hospital to Marquette is in Green Bay, Wisconsin, 178 miles away; the closest tertiary care hospital in Michigan is in Petoskey, in the northern Lower Peninsula, 203 miles away.

52.  Because a commercial health insurer must provide its subscribers with reasonable access to tertiary hospital care to be able to market a health insurance product, commercial health insurers that seek to market a competitive health insurance plan in the central and western Upper Peninsula must contract with Marquette General at prices that are competitive with Blue Cross' prices.  The MFN prevents Marquette General from contracting with other commercial health insurers at prices competitive with Blue Cross' hospital prices.

53.  There are several small, community hospitals in the Upper Peninsula.  These

hospitals – particularly those in the central and western portions of the Upper Peninsula – generally refer their more complex cases to Marquette General. Eleven of the thirteen smaller hospitals in the Upper Peninsula – Baraga County Memorial in L'Anse, Bell Memorial in Ishpeming, Grand View Health in Ironwood, Helen Newberry Joy in Newberry, Iron County Community in Iron River, Aspirus Keewenaw in Laurium, Mackinac Straits in St. Ignace, Munising Memorial in Munising, Ontonagon Memorial in Ontonagon, Portage Health in Hancock, and Schoolcraft Memorial in Manistique – are Peer Group 5 hospitals and are subject to the equal-to MFN in Blue Cross' Peer Group 5 PHA.

54. The only hospitals in the Upper Peninsula that do not currently have MFNs in their contracts with Blue Cross are Chippewa County War Memorial Hospital in Sault Ste. Marie, 165 miles from Marquette, and OSF St. Francis Hospital in Escanaba. Because of its relatively limited scope of services and distance from Marquette, Chippewa War Memorial is not a good alternative to Marquette General for residents of the western or central Upper Peninsula, where 84% of the Upper Peninsula's population resides. OSF St. Francis also is not a tertiary care hospital and does not offer the range of services offered by Marquette General. Insurers likely would not market a health plan with a network including Chippewa War Memorial and/or OSF St. Francis, but lacking Marquette General, to residents of the western or central Upper Peninsula.

55. Priority Health, a Michigan nonprofit health insurer based in Grand Rapids, sought to enter the market for commercial health insurance in the Upper Peninsula and compete with Blue Cross. Without the Blue Cross MFN-plus, Marquette General would have given Priority a discount that would have allowed Priority to compete with Blue Cross, and Priority would have

marketed and provided commercial health insurance in the Upper Peninsula.  However, Marquette General told Priority it would not offer Priority rates less than those required by Blue Cross' MFN-plus.  Marquette General accordingly gave Priority a revised offer with a significantly higher rates to comply with Blue Cross' MFN-plus.

56.  Priority, which had believed it could compete with Blue Cross and attract business if it contracted with Marquette General at rates comparable to those of Blue Cross, concluded that it could not compete with rates at the Upper Peninsula's principal hospital at the level required by Blue Cross' MFN-plus.  Priority therefore declined to contract with Marquette General at the rates required by the MFN, and did not enter the market for commercial health insurance in the Upper Peninsula.  As a result, Blue Cross maintained its leading market share in the commercial health insurance market in the central and western Upper Peninsula.  Other commercial health insurers, including Assurant and Health Alliance Plan ("HAP"), likely also would have entered into agreements with Marquette General if they had been able to contract with Marquette General at prices comparable to the prices Blue Cross pays to Marquette General.

57.  When Blue Cross entered into the MFN-plus with Marquette General, Blue Cross knew that Marquette General was considering entering into contracts with other commercial health insurers.  Blue Cross demanded the MFN-plus to prevent competitors from obtaining competitive discounts at Marquette General.  Blue Cross believed that its contract with Marquette General would, in Blue Cross' own words, "keep blue lock on U.P."

58.  Blue Cross increased the prices it pays other hospitals in the Upper Peninsula to induce the hospitals to agree to MFNs.  Blue Cross paid Schoolcraft Memorial a price increase in exchange for accelerating by six months the hospital's commitment to charge all other payers at

least as much as it charged Blue Cross.

59.  Blue Cross' MFNs with Peer Group 5 hospitals and with Dickinson County Hospital (a hospital that is also subject to an MFN) prevent these smaller hospitals in the Upper Peninsula from agreeing to lower prices for Blue Cross' competitors.  Blue Cross' MFNs with Marquette General and other hospitals in the Upper Peninsula have unreasonably lessened competition in the market for commercial health insurance in the central and western Upper Peninsula.

### 2. *The Lansing Area*

60.  In June 2009, Blue Cross entered into a ten-year provider agreement with Sparrow Hospital, the largest hospital in the Lansing area.  That contract includes an MFN-plus that requires Sparrow to charge other insurers at least 12% more than Blue Cross pays.  That contract also provides that Blue Cross would raise its rates to Sparrow by $5 million per year more than under Blue Cross' standard contract with similar hospitals.  This MFN-plus likely will result in a price increase in 2011 to the third largest insurer in Lansing.

61.  The two largest – and only tertiary care – hospitals in the Lansing area are Sparrow Hospital and Ingham Regional Medical Center ("IRMC").  Each of these two major hospitals has strengths in different fields.  Lansing area employers and employees generally prefer health insurers that can provide network access to (and discounts at) both hospitals.  Consequently, each of these hospitals is important to health insurers that seek to offer a provider network in the Lansing area.  Without access to both hospitals at competitive rates, insurers cannot offer health insurance plans to Lansing area employers or residents on terms or at premiums that would be competitive with Blue Cross products.

62.  Blue Cross is by far the largest commercial health insurer in the Lansing area, with

approximately 70% of insured lives.  The three largest commercial health insurers in the Lansing area, which in the aggregate insure 93% of residents with commercial group health insurance in the Lansing area, are Blue Cross, Physicians' Health Plan ("PHP"), which is owned by Sparrow's parent, and McLaren Health Plan, which is owned by McLaren Healthcare Corporation, the owner of IRMC.  Each of these three health insurers has competitive discounts at both hospitals.

63.  Sparrow and IRMC agreed in 2006 to contract with each others' health plans at favorable, "mutual and equitable" rates, to obtain comparable rates for each of their own health plans at the competing hospital.  Consequently, PHP and McLaren are the only health insurers that obtain hospital services in the Lansing area at rates comparable to the rates paid by Blue Cross.  Other insurers do not receive competitive prices.

64.  Blue Cross' MFN with Sparrow provides that Sparrow's existing agreements with other insurers are grandfathered until January 1, 2011.  After that date, Blue Cross' MFN will likely require Sparrow to raise prices to McLaren.  The resulting higher costs will reduce McLaren's effectiveness as a competitor to Blue Cross, which will likely reduce competition and raise prices for commercial health insurance in the Lansing area.  The MFN with Sparrow also prevents other potential entrants into the Lansing area, such as Priority Health and Health Plus, from entering the market in a manner that would create effective price competition to Blue Cross.

65.  Blue Cross also has equal-to MFNs with the three smaller hospitals in the Lansing area:  Hayes Green Beach Memorial Hospital in Charlotte, Eaton Rapids Medical Center in Eaton Rapids, and Clinton Memorial Hospital in Saint Johns.  The adoption of an MFN caused Eaton Rapids and Hayes Green Beach to increase their prices to Blue Cross' competitors by significant amounts.  Blue Cross' MFNs with these smaller hospitals in the Lansing area have

also prevented Blue Cross' competitors from obtaining better rates than Blue Cross at these hospitals.  Rather than providing a means to ensure that Blue Cross would pay the lowest prices paid by its competitors, the MFNs had the opposite effect – raising the prices paid by Blue Cross' competitors.

66.  Blue Cross' MFNs with Sparrow and other hospitals in the Lansing MSA have unreasonably restrained trade and lessened competition, or will likely do so in the future, in the market for commercial health insurance in the Lansing MSA.

### 3.  *The Alpena Area*

67.  Alpena Regional Medical Center ("Alpena Regional") is the only tertiary care hospital in Alpena County and in the northeastern Lower Peninsula.  The nearest tertiary care hospitals are in Petoskey, 100 miles west, and Bay City, 140 miles south.  Alpena Regional is important to health insurers that seek to offer a provider network in the Alpena area.  Without access to Alpena Regional at rates competitive with Blue Cross' rates, other insurers cannot offer health insurance plans to Alpena area employers or residents at premiums competitive with Blue Cross products.  Currently, the only two commercial health insurers with significant business in the Alpena area are Blue Cross and Priority.  Blue Cross has a market share of more than 80% in the Alpena area.

68.  In late 2009, Blue Cross and Alpena Regional negotiated a new contract.  Blue Cross offered a substantial rate increase "contingent on the formalization of the most favored discount."  In addition, Blue Cross sought and obtained a commitment by Alpena Regional that it would not improve the discount given to any other health insurer during the four-year life of the contract – a clause that, according to Blue Cross, "prohibits allowing better discounts to be

negotiated with payors."

69.  Pursuant to the Blue Cross MFN, Alpena Regional reduced Priority's inpatient discount, which increased the prices Priority pays for inpatient services significantly above the prices Blue Cross pays.  The MFN therefore likely resulted in a substantial reduction in competition in the sale of commercial health insurance in the Alpena area.

### 4.  *The Traverse City Area*

70.  Munson Healthcare owns Munson Medical Center ("Munson") in Traverse City, Paul Oliver Memorial Hospital in Frankfort, and Kalkaska Memorial Medical Center in Kalkaska, all of which are in the Traverse City Micropolitan Statistical Area.  Munson is the only tertiary care hospital in the market, and Paul Oliver and Kalkaska are the only other hospitals in the market.  The nearest tertiary care hospital other than Munson is in Petoskey, 66 miles north of Traverse City, and is not a reasonable substitute for Munson for Traverse City residents or for insurers seeking to sell commercial health insurance to residents of the Traverse City area. Munson, Paul Oliver and Kalkaska are each vital to health insurers seeking to offer a provider network in the Traverse City area.  Without access to these hospitals at competitive rates, insurers cannot offer health insurance plans to Traverse City area employers or residents at premiums competitive with Blue Cross products.

71.  Blue Cross has entered into an agreement with Munson that requires Munson to charge other health insurers more than it charges Blue Cross.  Blue Cross has entered into the Peer Group 5 PHA with Paul Oliver and Kalkaska, causing them to charge other health insurers at least as much as they charge Blue Cross.  Blue Cross has a market share of more than 60% in the Traverse City area.

72.   Paul Oliver and Kalkaska had previously agreed to grant greater discounts to Priority and Aetna than they had granted to Blue Cross.  Blue Cross' MFNs caused Paul Oliver and Kalkaska to raise their prices significantly to these Blue Cross' competitors.  The price increases substantially reduced Blue Cross' competitors' ability to compete against Blue Cross, which reduced competition in the sale of health insurance in the Traverse City area.

5.   *The Thumb Area*

73.   There are eight Peer Group 5 hospitals in the three Thumb Counties (Huron, Sanilac and Tuscola):  Caro Community Hospital, Hills and Dales General Hospital, Marlette Regional Hospital, McKenzie Memorial Hospital, Huron Medical Center, Scheurer Hospital, Deckerville Community Hospital, and Harbor Beach Community Hospital.  Blue Cross is the largest provider of commercial health insurance, with a market share of more than 75%, in the Thumb area.

74.   Each of the hospitals in the Thumb area is important to health insurers seeking to offer a provider network to residents there.  Without access to these hospitals at competitive rates, insurers cannot offer health insurance plans to Thumb area employers at premiums that would be competitive with Blue Cross products.

75.   Through the Peer Group 5 PHA, Blue Cross sought and obtained MFNs with Thumb area hospitals with "the realization that some of the[m] are giving commercial carriers discounts that are on par with (or better than) what they give [Blue Cross]."  Blue Cross sought and obtained the MFN clause with Thumb area hospitals over the concern expressed by one hospital that such a clause would "unquestionably . . . operate to drive up costs to other purchasers."  Accordingly, when that hospital accepted the MFN and Blue Cross' higher payments, it raised another commercial health insurer's rates.

-30-

76.  As Blue Cross had believed, other commercial health insurers had received discounts from Thumb area hospitals that were in some cases better than the discounts obtained by Blue Cross.  As a result of the MFN, Thumb area hospitals raised these insurers' rates to levels equal to or greater than the Blue Cross discount rate.  The commercial health insurers affected by Blue Cross' MFNs in the Thumb area have paid and are paying higher prices to Thumb area hospitals as a result of the hospitals' agreeing to the MFNs, rather than removing any Thumb area hospitals from their networks.  As a result, Blue Cross' MFNs with hospitals in the Thumb area have increased costs to competing insurers and to self-insured employers, and reduced insurers' ability to compete, thereby likely lessening competition in the market for commercial health insurance in the Thumb area.

### 6.  *Community Hospitals*

77.  As alleged above, Blue Cross has offered community hospitals a participating hospital agreement, the Peer Group 5 PHA, under which the hospitals would be subject to an equal-to MFN.  Most community hospitals have accepted this offer and receive higher payments from Blue Cross in exchange.  These agreements between Blue Cross and community hospitals have caused some hospitals to raise prices to other insurers by significant amounts – often by 100% or more.  For example:

a.  Bronson LakeView Community Hospital, in Paw Paw, in the Kalamazoo MSA, raised price to a competitor to comply with Blue Cross' MFN.

b.  At least two hospitals in Montcalm County raised price to Blue Cross competitors to comply with Blue Cross' MFNs.

c.  Three Rivers Health Medical Center, in Three Rivers, St. Joseph County,

raised price to four Blue Cross competitors to comply with the MFN.

  d. Allegan General Hospital, in Allegan, Allegan County, raised prices to a Blue Cross competitor to comply with Blue Cross' MFN.

  e. Spectrum Health Reed City Hospital, in Reed City, Osceola County, raised price to three Blue Cross competitors to comply with the MFN.

78. In each case, the Blue Cross competitor concluded that it needed the community hospital to be able to offer a network that would allow it to compete with Blue Cross, and thus agreed to pay, and is paying, higher hospital prices.

79. As a result, Blue Cross' competitors' hospital costs have increased, likely increasing the premiums those competitors offer for health insurance products in those areas, increasing costs of those competitors' self-insured customers, reducing competition in the sale of health insurance in those areas, and unreasonably restraining trade and lessening competition in the rural areas served by these hospitals.

     * * * * *

80. The anticompetitive effects alleged in paragraphs 41-80 above illustrate the types of harm that have occurred, and are likey to occur, as a result of Blue Cross' MFNs.  These effects have occurred and are likely to occur in the markets discussed in paragraphs 41-80 above, in the Detroit, Flint, Grand Rapids, Kalamazoo, and Saginaw MSAs, and in the Alma and Midland Micropolitan Statistical Areas.

81. There are no likely procompetitive or efficiency-enhancing effects of the MFNs that would outweigh the actual and likely anticompetitive effects alleged above.  The MFNs have not led, and likely will not lead, to lower hospital prices for Blue Cross or other insurers.  On no

occasion has a Blue Cross MFN resulted in Blue Cross' paying less for hospital services.

82.  If not enjoined, Blue Cross' MFNs with Michigan hospitals are also likely to have anticompetitive effects in the future.  Blue Cross has entered into MFNs with hospitals that are essential components of a competitive provider network.  The MFNs preserve a discount differential in favor of Blue Cross that is sufficient to prevent effective competition.  Absent an injunction, Blue Cross will seek to enter into and enforce MFN clauses with other hospitals in Michigan, with the purpose and likely effect of preventing effective entry or expansion by its competitors.

## VII.   VIOLATIONS ALLEGED

### Count One – Unlawful Agreement in Violation of Sherman Act § 1

83.  Plaintiffs repeat and reallege the allegations of paragraphs 1 through 82 above,

84.  Blue Cross has market power in the sale of commercial health insurance in each relevant geographic market alleged herein.

85.  Each of the provider agreements between Blue Cross and a Michigan hospital containing an MFN provision is a contract, combination and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

86.  Each of the challenged agreements has had, or is likely to have, substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

a.  Unreasonably restricting price and cost competition among commercial health insurers by limiting or preventing commercial health insurers in competition with Blue Cross from obtaining competitive pricing from critical hospitals;

b.  Unreasonably restricting the ability of hospitals to offer to Blue Cross'

competitors or potential competitors reduced prices for hospital services that the

hospitals and insurers consider to be in their mutual interest;

     c.  Unreasonably limiting entry or expansion by competitors or potential

competitors to Blue Cross in Michigan commercial health insurance markets;

     d.  Raising the prices of hospital services to commercial health insurers in

competition with Blue Cross, and to self-insured employers and their employees;

     e.  Raising the prices of commercial health insurance; and

     f.  Depriving consumers of hospital services and commercial health insurance of

the benefits of free and open competition.

87.  The procompetitive benefits, if any, for these provider agreements do not outweigh

the actual and likely anticompetitive effects of the agreements.

88.  Each of the agreements between Blue Cross and a hospital in Michigan containing

an MFN clause unreasonably restrains trade in violation of Section 1 of the Sherman Act, 15

U.S.C. § 1.

### Count Two – Violation of MCL 445.772

89.  Plaintiff State of Michigan repeats and realleges the allegations of paragraphs 1

through 88 above.

90.  Blue Cross entered into agreements with hospitals in Michigan that unreasonably

restrain trade and commerce in violation of Section 2 of the Michigan Antitrust Reform Act,

MCL 445.772.

## VIII.    RELIEF REQUESTED

WHEREFORE, Plaintiffs request that this Honorable Court:

a.  adjudge and decree that the provider agreements between Blue Cross and hospitals in Michigan containing MFNs violate Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 2 of the Michigan Antitrust Reform Act, MCL 445.772;

b.  permanently enjoin Blue Cross, its officers, directors, agents, employees, and successors, and all other persons acting or claiming to act on its behalf, directly or indirectly, from seeking, negotiating for, agreeing to, continuing, maintaining, renewing, using, or enforcing or attempting to enforce any MFNs in any agreement, or any other combination, conspiracy, agreement, understanding, plan, program or other arrangement having the same purpose or effect as an MFN, with any hospital in Michigan;

c.  reform the agreements between Blue Cross and hospitals in Michigan to strike the MFN clauses as void and unenforceable; and

    d.  award plaintiffs their costs in this action, including attorneys' fees to plaintiff

the State of Michigan, and such other and further relief as may be just and proper.

Dated: October 18, 2010

FOR PLAINTIFF UNITED STATES OF AMERICA:

| | |
|---|---|
| Christine A. Varney | Barry J. Joyce |
| Assistant Attorney General | Anne Marie Blaylock |
| | Barry Creech |
| Molly S. Boast | Ryan Danks |
| Deputy Assistant Attorney General | Mitchell Glende |
| | Steven Kramer |
| Joshua H. Soven, Chief | Richard Liebeskind |
| Litigation I Section | Peter Mucchetti |
| | Trial Attorneys |
| | Litigation I Section |
| | |
| J. Robert Kramer II | By |
| Director of Operations | /s/ Ryan Danks |
| Antitrust Division | Trial Attorney |
| U.S. Department of Justice | Antitrust Division |
| Washington, D.C. 20530 | U.S. Department of Justice |
| | 450 Fifth Street, N.W. |
| | Suite 4100 |
| | Washington, D.C. 20530 |
| | (202) 305-0128 |
| | Illinois Bar #6277334 |
| | ryan.danks@usdoj.gov |
| | |
| Barbara L. McQuade | Peter Caplan |
| United States Attorney | Assistant United States Attorney |
| Eastern District of Michigan | United States Attorney's Office |
| | Eastern District of Michigan |
| | 211 W. Fort Street |
| | Suite 2001 |
| | Detroit, Michigan 48226 |
| | (313) 226-9784 |
| | P-30643 |
| | peter.caplan@usdoj.gov |

FOR PLAINTIFF STATE OF MICHIGAN:


Michael A. Cox                          /s/ with the consent of M. Elizabeth Lippett
Attorney General                       M. Elizabeth Lippitt
State of Michigan                      Assistant Attorney General
                                       G. Mennen Williams Building, 6th Floor
                                       525 W. Ottawa Street
                                       Lansing, Michigan 48933
                                       (517) 373-1160
                                       P-70373
                                       LippittE@michigan.gov

-37-