**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN**

UNITED STATES OF AMERICA
and the STATE OF MICHIGAN,

                Plaintiffs,

                              Civil Action No. 10-cv-14155-DPH-MKM
v.                              Hon. Denise Page Hood

BLUE CROSS BLUE SHIELD OF
MICHIGAN, a Michigan nonprofit
healthcare corporation,

                Defendant.

---

## DEFENDANT BLUE CROSS BLUE SHIELD OF MICHIGAN'S MOTION TO DISMISS THE COMPLAINT WITH PREJUDICE

Joseph A. Fink (P13428)
Thomas G. McNeill (P36895)
DICKINSON WRIGHT PLLC
500 Woodward Avenue, Suite 4000
Detroit, Michigan 48226
313-223-3500
jfink@dickinsonwright.com

Todd M. Stenerson (P51953)
D. Bruce Hoffman (Adm. E.D. MI, DC Bar 495385)
Neil K. Gilman (Adm. E.D. MI, DC Bar 449226)
Marty Steinberg (E.D. MI Admission pending; DC Bar 996403)
David A. Higbee (E.D. MI Admission pending; DC Bar 500605)
HUNTON & WILLIAMS LLP
1900 K Street, NW
Washington, DC 20006
202-955-1500
tstenerson@hunton.com

Robert A. Phillips (P58496)
BLUE CROSS BLUE SHIELD OF MICHIGAN
600 Lafayette East, MC 1925
Detroit, MI  48226
313-225-0536
rphillips@bcbsm.com

---

## <u>DEFENDANT BLUE CROSS BLUE SHIELD OF MICHIGAN'S MOTION TO DISMISS THE COMPLAINT WITH PREJUDICE</u>

Defendant, by its undersigned counsel of record, submits this motion to dismiss, with prejudice, all claims alleged against them as set forth in the Complaint.  Specifically, Defendant seeks dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may granted.

In support of this motion, Defendant relies upon the statement of facts, authorities, and argument set forth in the accompanying memorandum and its attachments.

As required by Local Rule, Defendant's counsel has sought from Plaintiff's counsel concurrence in the relief sought herein and because such concurrence is not forthcoming, this motion is necessary.

Dated: December 17, 2010

Respectfully submitted,

___/s/ Todd Stenerson_____
Hunton & Williams LLP
1900 K Street, N.W.
Washington, DC  20006
tstenerson@hunton.com
P51953

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

UNITED STATES OF AMERICA
and the STATE OF MICHIGAN,

      Plaintiffs,

           Civil Action No. 10-cv-14155-DPH-MKM
v.           Hon. Denise Page Hood

BLUE CROSS BLUE SHIELD OF
MICHIGAN, a Michigan nonprofit
healthcare corporation,

      Defendant.

_____

<u>**MEMORANDUM IN SUPPORT OF DEFENDANT BLUE CROSS BLUE SHIELD OF**
**MICHIGAN'S MOTION TO DISMISS**</u>

Joseph A. Fink (P13428)
Thomas G. McNeill (P36895)
DICKINSON WRIGHT PLLC
500 Woodward Avenue, Suite 4000
Detroit, Michigan 48226
313-223-3500
jfink@dickinsonwright.com

Todd M. Stenerson (P51953)
D. Bruce Hoffman (Adm. E.D. MI, DC Bar 495385)
Neil K. Gilman (Adm. E.D. MI, DC Bar 449226)
Marty Steinberg (E.D. MI Admission pending; DC
Bar 996403)
David A. Higbee (E.D. MI Admission pending; DC
Bar 500605)
HUNTON & WILLIAMS LLP
1900 K Street, NW
Washington, DC 20006
202-955-1500
tstenerson@hunton.com

Robert A. Phillips (P58496)
BLUE CROSS BLUE SHIELD OF MICHIGAN
600 Lafayette East, MC 1925
Detroit, MI 48226
313-225-0536
rphillips@bcbsm.com

_____

<u>TABLE OF CONTENTS</u>

STATEMENT OF ISSUES PRESENTED........................................................................iii

CONTROLLING AUTHORITY FOR RELIEF SOUGHT ........................................ iv

INTRODUCTION ................................................................................................1

THE COMPLAINT ..............................................................................................5

ARGUMENT .......................................................................................................7

I.      Because Michigan Created Blue Cross Pursuant to a Comprehensive Health Care Regulatory Structure, State Action Immunity Requires Dismissal................9

      A.      The MFNs Flowed from Michigan's Clearly Articulated State Policy to Displace Unfettered Competition with Regulation......................................9

      B.      Though Blue Cross Need Not Show "Active Supervision," the Challenged Conduct Was in Fact Actively Supervised, Further Mandating Dismissal ................................................................................19

      C.      The United States has Previously Concluded that State Action Immunity Precludes Application of the Antitrust Laws to a Blue Cross Plan's Use of MFNs Under Far Less Regulation than that Present Here ..26

II.     The Court Must Abstain from Hearing this Case Because Of Its Disruptive Effect on State Policy............................................................................................26

      A.      This Case Involves Difficult Questions of State Law Bearing on Policy Problems of Substantial Public Import ......................................................27

      B.      The Exercise of Federal Review in this Case and Similar Cases Would Disrupt Michigan's Efforts to Establish a Coherent Policy......................29

      C.      There is an Adequate State Court Remedy ................................................31

III.    The Complaint Fails to Allege Viable Legal Claims Under *Twombly* and *Iqbal*..32

      A.      The Complaint Fails Plausibly to Allege Relevant Product and Geographic Markets.....................................................................................33

            1.      Plaintiffs Do Not Plausibly Allege Product Markets....................34
            2.      Plaintiffs Do Not Plausibly Allege Geographic Markets..............38

      B.      The Complaint Fails Plausibly to Allege Anticompetitive Effects Arising From the Use of MFNs in any Relevant Market...........................41

**C.**   The Complaint Fails To Plausibly Allege Facts Supporting A Viable Legal Theory of Harm ................................................................43

    **1.**   Recoupment ...............................................................45

    **2.**   Foreclosure..................................................................46

**IV.**   The Michigan Antitrust Law Claims Should Be Dismissed Because Those Laws Specifically Exempt Blue Cross's Alleged Conduct From Their Reach .....47

CONCLUSION.......................................................................................................49

## STATEMENT OF ISSUES PRESENTED

In this motion, Blue Cross Blue Shield of Michigan presents four separate and independent grounds for dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim:

1.      Whether the Complaint should be dismissed pursuant to the state action doctrine set forth in *Parker v. Brown*, 317 U.S. 341 (1943), because Blue Cross was created, and is comprehensively regulated, by the State of Michigan, including with respect to the challenged conduct?

2.      Whether the Court should abstain from hearing this lawsuit in deference to Michigan's comprehensive regulatory scheme pursuant to the abstention principles set forth in *Burford v. Sun Oil Co*., 319 U.S. 315 (1943), because timely and adequate state-court review is available and (1) there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case at bar; or (2) the exercise of federal review of the question in this case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern?

3.      Whether the Complaint fails to meet the pleading requirements established by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Total Benefits Planning Agency v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430 (6th Cir. 2008), because Plaintiffs allege conclusory and implausible product and geographic markets, fail to allege anticompetitive effects in any relevant markets, and present an implausible claim based on a challenge to conduct that constitutes price discounting?

4.      Whether the Complaint should be dismissed under Mich. Comp. Laws § 445.774(4)-(6), which provides immunity from the Michigan antitrust laws under certain circumstances?

## <u>CONTROLLING AUTHORITY FOR RELIEF SOUGHT</u>

### Federal Cases

*Ashcroft v. Iqbal*
      129 S. Ct. 1937 (2009)

*Atl. Richfield Co. v. USA Petroleum Co.*
      495 U.S. 328 (1990)

*Bell Atl. Corp. v. Twombly*
      550 U.S. 544 (2007)

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*
      509 U.S. 209 (1993)

*Brown Shoe Co. v. United States*
      370 U.S. 294 (1962)

*Burford v. Sun Oil Co.*
      319 U.S. 315 (1943)

*Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*
      445 U.S. 97 (1980)

*Care Heating & Cooling, Inc. v. Am. Standard, Inc.*
      427 F.3d 1008, 1014 (6th Cir. 2005)

*Coal. for Health Concern v. LWD, Inc.*
      60 F.3d 1188 (6th Cir. 1995)

*F.T.C. v. Ticor Title Ins. Co.*
      504 U.S. 621 (1992)

*Jackson, Tenn. Hosp. Co. v. West Tenn. Healthcare, Inc.*
      414 F.3d 608 (6th Cir. 2005)

*Mich. Paytel Joint Venture v. City of Detroit*
      287 F.3d 527, 535 (6th Cir. 2002)

*Parker v. Brown*
      317 U.S. 341 (1943)

*Patrick v. Burget*
      486 U.S. 94 (1988)

*S. Motor Carriers Rate Conference, Inc. v. United States*
      471 U.S. 48 (1985)

*Tampa Elec. Co. v. Nashville Coal Co.*
        365 U.S. 320 (1961)

*Total Benefits Planning Agency v. Anthem Blue Cross & Blue Shield*
        552 F.3d 430 (6th Cir. 2008)

*Town of Hallie v. City of Eau Claire*
        471 U.S. 34 (1985)

*In re Travel Agent Comm'n Antitrust Litig.*
        583 F.3d 896 (6th Cir. 2009)

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*
        549 U.S. 312 (2007)

**State Cases**

*Blue Cross & Blue Shield of Mich. v. Demlow*
        403 Mich. 399, 270 N.W.2d 845 (1978)

*Blue Cross & Blue Shield of Mich. v. Milliken*
        422 Mich. 1, 367 N.W.2d 1 (1985)

*Westland Convalescent Ctr. v. Blue Cross & Blue Shield of Mich.*
        414 Mich. 247, 324 N.W.2d 851 (1982)

**Statutes**

15 U.S.C. § 1

Mich. Comp. Laws §§ 550.1101-1704 (P.A. 350)

Mich. Comp. Laws §§ 445.772, 774

Defendant Blue Cross Blue Shield of Michigan ("Blue Cross") respectfully submits this memorandum of law in support of its motion to dismiss the Complaint, with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6).

## INTRODUCTION

"Most favored nations" clauses are standard devices by which buyers try to bargain for low prices, by getting the seller to agree to treat them as favorably as any of their other customers. … [It] is the sort of conduct that the antitrust laws seek to encourage.[1]

This case attacks Blue Cross's efforts to ensure that it is obtaining the best possible prices from hospitals—prices at least as good as, and hopefully better than, others.  Nothing in the antitrust laws prohibits Blue Cross from using "most favored nations" clauses ("MFNs") to strive for the best price.  Indeed, the courts have held, almost without exception, that MFNs do not violate the antitrust laws, and no court has ever granted relief under Plaintiffs' flawed and inadequately alleged theory.  The Complaint would thus merit dismissal even if Blue Cross was a private, profit-seeking competitor, and even if the MFNs at issue implicated no core concerns of Michigan public policy.

But Blue Cross is not a private profit-seeking competitor, and the MFNs do affect crucial Michigan policy issues.  "[Q]uasi-public,"[2] Blue Cross "is a unique creation.  It is a non-profit, tax-exempt 'charitable and benevolent institution,' incorporated pursuant to special enabling legislation … for the purpose of providing a mechanism for broad health care protection to the

──────────────

[1] *Blue Cross & Blue Shield of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) (Posner, J.).

[2] *Westland Convalescent Ctr. v. Blue Cross & Blue Shield of Mich.*, 414 Mich. 247, 264, 324 N.W.2d 851, 855 (1982); Op. Mich. Att'y Gen. No. 7115 at 2 (July 30, 2002), http://www.ag.state.mi.us/opinion/datafiles/2000s/op10190.htm [hereinafter "Granholm Op. AG"], attached hereto as Appendix 1.  Hereinafter, appendices will be designated as "App. _."

people of the State of Michigan."[3]  "Its special legal status makes [Blue Cross] Michigan's health

insurer of last resort."[4]  Pursuant to that mission, Blue Cross—closely intertwined with the state,

and subject to comprehensive oversight by Michigan's Commissioner of the Office of Financial

and Insurance Regulation ("OFIR")—provides health care throughout all of Michigan to, among

many others, vast numbers of subscribers deemed too ill or too unprofitable to obtain health care

financing from commercial health insurers[5] that do not shoulder similar public obligations.[6]  In

fact, "BCBSM is a health care corporation and not an insurance company."  *Blue Cross & Blue*

*Shield of Mich. v. Milliken*, 422 Mich. 1, 84, 367 N.W.2d 1, 42 (1985).  Blue Cross's MFNs help

it fulfill its statutory obligations by ensuring that Blue Cross is not required to pay more than its

fair share of hospital costs.

---

[3] *Blue Cross & Blue Shield of Mich. v. Demlow*, 403 Mich. 399, 415-416, 270 N.W.2d 845, 848 (1978) (citations omitted).

[4] Granholm Op. AG at 2 (App. 1).  The Court may, of course, consider Attorney General opinions and the other public records cited in this motion to dismiss.  "A court may consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment."  *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007); *Nugget Hydroelectric, L.P. v. Pac. Gas & Elec. Co.*, 981 F.2d 429, 435 (9th Cir. 1992) (taking judicial notice of regulatory decisions for purposes of state action analysis on a motion to dismiss).

[5] For the purposes of this motion, reference to commercial health insurers includes private insurers offering HMO products.

[6] *See* Order, *In the Matter of the Hospital Provider Class Plan Determination Report Pursuant to Public Act 350 of 1980*, No. 09-019-BC at 1, Office of Financial and Insurance Regulation (July 8, 2009) (describing Blue Cross's compliance with requirement to provide "reasonable access" in "any given area of the state") [hereinafter "2009 OFIR Order"] (App. 2); Granholm Op. AG at 1 (Blue Cross is "the only health care corporation governed by the Act.") (App. 1).  Blue Cross's status, though, is not statutorily exclusive: while no commercial health insurer has chosen to do so, they can apply for the same status that Blue Cross maintains, and thereby accept the public mission and public regulation that govern Blue Cross.  *See* Mich. Comp. Laws § 550.1201.  "While the bill would apply to any nonprofit health care corporation, Blue Cross … is the only such corporation in the state."  House Bill 4555 Second Analysis, at 1 (July 18, 1980) (App. 3).

Plaintiffs' case puts Blue Cross's legislatively-mandated mission at risk. Their blunderbuss challenge to every hospital agreement containing an MFN threatens Blue Cross's long-term ability to serve its millions of Michigan subscribers consistent with its statutory obligations. Plaintiffs' sweeping claims also attack contracts affecting more than half of the hospitals in Michigan—including hospitals in such wildly different circumstances as, on the one hand, Alpena hospital, which is a 65-mile drive from the next closest hospital, and on the other, the St. John Providence Health System, a five-hospital-system within the 3900-square-mile Detroit MSA in which only 9 of the over 40 hospitals are alleged by the DOJ to have MFN provisions in their contracts. (Compl. ¶ 39).

The relief Plaintiffs demand is stunningly overbroad even when measured against their sprawling claims. They seek an order "permanently" barring Blue Cross from seeking or obtaining "any MFNs in any agreement, *or any other ... arrangement having the same purpose or effect as an MFN*, with *any* hospital in Michigan"[7]—in other words, prohibiting any future attempt by Blue Cross, regardless of circumstances, to lower its hospital costs to match or beat those of commercial insurers. And that is not all. Plaintiffs' Complaint has already attracted a growing swarm of class action lawyers, seeking injunctions of their own, plus untold millions of dollars—claims that could engulf nearly half of Michigan's hospitals as well as Blue Cross.[8]

The Complaint thus seeks to usurp Michigan's ability to regulate issues of central importance to the health and welfare of Michiganders. But as demonstrated below, the antitrust

---

[7] (Compl. at VIII.b., p. 35 (emphasis added).)

[8] *See* Class Action Complaint, *Frankenmuth Mut. Insur. Co. v. Blue Cross Blue Shield of Mich.*, No. 10:CV-14633, ¶ 1 (E.D. Mich. Nov. 22, 2010), *voluntarily dismissed*, No. 10:CV-14633 (E.D. Mich. Nov. 24, 2010). Plaintiffs' case exposes each hospital with an MFN to joint and several liability for the full amount of any damages a private plaintiff might seek. *See id.* at ¶¶ 142, 149.

laws cannot be used to run roughshod over Michigan's state regulatory structure, which is designed to provide comprehensive health care and has largely succeeded in that end.[9]  The Court should therefore dismiss this case at the outset.

More specifically, dismissal is required for the following reasons.

First, the state action immunity doctrine, announced by the Supreme Court in *Parker v. Brown*, 317 U.S. 341 (1943), bars antitrust challenges to conduct of state-created corporations— such as Blue Cross—that foreseeably flows from a comprehensive state regulatory scheme such as Michigan's.  Indeed, the United States—lead plaintiff here—has previously concluded that state action immunity precluded antitrust claims against a Blue Cross entity that included MFNs in its contracts in Pennsylvania, which has less comprehensive regulation than Michigan.

Second, under principles laid down by the Supreme Court nearly 70 years ago in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), and repeatedly applied by the Sixth Circuit, federal courts must abstain from cases that interfere with state agencies' regulation of substantial public policy issues.  The Complaint's sweeping legal theory, and the even more sweeping relief it seeks, would straightjacket the Insurance Commissioner's ability to regulate Blue Cross's role in health care financing—an "essential part of the general health, safety, and welfare of the people of [Michigan]"[10]—and so the Complaint cannot proceed.

---

[9] For example, Michigan enjoyed the lowest rate of increase for employer-sponsored family premiums of any state in the nation between 1999-2009.  Executive Report, White House Office of the Press Secretary, *The Burden of Health Insurance Premium Increases on American Families* (Sept. 22, 2009), *available at* http://www.whitehouse.gov/the-press-office/white-house-report-burden-health-insurance-premium-increases-american-families (noting "[o]ver the past decade, premium growth has ranged from 88% in Michigan to 145% in Alaska") (App. 4).

[10] Mich. Comp. Laws § 550.1102(1).

Third, and wholly apart from the clash between this case and Michigan's regulatory system, the Complaint fails to state a claim under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), for numerous reasons including, (1) the Complaint's failure plausibly to allege coherent product and geographic markets in anything more than conclusory and contradictory terms; (2) the Complaint's failure plausibly to allege market power or anticompetitive effects in any relevant market; and (3) the Complaint's failure to allege a viable theory challenging Blue Cross's efforts to obtain price discounts because, as the Supreme Court has explained:

> Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, *they do not threaten competition. Hence, they cannot give rise to antitrust injury*.

> We have adhered to this principle regardless of the type of antitrust claim involved.

*Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990) (emphasis added).

Fourth, Michigan antitrust law claims are barred under express exceptions in that law.

The Complaint should be dismissed with prejudice.

## THE COMPLAINT

Claiming that discounts raise prices, the Complaint seeks to enjoin Blue Cross "from including MFNs in its contracts with hospitals in Michigan, to enjoin the enforcement of such clauses by Blue Cross, and to remove those clauses from existing contracts" (Compl. at p. 1), as well as from ever seeking or obtaining "any … arrangement having the same purpose or effect as an MFN, with any hospital in Michigan," (*id*. at VIII.b., p. 35).

The Plaintiffs unmistakably have pled that the prices Blue Cross pays for hospital reimbursement rates represent *discounted rates*.  Indeed, the crux of their case is that by securing discounted rates for its customers, Blue Cross allegedly drove up the cost of health insurance for

those who were not its customers (*see* Compl. ¶¶ 6, 18, 41.b), and also that by securing those

discounts, Blue Cross was somehow "likely raising the prices for commercial health insurance

charged by Blue Cross," (*Id.* ¶ 41.d).  More specifically, the Plaintiffs allege the following facts

regarding hospital rates:

> Hospitals and commercial health insurers generally negotiate a discount to be
> applied to a standardized hospital fee schedule.  The standardized schedule could
> be set forth as a master list of hospital fees for services (referred to in the industry
> as a "chargemaster"), a schedule of fees for treatment of a particular illness
> (typically based on "diagnosis-related groups" or "DRGs" as defined by Medicare
> and Medicaid) or another basis.  Blue Cross' equal-to MFNs typically require that
> hospitals not grant other commercial health insurers *better discounts from the fee
> schedules than Blue Cross receives*.  Blue Cross' MFN-pluses typically require
> that hospitals not grant other commercial health insurers discounts within a
> specified percentage *of Blue Cross' discounts*.

(Compl. ¶ 17 (emphasis added).)

The Complaint alleges that Blue Cross has "sought to include MFNs" in "many of its

agreements with Michigan hospitals" generally when a "hospital requests a price increase" (*id.*

¶¶ 36-37; *see also id.* ¶¶ 4, 44), and that Blue Cross is "likely to enter into MFNs with additional

Michigan hospitals," (*id.* ¶ 3).  It describes two completely different types of MFNs: one that

requires hospitals to charge Blue Cross *no more* than any commercial health insurer, and one that

would have hospitals charge Blue Cross *lower* prices than any commercial health insurer (by

widely varying amounts).  (*Id.* ¶ 4.)  The Complaint claims that contracts with "at least 70 of

Michigan's 131 general acute care hospitals," comprising "more than 40% of Michigan's acute

care hospital beds," contain one or another type of MFN.  (*Id.* ¶ 3.)  It alleges that those MFNs

raised hospital costs to some Blue Cross rivals and so "likely" increased prices for health

insurance, and are "likely" to do so in the future.  (*Id.* ¶¶ 3-6.)  The Complaint vaguely identifies

somewhere between two and six relevant product markets, (*id.* ¶¶ 20-22), and seventeen relevant

geographic markets, (*id.* ¶ 28).  The Complaint challenges each different MFN, in each different

product market, within each different geographic market, as causing anticompetitive harm outweighing any procompetitive benefits—generating the need for dozens, if not scores, of separate rule of reason analyses.[11]

The Complaint, however, makes almost no effort plausibly to allege the facts required for these admittedly separate rule of reason tests.  Instead, it lumps all of its disparate claims together into one unwieldy Sherman Act claim, 15 U.S.C. § 1, and one unwieldy claim under Michigan's equivalent statute, § 2 of Mich. Comp. Laws 445.772.  It conclusorily alleges varying and inconsistent product markets and then fails to allege market shares for any of the products it attempts to describe.  It alleges no facts supporting its geographic markets, instead defaulting to arbitrary lines such as metropolitan and micropolitan statistical areas ("MSAs") that have long been rejected as generally viable antitrust markets.  It attempts to mask its failure to make any specific allegations about any specific market by grouping them all together.  And instead of alleging facts showing that Blue Cross's efforts to seek discounts harmed competition, the Complaint resorts to a litany of conclusions.  This is more than simply a technical lapse in pleading—it is a complete failure to plead the required elements of a single antitrust claim, let alone the dozens of separate claims the Complaint pursues.

## **ARGUMENT**

This is not the first antitrust challenge to MFNs.  Indeed, it is not the first antitrust challenge to MFNs in contracts between health care providers and Blue Cross-affiliated health

---

[11] In turn, to analyze each MFN under the rule of reason, the Court must determine in each case "(1) that the defendant(s) contracted, combined, or conspired; (2) that such contract produced adverse anticompetitive effects; (3) within relevant product and geographic markets; (4) that the objects of and conduct resulting from the contract were illegal; and (5) that the contract was a proximate cause of plaintiff's injury."  *Partner & Partner, Inc. v. ExxonMobil Oil Corp.*, No. 05-74499, 2008 WL 896052, at *5 (E.D. Mich. Mar. 31, 2008) (Hood, J.) (unpublished).

insurers, including Blue Cross Blue Shield of Michigan.  Courts are nearly unanimous in holding

that MFNs do not violate the antitrust laws.  *See*, *e.g.*, *Blue Cross & Blue Shield of Mich. v.*

*Mich. Ass'n of Psychotherapy Clinics*, No. 9-71014, 1980 WL 1848, at *3 (E.D. Mich. Mar. 14,

1980) (rejecting the idea that MFNs have "a chilling effect upon the rate structure of mental

heath care clinics," or that these contracts compel medical service providers to charge a specific

rate); *Marshfield Clinic*, 65 F.3d at 1415 ("'Most favored nations' clauses are standard devices

by which buyers try to bargain for low prices, by getting the seller to agree to treat them as

favorably as any of their other customers.  *The Clinic did this to minimize the cost of these*

*physicians to it, and that is the sort of conduct that the antitrust laws seek to encourage.*"

(emphasis added)); *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*,

883 F.2d 1101 (1st Cir. 1989).[12]  Here, however, the Court does not need to reach the

competitive merits of MFNs in multiple different product and geographic markets because the

Complaint fails at the outset to state a claim for which relief can be granted under Federal Rule

of Civil Procedure 12(b)(6) due to the principles of state action immunity and *Burford*

abstention.

---

[12] *See also E.I. Du Pont de Nemours & Co. v. F.T.C.*, 729 F.2d 128 (2d Cir. 1984)
(rejecting the FTC's theory that most favored nation clauses substantially lessened competition
and thus holding that they did not violate the antitrust laws); *Kitsap Physicians Serv. v. Wash.
Dental Serv.,* 671 F. Supp. 1267, 1269 (W.D. Wash. 1987) ("The nondiscrimination clause, far
from being a price control measure, provides insurance companies with protection from (1) being
overcharged by dentists, and (2) in the long term, being priced out of the highly competitive
dental insurance market."); *cf. Reazin v. Blue Cross & Blue Shield of Kan.*, 899 F.2d 951, 971
n.30 (10th Cir. 1990) (suggesting that an MFN was indicative of monopoly power but not itself a
violation of § 2 of the Sherman Act); *United States v. Delta Dental of R.I.*, 943 F. Supp. 172
(D.R.I. 1996) (holding that government had alleged sufficient facts to survive a motion to
dismiss involving a challenge to MFN clauses under § 1 of the Sherman Act).

I.     **Because Michigan Created Blue Cross Pursuant to a Comprehensive Health Care Regulatory Structure, State Action Immunity Requires Dismissal**

The Supreme Court has established a two-part framework for determining whether conduct overlapping with state regulation is immune from antitrust challenge.[13]  First, actions of public or state-created entities that are the foreseeable result of a clearly articulated state policy to displace unfettered competition with a regulatory structure are immune.  *See Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 41-42 (1985).  Second, even purely private entities are immune if their conduct meets that clearly articulated state policy requirement, and they are "actively supervised" by the state.  *See id.* at 40-42; *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105-106 (1980); *Jackson, Tenn. Hosp. Co. v. West Tenn. Healthcare, Inc.*, 414 F.3d 608, 611 (6th Cir. 2005).

A quasi-public, state-created health care corporation, Blue Cross need only meet the first prong of this test—showing that its conduct foreseeably flowed from Michigan's policy—which it does with ease.  And, though it does not need to, Blue Cross can readily demonstrate that the state actively supervised the conduct at issue.  Thus, the Complaint should be dismissed on state action immunity grounds.

A.     **The MFNs Flowed from Michigan's Clearly Articulated State Policy to Displace Unfettered Competition with Regulation**

The "clear articulation" test presents only a low hurdle.  *See S. Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 64 (1985) ("As long as the State as sovereign

---

[13] Michigan's antitrust laws are based on the federal antitrust laws and interpreted in the same manner.  Mich. Comp. Laws § 445.784(2); *see also*, *Partner & Partner*, 2008 WL 896052, at *6 ("These two sections of MARA are modeled after the restraint of trade (§1) and monopoly (§ 2) sections of the Sherman Act.").  Accordingly, the Michigan claims are barred on the same grounds as the federal claims.  *See Miranda v. Michigan*, 141 F. Supp. 2d 747, 755-756 (E.D. Mich. 2001) (holding that a finding of state action immunity similarly bars claims under Michigan state antitrust laws under the exemptions provided in Mich. Comp. Laws § 445.774).

clearly intends to displace competition in a particular field with a regulatory structure, the first prong of the *Midcal* test is satisfied").  "The state legislature need not explicitly authorize anticompetitive conduct, as long as [an] anticompetitive effect would logically result from the authority granted by the state." *Jackson, Tenn. Hosp.*, 414 F.3d at 612; *see also Mich. Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 535 (6th Cir. 2002).  That is, the clear articulation test is satisfied by broad grants of authority that could foreseeably result in anticompetitive effects.  *Hallie*, 471 U.S. at 42 ("[w]e think it is clear that anticompetitive effects logically would result from this broad authority to regulate"); *Miranda*, 141 F. Supp. 2d at 754.  That test is easily met here.

    <u>First</u>, to meet the "essential" public goal of comprehensive access to quality care at a reasonable cost, Michigan has displaced unfettered competition with regulation in providing and financing health care.

    In the legislation authorizing Blue Cross, the Michigan Legislature explicitly determined "that the health care financing system is an essential part of the general health, safety, and welfare of the people of this state."  Mich. Comp. Laws § 550.1102(1).  Rather than trusting whatever outcomes the market might produce, Michigan chose to use statutory and regulatory means "to promote an appropriate distribution of health care services for all residents of this state … [and] to assure for nongroup and group subscribers, reasonable access to, and reasonable cost and quality of, health care services …"  *Milliken*, 422 Mich. at 42, 367 N.W.2d at 23.  Indeed, Blue Cross's enabling statute "represents an effort of the Legislature aimed at curbing the rise on health care costs by a unique statutory scheme which combines ***both*** free-market and government regulatory methods of control."  *Milliken*, 422 Mich. at 18, 367 N.W.2d at 12 (emphasis added).

- 10 -

<u>Second</u>, in order to implement that policy, the Michigan legislature created an entity with a unique statutory mission, unique powers, and unique obligations: Blue Cross.  Michigan also charged a regulator—the Insurance Commissioner ("Commissioner")[14]—with ensuring that Blue Cross meets its statutory charge.

Blue Cross's unique mission as the primary tool for ensuring comprehensive health care access at reasonable cost is articulated in an extensive statutory and regulatory scheme.[15]  Mich. Comp. Laws §§ 550.1101-1704 ("P.A. 350"); *see also id.* §§ 500.3501-3580 ("HMO Act"); §§ 550.51-63 ("PPA Act"); *Milliken*, 422 Mich. at 84, 367 N.W.2d at 42 ("[Blue Cross] is a health care corporation and not an insurance company.").  A "quasi-public" entity created by Michigan statute,[16] Blue Cross is intertwined with the state at the highest levels of the

---------------

[14] The Commissioner is the head of OFIR, and we use the term Commissioner to refer to the Commissioner and OFIR collectively, except where clarity requires otherwise.  *See* Mich. Exec. Order No. 2008-2 (App. 5); *see also* "Who We Are," Office of Financial and Insurance Regulation, at http://www.michigan.gov/dleg/0,1607,7-154-10555-40268--,00.html (App. 6).

[15] *Westland*, 414 Mich. at 265, 324 N.W.2d at 855-56.  As the Michigan Supreme Court has explained:

> [Blue Cross] is a unique statutory creation, distinct from a private insurance company in that "'it is not carried on as an insurance business for profit ..., but rather it provides a method for promoting the public health and welfare in assisting ... persons to budget' health care costs."  Under its enabling legislation, [Blue Cross] is not "subject to the laws of this state with respect to insurance corporations, except as provided in [the] act ... [nor] with respect to corporations generally." § 201(4). Rather, [Blue Cross] is, by legislative declaration, a nonprofit "charitable and benevolent institution, and its funds and property shall be exempt from taxation by this state or any political subdivision of this state."

*Milliken*, 422 Mich. at 14-15, 367 N.W.2d at 10 (internal citations omitted).  In briefing in *Milliken*, the Michigan Attorney General argued that Blue Cross was a quasi-public entity.  *See* 422 Mich. at 19, 367 N.W.2d at 12.

[16] *See Westland*, 414 Mich. at 265, 324 N.W.2d at 855-56; *Demlow*, 403 Mich. at 446, 270 N.W.2d at 863; 1939 Mich. Pub. Acts 108, 109; 1980 Mich. Pub. Acts 350, Mich. Comp. Laws §§ 550.1101-1704.

organization and of the government, with the composition of Blue Cross's Board of Directors set by statute—including the requirement that Michigan's Governor appoint four members to the Board. *See* Mich. Comp. Laws § 550.1301(2). As a "charitable and benevolent institution," Blue Cross is endowed with unique powers and tax-exempt status and charged with providing "reasonable access to, and reasonable cost and quality of, health care services," *id.* § 550.1102(1), including bearing the designation of Michigan's insurer of last resort, *id.* §§ 550.1102, 550.1202(1)(d)(ii).

As insurer of last resort, Blue Cross—in stark contrast to commercial health insurers—must "provide access to health care at a fair and reasonable price to ***all*** Michigan citizens who apply for coverage." Granholm Op. AG at 2 (emphasis in original) (App. 1). Along with its obligation to make coverage available, Blue Cross's provider agreements must have "[r]esponsible cost controls … that *balance* quality, accessibility and cost," Mich. Comp. Laws § 550.1516 (emphasis added), and Blue Cross must "promote programs and policies which encourage cost-effective behavior by providers." *Id.*; *see also Milliken*, 422 Mich. at 41, 367 N.W.2d at 22 ("[w]hat 1980 P.A. 350 attempts to do is provide greater incentives for [Blue Cross] to use its dominant market position to engage in more effective cost containment programs").

Thus, while Blue Cross participates in providing health care by, among other things, ensuring the universal availability of health care financing, it is, by design, not an unfettered competitor. Rather, it is charged by the state with fulfilling state policy as the insurer of last resort, and the actions it takes are shaped by that role.[17]

---

[17] In *Blue Cross & Blue Shield of Mich. v. Baerwaldt*, 139 Mich. App. 109, 117, 361 N.W.2d 742, 747 (Mich. Ct. App. 1984), the court rejected Blue Cross's request to be allowed to implement rate structures similar to commercial insurers and rejected Blue Cross's assertion that

The Michigan Legislature did not leave Blue Cross's performance of its statutory mission to chance.  Instead, the Michigan Legislature "provide[d] for the regulation and supervision of nonprofit health care corporations [such as Blue Cross] by the commissioner of insurance so as to secure for all of the people of this state who apply for a certificate, the opportunity for access to health care services at a fair and reasonable price."  Mich. Comp. Laws § 550.1102(2); *see also Genord v. Blue Cross & Blue Shield of Mich.*, 440 F.3d 802, 803 (6th Cir. 2006) ("Blue Cross is a 'health care corporation' that is regulated extensively by the Michigan Commissioner of Insurance under the Nonprofit Health Care Corporation Reform Act." ).  And, it established an "alternate, expeditious, and effective procedure for the resolution of issues and the maintenance of administrative appeals relative to provider class plans"—the vehicles under which Blue Cross develops and enters into the hospital contracts at issue here.  Mich. Comp. Laws § 550.1102(3).

<u>Third</u>, as the foregoing suggests, Michigan's comprehensive regulatory scheme embraces Blue Cross's hospital contracts.

P.A. 350 *requires* Blue Cross to enter into reimbursement contracts with hospitals to assure subscribers reasonable access to quality health care at a reasonable cost.  Mich. Comp. Laws § 550.1504.  The Act also sets standards for the rate of cost increases in provider contracts, and requires that Blue Cross enter into an adequate number of contracts to assure each subscriber access.  *Id.*  The Act expressly permits Blue Cross to implement reimbursement arrangements that provide hospitals incentives and disincentives.  *Id.* § 1516(2)(b).

---

the insurance commissioner's regulation placed it at a competitive disadvantage.  The court held that these arguments had no merit because Blue Cross "is not carried on as an insurance business, but rather provides a method for promoting the public health and welfare."  *See also Blue Cross & Blue Shield of Mich. v. Comm'r of Ins.*, 179 Mich. App. 246, 252, 445 N.W.2d 215, 218 (Mich. Ct. App. 1989) (same).

Indeed, Michigan has steadily expanded the state's authority over Blue Cross's provider agreements.  Under Blue Cross's original enabling statute, the Commissioner had statutory authority to approve or disapprove payment rates to hospitals, but not to require specific cost containment programs.  *See Milliken*, 422 Mich. at 17-18, 367 N.W.2d at 11.  P.A. 350 broadened the Commissioner's power to regulate Blue Cross's reimbursement arrangements with hospitals.  *Milliken*, 422 Mich. at 18, 367 N.W.2d at 11.  "The primary objective of the act is to check rising health care costs by implementing definite cost containment goals with respect to provider reimbursement arrangements and providing *greater incentives for [Blue Cross] to develop cost-efficient programs, all subject to the supervisory powers of the Insurance Commissioner.*"  *Id*. (emphasis added).  To that end, the Michigan Legislature gave the Commissioner the power to review Blue Cross's provider class plans, which include Blue Cross's hospital reimbursement contracts, and established the goals and requirements of those agreements.  Mich. Comp. Laws §§  550.1107(7), 1504, 1505(2); *see also id.* § 550.1507(8) (defining "provider contract" as "an agreement between a provider and a health care corporation that contains provisions to implement the provider class plan").

Further, this comprehensive regulatory structure grants Blue Cross the power to enter into provider contracts executed under the Prudent Purchaser Act ("PPA").  *See* Mich. Comp. Laws § 550.1502a; *see also* Mich. Comp. Laws §§ 550.51-63 (the Prudent Purchaser Act); Op. Mich. Att'y Gen. No. 6621 (July 13, 1989) (App. 7).  Blue Cross's PPO plan, TRUST, is further regulated under the PPA.  *See Cowan v. Blue Cross & Blue Shield of Mich.*, 166 Mich. App. 568, 570, 421 N.W.2d 243, 244 (Mich. Ct. App. 1988) (stating that Blue Cross's TRUST program is

- 14 -

regulated under the PPA).[18]  The PPA requires that prudent purchaser agreements set out the standards for controlling health care costs and requires that the agreements be submitted to the Insurance Commissioner for review.  *See* Mich. Comp. Laws § 550.53(3).  The ongoing regulatory review of Blue Cross's provider agreements is discussed in more detail below.

*       *       *

To summarize, Michigan established a comprehensive state policy displacing unfettered competition in health care and health care financing with regulation in order to meet the state's goal of providing universal access to cost effective, quality health care services; created Blue Cross—"different" from private insurers in mission, powers, obligations, and incentives, and subject to close regulatory supervision—to execute that policy; and specifically subjected to that regulatory structure Blue Cross's arrangements for contracting with providers.  No more is needed for immunity.  *See*, *e.g.*, *Hallie*, 471 U.S. at 42 ("It is not necessary … for the state legislature to have stated explicitly that it expected the City to engage in conduct that would have anticompetitive effects."); *S. Motor Carriers*, 471 U.S. at 64 (holding that a legislature need not provide "specific, detailed" authorization for the challenged conduct); *Jackson, Tenn. Hosp.*, 414 F.3d at 612 ("[T]he state legislature need not explicitly authorize anticompetitive conduct, as long as anticompetitive effect would logically result from the authority granted by the state.");

---

[18] HMO products—which are sold by Blue Cross's wholly-owned subsidiary, the Blue Care Network ("BCN") (which is not named in the Complaint), are further regulated under Michigan's Health Maintenance Organization Act, §§ 500.3501-3580 of the Michigan Compiled Laws ("HMO Act").  The HMO Act, as with P.A. 350 and the PPA, requires OFIR to ensure that HMOs conduct their business in a manner consistent with "overall health care cost containment" and to enter into contracts with providers "to control health care costs."  Mich. Comp. Laws §§ 500.3513(2), 500.3531(2).  In approving such contracts, the Insurance Commissioner must take into account the "[s]tandards for controlling health care cost."  *Id*. § 500.3531(4)(b).  HMOs must also submit their rates to OFIR and the rates cannot take effect for 60 days after the submission.  *Id*. § 500.3525(1).

*Mich. Paytel*, 287 F.3d at 535 ("[E]xplicit authorization by state legislatures to displace

competition was not necessary to pass the clear articulation test.") (internal quotations omitted);

*LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 477-78 (2d Cir. 2009) (holding that

the state's broad grant of powers to contract with providers "indicated that the legislature clearly

foresaw that [the public benefit corporation] could be party to anticompetitive contractual

arrangements ...").

 But Michigan has gone much farther.  Though the "clear articulation" prong requires no

such specificity, the Michigan Legislature anticipated and intended that its policies could result

in precisely the conduct alleged to be "anticompetitive" here: Blue Cross's use of its size to

obtain hospital rates that would be lower than those available to commercial health insurers,

thereby putting those insurers at a competitive disadvantage.  *See* House Bill 4555 Second

Analysis, 1, 7  (Feb. 19, 1981) (arguing that Blue Cross enjoys statutorily granted advantages

that none of its competitors do, should be required to use the size it has gained through these

advantages for the benefit of the people of Michigan, and advocating that Blue Cross use its

influence "in imposing cost containment measures on the health care system") (App. 8); *see also*

*Milliken*, 422 Mich. at 41, 367 N.W.2d at 22 ("It is widely recognized that the health care system

does not, and has not, operated as a competitive market" and P.A. 350 attempts to provide

greater incentives for Blue Cross to use its dominant position to more effectively contain costs).

 Moreover, P.A. 350 specifically contemplates that Blue Cross may enter into

reimbursement arrangements that "include financial incentives and disincentives" *even if those*

*incentives might mean that some share of hospital costs are borne by other health care*

*purchasers.*  Mich. Comp. Laws § 550.1516(2)(b) ("No portion of the health care corporation's

fair share of hospitals' reasonable financial requirements shall be borne by other health care

purchasers.  However, this subdivision shall not preclude reimbursement arrangements which include financial incentives and disincentives.").  In other words, the Michigan Legislature anticipated that Blue Cross might enter into reimbursement arrangements that could have the effect of spreading hospital costs to other health care purchasers, and charged the *Commissioner*—not the market, and not antitrust courts—with ensuring that those reimbursement arrangements did not shift *Blue Cross's* "fair share" of those costs to others. Mich. Comp. Laws § 550.1509(4)(b).

When the Legislature not only could have foreseen that its policies would produce the conduct at issue, but actually foresaw and intended that result, the state policy test is not only met, but exceeded.  And, having shown that the conduct at issue here flowed from state policy, Blue Cross need do no more.  State-created corporations and other quasi-public entities need only meet the "clear articulation" prong of the state action test to have immunity.  *Hallie*, 471 U.S. at 38-45; *Jackson, Tenn. Hosp.*, 414 F.3d at 612; *Askew v. DCH Reg'l Healthcare Auth.*, 995 F.2d 1033, 1037-38 (11th Cir. 1993).  This is so because such entities lack private actors' profit motive, and therefore are deemed to act in furtherance of state policy without the need for active state supervision.  *Hallie*, 471 U.S. at 47; *see also Askew*, 995 F.2d at 1037-38 (health care authorities were entitled to the "clearly articulated" test of *Hallie* and compiling cases); *LaFaro*, 570 F.3d at 476-77 (holding that a state-created public benefit corporation created to provide health and medical services was a state entity for the purposes of state action); *Benton, Benton & Benton v. La. Pub. Facilities Auth.*, 897 F.2d 198, 199-200 (11th Cir. 1990) (holding that the LPFA was a public corporation empowered to act for public purposes and, as such, was entitled to prong one treatment under the state action doctrine).

- 17 -

Blue Cross is a quasi-public creature of statute, *see Westland*, 414 Mich. at 264, 324

N.W.2d at 855; the state takes a direct hand in its governance, *see* Mich. Comp. Laws

§ 550.1301(2); it is tax exempt and non-profit, *see id.* § 550.1102; it is prohibited by statute from

altering its status as a non-profit entity and is barred from merging, consolidating, selling all of

its property, or taking other actions that a private entity could normally undertake, *see id.*

§ 550.1218; Granholm Op. AG at 2 (App. 1); and it is expressly charged with implementing state

policy by ensuring reasonable access to health care for the citizens of Michigan.  Mich. Comp.

Laws §§ 550.1102, 550.1202(1)(d)(ii).  Blue Cross falls well within the group of state-created

entities that are immune from antitrust liability on a mere showing that their actions were

undertaken pursuant to a clearly articulated state policy—a showing not only met, but exceeded

here.[19]  The Court should dismiss this case.[20]

---

[19] *See, e.g.*, *Jackson, Tenn. Hosp.*, 414 F.3d at 610-12 (holding hospital authority was subject only to the first prong of the *Midcal* test when it was created by statute and empowered to "own, manage, and operate hospital facilities" and to "acquire, manage, lease, purchase, sell, contract for or otherwise participate solely or with others in the ownership or operation of hospital, medical or health program properties and facilities and properties, facilities, and programs …"); *Crosby v. Hosp. Auth. of Valdosta and Lowndes County*, 93 F.3d 1515, 1530 (11th Cir. 1996) (considering factors supporting a finding that an entity is subject only to the first prong of the *Midcal* test, including being a creature of statute, tax exempt status, restrictions on disposition of entity's property, state appointment of board members, and charge to implement state policy); *Scara v. Bradley Mem'l Hosp.*, No. 1-91-28, 1993 WL 404150, at *3 (E.D. Tenn. Feb. 4, 1993) (holding public hospital was subject only to the first prong of the *Midcal* test when it was created as a municipal agent).

[20] Also, any contracts between Blue Cross and any state, county, or city-owned hospital are immune from antitrust scrutiny based on Michigan's clearly articulated state policy.  *See LaFaro,* 570 F.3d at 479-80 (holding that an antitrust suit that attacked a contract between a state-created hospital and physicians would need only meet the clear articulation prong of the state action doctrine).  The public hospitals named in the Complaint are: Alpena Regional Medical Center; Baraga County Memorial Hospital; Dickinson County Memorial Hospital; Kalkaska Memorial Health Center; Schoolcraft Memorial Hospital; and Three Rivers Health. *Compare* Compl. ¶¶ 39.h, 53, 59, 70, 77.c, *with* The Michigan Health & Hospital Association, Public Hospitals, *available at* http://www.mha.org/mha/public_site/about_us/hospitals/public_ hospitals.pdf (App. 9).

**B.      Though Blue Cross Need Not Show "Active Supervision," the Challenged Conduct Was in Fact Actively Supervised, Further Mandating Dismissal**

To be immune under the state action doctrine, private entities must show, in addition to a clearly articulated state policy, that the state actively supervises their actions.  *Midcal*, 445 U.S. at 105.  This requirement ensures that the state action defense "will shelter only the particular anticompetitive acts of private parties that, in the judgment of the State, actually further state regulatory policies."  *Patrick v. Burget*, 486 U.S. 94, 100-01 (1988).  "Active supervision" requires the state to play something more than a purely passive role; it must exercise sufficient jurisdiction to show that an entity's actions occurred with state involvement, and not merely as a purely private agreement.  *F.T.C. v. Ticor Title Ins. Co.*, 504 U.S. 621, 634-35, 638 (1992).  However, the state need not specifically assess the exact conduct at issue; it is enough that the state "ha[s] and exercise[s] power to review particular anticompetitive acts of private parties and disapprove[s] those that fail to accord with state policy."  *Patrick*, 486 U.S. at 101; *see also S. Motor Carriers*, 471 U.S. at 51 (noting state public service commissions "have and exercise ultimate authority and control over all intrastate rates").  That is, the private party must show more than a mere possibility of supervision, *Aurora Gas Co. v. Presque Isle Elec. & Gas Co-op*, No. 96-CV-10093-BC, 1996 WL 627399, at *7 (E.D. Mich. Sept. 11, 1996) (unpublished) (citing *Ticor*, 504 U.S. at 638); it must show "'actual state involvement,'" *Miranda v. Michigan*, 141 F. Supp. 2d 747, 753 (quoting *Ticor*, 504 U.S. at 633).

As discussed above, Blue Cross need not demonstrate "active supervision."  But the state in fact actively supervised Blue Cross in a manner sufficient to find state action immunity for a private entity.

<u>First</u>, Blue Cross is extensively supervised and subject to regulatory control that far exceeds any requirement for state action immunity.

"[Blue Cross] has always been subject to broad and intrusive regulation." *Milliken*, 422 Mich. at 29 n.25, 367 N.W.2d at 17 n.25 (noting the Commissioner's extensive approval power under the 1939 enabling statute); *see also Genord*, 440 F.3d at 803-04;  Mich. Comp. Laws § 550.1102(2).   In addition to the extensive regulation described above, *see* pp. 10-15, the Commissioner can examine Blue Cross's business documents and can take testimony from the company's officers and employees.  Mich. Comp. Laws § 550.1603(2).  Any violations must be reported to the Michigan Attorney General.  *Id.* § 550.1603(4).  The Commissioner has done just that in other instances.  *See P.T. Today, Inc. v. Comm'r of Office of Fin. & Ins. Servs.*, 270 Mich. App. 110, 134, 715 N.W.2d 398, 415 (Mich. Ct. App. 2006).

The Commissioner can also investigate and modify Blue Cross's activities, including Blue Cross's provider contracts, if the Commissioner believes that Blue Cross has violated P.A. 350 or harmed the public.  Mich. Comp. Laws §§ 550.1402(8)-(11), 550.1605.  The Commissioner has the power to suspend or limit Blue Cross's authority to operate, or to impose obligations or limitations on Blue Cross, if Blue Cross "is using methods or practices in the conduct of its business which render further transactions hazardous or injurious to subscribers of the corporation or the public."  *See id.* § 550.1605(1)(b).  Thus, to the degree that the Commissioner concluded that hospital agreements with MFNs were harmful to the public, the Commissioner could suspend or limit Blue Cross's certificate of authority or impose appropriate obligations and limitations on Blue Cross's activities.  *See id*. § 550.1605(2)-(3).

It is also worth noting that the Michigan Attorney General, a Plaintiff in this case, possesses the power, among many others, to bring an action alleging violations of P.A. 350 (*see* Mich. Comp. Laws § 550.1619(2)), and to appeal a provider class plan determination (*see id*. § 550.1515(1)).  The Attorney General thus had ample ability to make a *proper* challenge to Blue

Cross's MFNs as violating state law or negatively affecting rates through the channels provided under Michigan's carefully articulated regulatory structure—as opposed to launching this antitrust complaint in federal court.

Second, Michigan's "broad and intrusive regulation"[21] specifically embraces Blue Cross's reimbursement agreements with Michigan hospitals.

As the Commissioner explained, "[P.A. 350] allows the Commissioner … to determine whether the arrangements [Blue Cross] has established with health care providers have substantially achieved the cost, access and quality of care goals set forth in the Act."  Order for Notice of Intent to Review, No. 09-001-BC, Office of Financial and Insurance Regulation, at 1 (Jan. 15, 2009), http://www.michigan.gov/documents/dleg/ASF_and_Hospital_Provider_Class_Plan_2006-2007_264447_7.pdf [hereinafter "2009 Review Order"] (App. 10).  *See also* Mich. Comp. Laws §§ 550.1504-1506.

Blue Cross enters into contracts with hospitals under "provider class plans."  *Genord*, 440 F.3d at 804.  Provider class plans are "document[s] containing a reimbursement arrangement and objectives for a provider class, and, in the case of those providers with which a health care corporation contracts, provisions that are included in that contract."  Mich. Comp. Laws § 550.1107(7).  Individual provider agreements contain provisions implementing these plans. *Genord*, 440 F.3d at 804.

When Blue Cross first files a provider class plan—45 days prior to its effective date—the Commissioner conducts an initial review to make sure it meets the requirements of P.A. 350, and must notify Blue Cross of any deficiencies.  Mich. Comp. Laws § 550.1506(2)-(4).  Subsequently, Blue Cross must submit "an annual report for each provider class to the

---

[21] *Milliken*, 422 Mich. at 29 n.25, 367 N.W.2d at 17 n.25.

commissioner regarding the level of achievement of the goals provided in section 504." *Id.*
§ 550.1517.  These annual reports become part of the administrative record, which will also
include public comments and submissions when the Commissioner conducts periodic reviews
and determinations of whether Blue Cross has met the goals of the provider class plan. *Id.*
§ 550.1509(4).  These reviews first occur two years after the initial filing. *Id.* § 550.1509(1)(b).
Following this initial review, the Commissioner must review an adequate number of the various
provider class plans so that in every subsequent three year period, the Commissioner has
reviewed plans accounting for 75% of Blue Cross's provider payouts. *Id.* § 550.1509(7).

     In developing the provider class plan, both Blue Cross and the Commissioner are
required to establish procedures to obtain advice and input from providers, subscribers and any
other interested persons. *Id*. § 550.1505.  Similarly, during the periodic reviews, the
Commissioner "must establish a procedure to gain [public] input into the review and
development of provider class plans…"  2009 Review Order at 2 (App. 10); Mich. Comp. Laws
§§ 550.1505, 1509.  Each determination by the Commissioner must include a detailed statement
of findings. *Id.* § 550.1509.

     The Commissioner's reviews must determine (1) whether Blue Cross has contracts with
"an appropriate number of hospitals … throughout Michigan to assure that each subscriber has
access to covered services," (2) whether Blue Cross has "established and maintained reasonable
standards of health care quality for participating hospitals…" and (3) whether "the
reimbursement arrangements for hospitals … assure that the rate of change in [Blue Cross]
payment per member to those providers is not higher than the compound rate of inflation and real
economic growth."  2009 Review Order at Attach. A (App. 10)  "The Commissioner needs to
consider the overall balance of the goals achieved" by Blue Cross. *Id.*  "Weight is to be given to

each of the 3 statutory goals so that one goal is not focused on independently of the other goals." *Id.* Notably, the Commissioner is charged with ensuring that no portion of Blue Cross's fair share of reasonable costs to the provider are borne by other health care purchasers. Mich. Comp. Laws § 550.1516(2)(b). If Blue Cross fails to perform satisfactorily, the Commissioner possesses substantial remedial tools. *See supra* pp. 20, 23; *see also* Mich. Comp. Laws §§ 550.1603(4), 1605.

Blue Cross has the right to appeal the Commissioner's determinations, as do subscribers, the Attorney General, employers, organizations, or associations representing a subscriber or an employer, or organizations or associations representing the affected provider class. *Id.* § 550.1515. The Commissioner's most recent review process was completed in 2009. *See* 2009 OFIR Order (App. 2).

Given this extensive review structure, the Commissioner has and exercises the power to review and disapprove conduct of the nature at issue in this case: Blue Cross's hospital reimbursement agreements. That is all that is required for active supervision. *See Patrick*, 486 U.S. at 101 ("The active supervision prong of the *Midcal* test requires that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy."); *DFW Metro Line Servs. v. Sw. Bell Tel., Corp.*, 988 F.2d 601, 606 (5th Cir. 1993) (holding "active supervision" prong satisfied where "published decisions reflect that the [Public Utility Commission] has conducted other broad-based ratemaking proceedings").

<u>Third</u>, Michigan has far exceeded the requirements of active supervision, because the Commissioner has previously considered the issues, MFN provisions, and alleged effects described in the Complaint. This is conclusively demonstrated by the Commissioner's review

- 23 -

and Order regarding Blue Cross's Hospital Provider Class Plan containing its model MFN provision.

As required by P.A. 350, Blue Cross submitted its Hospital Provider Class Plan Detailed Report for 2006 and 2007 to the Commissioner.  That plan contained the exact model hospital agreements containing "equal to" MFNs at issue in the present case.  *See* 2009 OFIR Order at 5 (App. 2); Compl. ¶¶ 4(B), 17, 36, 40, 44, 53, 65, 77.  The Commissioner conducted the review process described above, culminating in an Order issued on July 8, 2009 in which the Commissioner found that Blue Cross had met the goals of the plan—and specifically recognized that under Blue Cross's provider agreements, "*[h]ospitals must attest that their rates are at least as favorable as those for other non-governmental commercial insurers.*"  *See* 2009 OFIR Order at 5 (emphasis added) (App. 2).

Moreover, commercial health insurers have directly complained—in formal written submissions, and in oral testimony at a public hearing—to the Commissioner about *all* of the MFN clauses, and raised the very issues presented in the Complaint.  *See* Letter from Michigan Association of Health Plans to the Honorable Ken Ross, Commissioner, Office of Financial and Insurance Regulation, at 8-9 (Nov. 23, 2009), http://www.mahp.org/testimony.html (click on "Nov. 23, 2009 Formal Written Testimony on PHPMM Acquisition") (App. 11); *In re Acquisition of Physicians Health Plan of Mid-Michigan - Family Care and Physicians Health Plan of Mid-Michigan Insurance Company by Blue Care Network of Michigan: Hearing Before the Office of Financial and Insurance Regulation*, at 22 (Nov. 23, 2009) (App. 12).  The Commissioner has not yet required Blue Cross to change or abandon the MFNs and, at the very least, would presumably not do so without a careful, MFN-by-MFN evaluation in the context of balancing Blue Cross's goals and mission.

Thus, while the active supervision prong of the state action doctrine does not require explicit review, much less explicit approval, of the exact conduct alleged,[22] the Commissioner, here, in fact, specifically reviewed Blue Cross's use of MFN clauses in its hospital contracts, specifically received complaints about the purported anticompetitive effects of those clauses, and yet left the clauses in place unchanged.  This is far more than enough for immunity.  *See Capital Tel. Co., Inc. v. N.Y. Tele. Co.*, 750 F.2d 1154, 1164 (2d. Cir. 1984) (finding that that state's power to review contracts entered into by a telephone company and examine and investigate acts by the telephone company meets the active supervision requirement of *Midcal*); *Miranda*, 141 F. Supp. 2d at 755  (holding in a suit against the private telephone companies providing collect-calling to the state's jails that the Michigan Department of Corrections' monitoring, revising, and enforcing the requirements of the state's penal institutions satisfied the active supervision prong); *Lender's Serv., Inc. v. Dayton Bar Ass'n*, 758 F. Supp. 429 (S.D. Ohio 1991) (holding state supervision satisfied where Ohio Supreme Court retained authority to make a final determination on the disputed conduct); *Hybud Equip. Corp. v. City of Akron*, 742 F.2d 949, 964 (6th Cir. 1984) (pre-*Hallie* decision applying state supervision prong to City and finding sufficient state supervision where City was required to report periodically to Ohio Water Development Agency and agency was authorized to assume operating responsibility for the project if the City failed to meet its obligations).

---

[22] *See*, *e.g.*, *Trigen-Oklahoma City Energy Corp. v. Okla. Gas & Elec. Co*., 244 F.3d 1220, 1226 (10th Cir. 2001) (the power to engage in review alone is sufficient for active supervision) (citing *Lease Lights*, 849 F.2d 1330, 1334 (10th Cir. 1988)); *Nugget Hydroelectric v. Pac. Gas & Elec. Co.*, 981 F.2d 429, 435 (9th Cir. 1992) (the active supervision standard does not require that the supervising agency continually intervene, or even that the supervisory agency review the actions of the private party in every instance, but only that the supervisory agency had at least occasionally reviewed the actions of the private party).

C.   **The United States has Previously Concluded that State Action Immunity Precludes Application of the Antitrust Laws to a Blue Cross Plan's Use of MFNs Under Far Less Regulation than that Present Here**

In 1994, the Department of Justice, through the Antitrust Division, investigated Independence Blue Cross of Pennsylvania's "Prudent Buyer Policy," which, like this case, involved the use of MFNs in hospital contracts.  The Department of Justice, acting through at least one of the counsel of record in the present case, subsequently closed the investigation because it recognized that any claims would be barred by the state action doctrine:

> We have now had the opportunity to analyze carefully information and arguments relevant to whether the Prudent-Buyer policy is exempt from scrutiny under the federal antitrust laws by virtue of the so-called state-action doctrine, as explained, for example, in <u>F.T.C. v. Ticor Title Ins. Co.</u>, 112 S. Ct. 2169 (1992).
>
> We have concluded that a court would likely rule that the Prudent-Buyer policy is exempt from federal antitrust scrutiny and have consequently decided to close our investigation. We would like to emphasize that, in reaching this decision, we did not reach any judgment about whether the Prudent-Buyer policy, on balance, reduces or raises health-care costs in southeastern Pennsylvania. We currently have insufficient information to make such a judgment and, in view of our conclusion about the likely applicability of the state-action doctrine to the Prudent-Buyer policy, would likely encounter legal objections by IBC if we sought to compel production of the information.

*See* Letter from Steve Kramer, Attorney, United States Department of Justice, to Hon. Cynthia Maleski, Insurance Commissioner, Commonwealth of Pa. (May 5, 1994) (App. 13).

The Department of Justice's conclusion in the letter was undoubtedly correct, and even more applicable here, where the Michigan regulations are significantly more comprehensive than those found in Pennsylvania.  *Compare* Mich. Comp. Laws § 550.1101-1704, *with* 40 Pa. Cons. Stat. App. §§ 101-127, 301-335 (West 1999).  The Complaint should be dismissed under the state action doctrine.

II.   **The Court Must Abstain from Hearing this Case Because of Its Disruptive Effect on State Policy**

Independent of the state action doctrine, long-established principles of abstention bar complaints when the relief sought—considering not only the effect of the case at bar, but also the

consequences if similar cases were brought in the future—would interfere in ongoing and

important state regulation.  That principle was first set forth in *Burford v. Sun Oil Co*., 319 U.S.

315 (1943) and is applicable to this case.

> As the Sixth Circuit has explained, *Burford* mandates that
>
> where timely and adequate state-court review is available, a federal court sitting
> in equity must decline to interfere with the proceedings or orders of state
> administrative agencies: (1) when there are difficult questions of state law bearing
> on policy problems of substantial public import whose importance transcends the
> result in the case then at bar;" or (2) where the "exercise of federal review of the
> question in a case and in similar cases would be disruptive of state efforts to
> establish a coherent policy with respect to a matter of substantial public concern."

*Coal. for Health Concern v. LWD, Inc*., 60 F.3d 1188, 1194 (6th Cir. 1995) (quoting *New

Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989)).  If ***either***

condition is met, abstention is appropriate.  *Id.*  Both are present here.

### A.     This Case Involves Difficult Questions of State Law Bearing on Policy Problems of Substantial Public Import

As demonstrated above, this case challenges contracting practices by Blue Cross that lie

at the heart of Michigan's complex and sophisticated statutory and regulatory system for

ensuring comprehensive access to quality, cost-effective health care.  Blue Cross's contracting

and reimbursement policies—and its conduct in general, including its costs, rates, and

competitive behavior—are comprehensively regulated by a specialized agency.  *See* Mich.

Comp. Laws §§ 550.1506, 1102(2); *see also Genord*, 440 F.3d at 803.  The Commissioner is

charged with administering rules, regulations, and oversight regarding the provision of health

insurance in Michigan. In regulating Blue Cross's reimbursement agreements, the Commissioner

seeks to fulfill a number of statutory mandates and public mission goals far more complex than,

and in some places contrary to, advancing unfettered private market competition.  *See* Mich.

Comp. Laws §§ 550.1102, 1504, 1506.  As shown above, the Commissioner exercises continual

oversight of Blue Cross's contracting activities, has specifically considered Blue Cross's MFNs,

and, as recognized by the Western District of Michigan, has highly specialized expertise in the

insurance industry.  *See McLiechey v. Bristol W. Ins. Co.*, 408 F. Supp. 2d 516, 525 (W.D. Mich.

2006).[23]  Plaintiffs would cast themselves and this Court as Blue Cross's new regulators,

disrupting the Commissioner's ability to pursue Michigan's policy goals.

The Commissioner is best suited to evaluate the historical use of Blue Cross's MFN

provisions, the impact of Blue Cross's MFN provisions on provider prices and subscriber costs,

and the role of Blue Cross's MFN clauses in ensuring both low health care costs and the

comprehensive availability of health care services—goals which may sometimes be in tension.

*See* Mich. Comp. Laws § 550.1516 (requiring that Blue Cross contracts with providers have

"[r]easonable cost controls … that balance quality, accessibility and cost").  Given the expertise

and specialized knowledge necessary to balance and resolve these complex legislative mandates,

and to thereby achieve Michigan's public policy goals, the risk is obvious that any decision in

this case (and others like it) could either directly contravene the Commissioner's decisions or

limit the Commissioner's discretion, crimping the Commissioner's ability to discharge his

statutory mandate.

In *North Michigan Land & Oil Corp. v. Consumers Power Co.,* Nos. 93-1705, 93-1775,

1994 WL 463994 (6th Cir. Aug. 26, 1994), the Sixth Circuit affirmed the dismissal of the

---

[23] In fact, the Michigan Antitrust Reform Act explicitly recognizes the need for deferring to OFIR's authority in providing that "[a] transaction or conduct made unlawful by this act shall not be construed to violate this act where it is the subject of a legislatively mandated pervasive regulatory scheme, *including but not limited to*, the insurance code of 1956, being sections 500.100 to 500.8302 of the Michigan Compiled Laws, which confers exclusive jurisdiction on a regulatory board or officer to authorize, prohibit or regulate the transaction or conduct."  Mich. Comp. Laws § 445.774(5) (emphasis added).

plaintiff's complaint based on *Burford* abstention.  The district court had abstained under

*Burford* because plaintiffs' claims challenging the Michigan Public Service Commission's

("MPSC") actions raised difficult questions of state law that affected public policy concerns, and

"the MPSC has specialized competence in the area of natural gas regulation in Michigan which

this Court could not duplicate."  *Id*. at *3 (quotation omitted).  The Sixth Circuit agreed, noting

also that there was adequate state court review of the MPSC order available and that a

determination of the issues in that case would require the court to delve into the complexities of

Michigan's extensive regulation concerning intrastate gas purchases.  *Id*.  This case presents

exactly the same concerns and the Court should abstain for the same reasons.

> **B.    The Exercise of Federal Review in this Case and Similar Cases Would Disrupt Michigan's Efforts to Establish a Coherent Policy**

Separately, the blunt instrument of antitrust, if applied in this case and similar cases,

would disrupt Michigan's efforts to establish coherent health care policy—an area of great public

concern in Michigan.

This case challenges far more than Blue Cross's current MFNs.  As the Complaint makes

clear, the Plaintiffs seek to dictate Blue Cross's hospital contract negotiating position for the

indefinite future.  They are asking this Court to prohibit Blue Cross from *ever* seeking or

obtaining "any MFNs in any agreement, *or any other combination, conspiracy, agreement,*

*understanding, plan, program, or other arrangement having the same purpose or effect as an*

*MFN*, with *any* hospital in Michigan."  (Compl. at VIII.b., p. 35 (emphasis added).)

In so doing, Plaintiffs ask this Court to do more than supplant Michigan's statutorily-

appointed regulator.  They also demand that the Court reject Michigan's public policy.  As

shown above, that policy seeks to use Blue Cross to balance cost, accessibility, and quality to

ensure comprehensive health care.  *Competition* is not, itself, a policy goal.  Indeed, as also

shown above, in order that Blue Cross might fulfill its mission, the Michigan Legislature

conferred on it competitive advantages over commercial insurers.

In debating P.A. 350, the Legislature recognized the unique advantages that Blue Cross

brought to the people of Michigan.  Those for the new Act argued that

> Blue Cross … is treated in a different manner than its competitors in the health
> insurance field because it *is* different. The corporation—a nonprofit, tax-exempt
> charitable and benevolent institution created by statute—enjoys benefits none of
> its competitors does, including exemptions from taxes and the right to negotiate
> discounts and lower rates from hospitals and other health care providers.

House Bill 4555 First Analysis at 6 (Nov. 28, 1979) (emphasis in original) (App. 14).

Proponents argued that this size should be used to the advantage of Michigan's citizens by

requiring Blue Cross act "charitably and benevolently."  *Id*.; *see also* House Bill 4555 Second

Analysis, at 1 (Feb. 19, 1981) (the legislature sought "to make use of the corporation's influence

in imposing cost containment measures on the health care system") (App. 8).

Starkly rejecting Michigan's policy, *competition* is the sole goal of Plaintiffs' antitrust

claim.[24]  And, while seeking in the name of unfettered competition to abolish Blue Cross's

unique advantages, Plaintiffs would leave untouched the burdens Blue Cross shoulders in its

public mission.  This outcome is unsustainable, and substitutes Plaintiffs' judgment, through this

Court, for the Michigan Legislature's careful balancing and the Commissioner's on-going

supervision.

---

[24] Antitrust recognizes no goals other than competition.  *See Nat'l Soc'y of Prof'l Eng'rs
v. United States*, 435 U.S. 679 (1978) ("the Court has adhered to the position that the inquiry
mandated by the Rule of Reason is whether the challenged agreement is one that promotes
competition or one that suppresses competition"); Antitrust Div., U.S. Dep't of Justice, Antitrust
Division Mission, http://www.justice.gov/atr/about/mission.html ("The goal of the antitrust laws
is to protect economic freedom and opportunity by promoting free and fair competition in the
marketplace.") (App. 15).  That is precisely why various doctrines, such as state action and
abstention, sharply limit the reach of antitrust law.

And that is not all.  In considering the effects of Plaintiffs' case on Michigan policy, the Court must also consider the effect of similar cases were they to be brought in the future.  In other words, if the Court opens the floodgates to antitrust attacks on any and all differences between Blue Cross and commercial insurers, what would be left of Michigan's intention to create in Blue Cross a "unique" institution charged with a unique task and provided with unique tools to achieve it?  And what role would be left for the Commissioner?

In *Coalition for Health Concern v. LWD*, the Sixth Circuit reversed the decision of the district court refusing to abstain where state law provided an adequate review process and the exercise of federal jurisdiction would have disrupted state efforts to establish a coherent policy with respect to the licensing of hazardous waste facilities.  60 F.3d at 1194-95.  This case presents a far more compelling basis for abstention because Michigan has established a coherent health care policy that would be disrupted by rampant antitrust challenges to Blue Cross's unique statutory status.[25]

### C.    There is an Adequate State Court Remedy

Granting this motion on *Burford* abstention grounds will not leave Blue Cross's conduct unchecked.  Decisions of the Commissioner regarding the provider class plan are appealable to an independent hearing officer and then to the Michigan Court of Appeals.  Mich. Comp. Laws §§ 550.1514-1515; *see also Mich. Chiropractic Ass'n v. Office of Fin. & Ins. Servs.*, Nos.

---

[25] *See also Adrian Energy Assocs. v. Mich. Pub. Serv. Comm'n*, 481 F.3d 414, 423-24 (6th Cir. 2007) (*Burford* abstention appropriate because federal review of state administrative decision would disrupt Michigan's efforts to establish coherent policy with respect to regulation of non-utility power producers and where the state statute provided a state court appellate procedure for the decisions of the state regulator); *MacDonald v. Vill. of Northport*, 164 F.3d 964, 967-70 (6th Cir. 1999) (*Burford* abstention appropriate in landowner's suit to amend plat to remove public access road because federal review would have disrupted state efforts to establish coherent policy with respect to matter of substantial public concern and adequate state court review was available).

287597, 287598, 2010 WL 199583, at *1-2 (Mich. Ct. App. Jan. 21, 2010).  Violations of the

Participating Hospital Agreement are enforced by the Commissioner and the Michigan Attorney

General in state court.  Mich. Compl. Laws § 550.1603(4).  OFIR's hearing procedures provide

for "a just, speedy, efficient, and fair determination of the issues presented."  Mich. Admin. Code

r. 500.2102.  The hearing procedures set forth a comprehensive set of rules by which OFIR

reviews a case.  *Id*. at r. 500.2101-2142.  Further, the Michigan Administrative Procedures Act of

1969 provides that OFIR decisions are subject to direct review, and there are established

procedures for bringing a petition for review by state courts, thereby providing for adequate

judicial review of any OFIR orders.  *See* Mich. Comp. Laws §§ 24.301 *et seq*.  Thus, Michigan

has provided channels for regulatory and judicial review of the issues raised in Plaintiffs'

Complaint—a review that can properly assess the myriad and complex concerns raised by this

case, as opposed to the antitrust litigation forum sought by the Complaint.

**III.    The Complaint Fails to Allege Viable Legal Claims Under *Twombly* and *Iqbal***

In two significant, recent cases, the Supreme Court articulated the proper pleading

standard under Rule 8.  A complaint "demands more than an unadorned, the-defendant-

unlawfully-harmed-me accusation."  *Iqbal*, 129 S. Ct. at 1949; *see also Twombly*, 550 U.S. at

554-55.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the

elements of a cause of action will not do.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550

U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked assertions' devoid of 'further

factual enhancement.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  While the factual allegations in

the complaint are accepted as true, the Court need "'not accept as true legal conclusions or

unwarranted factual inferences.'"  *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008)

(quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)); *see also In re Travel Agent

Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009).  Likewise, "[c]onclusory allegations

or legal conclusions masquerading as factual allegations will not suffice." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007); *see also In re Travel Agent*, 583 F.3d at 902-03.  In short, a complaint must contain "either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Twombly*, 550 U.S. at 562).  Without a viable legal theory, a complaint fails as a matter of law.  *See id.*

These principles are directly applicable in antitrust cases, in which "the federal courts have been 'reasonably aggressive' in weeding out meritless antitrust claims at the pleading stage." *Nicsand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (internal citations omitted); *see also Twombly*, 550 U.S. at 558 ("it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive").  Thus, a complaint should be dismissed when its allegations "def[y] the basic laws of economics." *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 419 (5th Cir. 2010).

Here, the Complaint fails under these standards for at least three independent reasons.  First, the Plaintiffs fail to allege any facts supporting the scores of different product and geographic market configurations they claim exist.  Second, the Plaintiffs fail to allege any facts supporting their assertion that the MFNs had any anticompetitive impact in any one of these numerous markets.  Third, Plaintiffs fail to allege crucial elements required for any plausible economic theory challenging Blue Cross's efforts to obtain discounts.

### A.      The Complaint Fails Plausibly to Allege Relevant Product and Geographic Markets

There is no dispute that the legality of Blue Cross's MFNs is governed by the rule of reason.  (Compl. ¶¶ 41, 80, 81, 86.)  In rule of reason cases, "[t]he Supreme Court requires

plaintiffs to identify the relevant product and geographic markets so the district court can assess 'what the area of competition is, and whether the alleged unlawful acts have anticompetitive effects in that market.'" *Total Benefits Planning Agency v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008) (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 324 (1962)).  "Although the 'parameters of a given market are questions of fact' antitrust plaintiffs still must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets.'" *Jacobs v. Tempur-Pedic Int'l, Inc.*, No. 08-12720, 2010 WL 4880864, at *4 (11th Cir. Dec. 2, 2010) (internal citations omitted); *PSKS*, 615 F.3d at 417 (5th Cir. 2010) ("To state an antitrust claim for anticompetitive [resale price maintenance], PSKS's complaint must plausibly define the relevant product and geographic markets.").

The Plaintiffs are seeking to bring claims involving multiple product markets and seventeen different geographic markets.  But the alleged anticompetitive effects from the MFNs must be examined on a product-by-product, market-by-market basis.  *See, e.g., Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1014 (6th Cir. 2005) ("[r]ule of reason analysis requires the plaintiff to prove (1) that the defendant(s) contracted, combined, or conspired; (2) that such contract produced adverse anticompetitive effects; (3) *within relevant product and geographic markets*; (4) that the objects of and conduct resulting from the contract were illegal; and (5) that the contract was a proximate cause of plaintiffs' injury" (emphasis added)).  It is therefore crucial that Plaintiffs plead facts plausibly supporting each of these numerous markets.  They do not even come close.

### 1.  Plaintiffs Do Not Plausibly Allege Product Markets

In a recent Sixth Circuit case regarding Anthem Blue Cross and Blue Shield, the Court explained that "[w]ithout an explanation of the other insurance companies involved, and their products and services, the court cannot determine the boundaries of the relevant product market

and must dismiss the case for failure to state a claim." *Total Benefits*, 552 F.3d at 437.  Ignoring

the law of this Circuit, Plaintiffs have declined to include any market-by-market explanation of

the insurance companies involved, and their products and services, such that this Court would be

able to determine the boundaries of the relevant product market.  The rule in *Total Benefits*

requires dismissal.  *Id.*

      *Total Benefits* is not an isolated case.  Courts have consistently held that a plaintiff must

specifically define the product market by reference to "'the reasonable interchangeability of use

or the cross-elasticity of demand between the product [in question] and substitutes for it.'"

*Queen City Pizza, Inc. v. Domino's Pizza, Inc*., 124 F.3d 430, 436 (3d Cir. 1997) (quoting *Brown*

*Shoe Co.*, 370 U.S. at 325); *see also Am. Council of Certified Podiatric Physicians & Surgeons*

*v. Am. Bd. of Podiatric Surgery, Inc*., 185 F.3d 606, 622 (6th Cir. 1999) (citing *White & White,*

*Inc. v. Am. Hosp. Supply Corp*., 723 F.2d 495, 500 (6th Cir. 1983)).  That is, the relevant market

must take into account whether there are substitutes for the alleged product.  If not, the

Complaint does not properly define the market, and a company's share in the market cannot be

ascertained, requiring dismissal.  *See Gene Cope & Assocs. v. Aura Promotions, Ltd*., 692 F.

Supp. 724, 729 (E.D. Mich. 1988) (citing *United States v. E. I. du Pont de Nemours & Co*., 351

U.S. 377, 394-95 (1956) and *Brown Shoe Co*., 370 U.S. at 325).

      The Complaint waffles back and forth between what appears to be somewhere between

two and six possible product markets.  Plaintiffs appear to start with three possible candidates:

(1) the sale of "fully insured" commercial group health insurance; (2) the sale of "self-insured"

commercial group health insurance; and (3) the sale of commercial individual health insurance.

(*See* Compl. ¶¶ 15, 20, 22.)  They then proceed to combine these separate product markets into

one category jointly labeled "commercial health insurance" for the purpose of alleging relevant geographic markets and averaged market shares.  (Compl. ¶¶ 24-26.)

But Plaintiffs expressly recognize that "commercial health insurance" cannot be a product market, alleging in paragraphs 21 and 22 of the Complaint that group and individual health insurance are not substitutes for each other—the textbook example of when two products are ***not*** in the same market.  Whatever allegations Plaintiffs may make about "commercial health insurance" are, therefore, meaningless—including the allegations about Blue Cross's purported market shares.  This leaves Plaintiffs without any allegations of market shares or even who are the market participants in any alleged product market.

Further, Plaintiffs allege other facts that result in even more possible product markets requiring individual analysis.  As they allege, Blue Cross (which, as explained earlier, does not sell "commercial insurance" at all and is expressly *not* a "commercial insurer")[26] offers different products, *e.g.*, HMO, PPO, Traditional, and Medicare Supplemental.  However, it is unclear which of these products may be included in the Plaintiffs' product market definitions.  (*See* Compl. ¶ 7 (simply noting that Blue Cross provides PPO and HMO health insurance products).)[27]  In fact, the Department of Justice itself has previously taken the position that these products must be analyzed as separate product markets,[28] and this says nothing about the

———————————————

[26] Op. Mich. Att'y Gen., No. 5761, at 3 (Aug. 21, 1980) ("[t]he legislature would not have conferred statutory preferential status upon BCBSM if it had intended to authorize BCBSM to engage in commercial insurance") (App. 16); *Milliken*, 422 Mich. at 84, 367 N.W.2d at 42 ("BCBSM is a health care corporation and not an insurance company.").

[27] *See* http://www.bcbsm.com/chooseblue/employer_coverage.shtml; http://bcbsm.com/myblue/all-myblue-products.shtml; http://bcbsm.com/medicare (App. 17).

[28] *See*, *e.g.*, Complaint ¶ 17, *United States v. Aetna Inc.*, No. 3-99 CV 398-H (N.D. Tex. June 21, 1999), *available at* http://www.justice.gov/atr/cases/f2500/2501.htm (asserting, "[b]y virtue of the benefit design differences, pricing differentials, and other factors, PPOs and

obvious differences between patients seeking different types of medical services.  The Complaint

is thus facially unclear, and Blue Cross should not be left to guess what claims the Plaintiffs are

trying to bring against it.

The Plaintiffs also fail to allege sufficient facts about other companies within any

possible product markets, further demonstrating the Complaint's inadequacy.  *See Total Benefits*,

552 F.3d at 437 ("Without an explanation of the other insurance companies involved, and their

products and services, the court cannot determine the boundaries of the relevant product market

and must dismiss the case for failure to state a claim.").

Moreover, though all of Blue Cross's alleged conduct and its effects, if any, on

commercial insurers appear to be alleged to have occurred in the market for *buying hospital*

*services*, the Complaint alleges nothing about any such market.  It is silent as to the product

composition (though it sometimes seems to differentiate between different kinds of hospitals,

*e.g.*, tertiary v. primary), silent as to their geographic scope, silent as to the identity of

competitors, silent as to market shares, and silent as to market power for any market

participants.[29]

---

indemnity plans are not reasonable substitutes for HMO and HMO-POS products.  Neither
employers nor employees view HMOs and PPOs as the same product, and enrollees who leave
an HMO disproportionately select another HMO, rather than a PPO, for their next plan.").  (App.
18)  Additionally, the State of Michigan, in offering its employees nine types of health plans,
separates HMOs and PPOs into two different product groups.  *See* Michigan Civil Service
Commission, State Health Plan Benefit Information, http://www.michigan.gov/mdcs/0,1607,7-
147-22854_22857_23301---,00.html (App. 19).

[29] The Complaint alleges that Blue Cross is "the largest non-governmental purchaser of
health care services, including hospital services, in Michigan." (Compl. ¶ 2.)  But it makes no
attempt to link this to any product or geographic market, to identify shares, to allege market
power, or even to explain why it matters, if it does, that Blue Cross is a non-governmental
purchaser.

The allegations in the Complaint concerning the relevant product market(s) fail the most basic pleading standards. *See In re Travel Agent*, 583 F.3d at 902-03; *Eidson*, 510 F.3d at 634 ("Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice."). Indeed, beyond failing to assert any facts that would support, or even clearly identify, their proposed product market(s), the Plaintiffs' other allegations emphatically disclaim the definitions they appear to use. Thus, the Complaint should be dismissed for failure to plead a plausible product market.

> **2.      Plaintiffs Do Not Plausibly Allege Geographic Markets**

Plaintiffs start with the unremarkable proposition that a relevant geographic market is "the area in which the seller operates and in which the purchaser can practicably turn for supplies or services." (Compl. ¶ 26.) The Complaint then makes some conclusory assertions about a purported "Lansing" market, saying that Lansing employers and insureds "cannot practicably turn to commercial health insurers that do not offer network access to hospitals in the Lansing MSA." (*Id.* ¶ 27.) But Plaintiffs do not provide sufficient facts that even begin to explain why the "Lansing MSA" is a relevant geographic market. For example, why is the Lansing MSA not part of a larger market? Or a smaller market, including only part of Lansing? And what about employers with operations throughout the State of Michigan, or the Midwest region, or even nationally, for whom network access to hospitals in Lansing is wanted but not sufficient?

Without any facts, the conclusory assertion of a "Lansing market" is inadequate. *See, e.g., Jacobs,* 2010 WL 4880864, at *5 (noting that plaintiffs' "conclusional statement [regarding markets] merely begs the question of what, exactly, makes foam mattresses comprise this submarket"); *Little Rock Cardiology Clinic Pa. v. Baptist Health*, 591 F.3d 591, 596 (8th Cir. 2009) (test for whether a geographic market is adequately pled requires a court to first determine whether a plaintiff has alleged the geographic market that includes the area in which the

defendant draws a sufficiently large percentage of its business, and second, to determine whether a plaintiff has alleged a geographic market in which only a small percentage of purchasers have alternate suppliers to whom they could practicably turn in the event of a price increase).

Further, while the Complaint alleges a few, albeit inadequate, facts about Lansing, it alleges virtually no facts at all about the other 16 alleged geographic markets or their relationship to the multiple different products at issue.  It simply asserts the bare conclusion that the boundaries of various MSAs or county lines in Michigan constitute (or, as the Complaint reads, "approximate," (Compl. ¶ 30)) relevant geographic markets, without making a single distinction across product types.  But simply asserting the boundaries of a geographic market is not enough. *See Jacobs*, 2010 WL 4880864, at *4 (antitrust plaintiffs "must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets"); *Apani Sw. v. Coca-Cola Enters.*, 300 F.3d 620, 630 (5th Cir. 2002) (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 321, 331-32 (1961) ("identifying a relevant market requires more than a determination of 'metes and bounds'").  "[T]he economic significance of a geographic area does not depend upon singular elements such as population, income, political boundaries, or geographic extent, but rather upon the relationship between these elements and the characteristics of competition in the relevant product market within a particular area."  *Apani*, 300 F.3d at 626-27.  For this reason, courts have repeatedly rejected geographic markets that, as here, are based on nothing more than the arbitrary lines drawn by MSAs (or other political delineations).  As the Supreme Court explained in the context of banking markets:

> [T]he Government cannot rely, without more, on Standard Metropolitan Statistical Areas (SMSA's) as defining the geographic markets of the two banks. SMSA's are prepared by the Office of Management and Budget to determine areas of economic and social integration, principally on the basis of the commuting patterns of residents. They are not defined in terms of banking criteria, and they were not developed as a tool for analyzing banking markets. Exclusive reliance on SMSA's here may lead to inaccuracies.… In sum, although the Bridgeport and New Haven SMSA's may be helpful in defining the general

metropolitan characteristics of southwest Connecticut, they are not sufficiently refined in terms of realistic commercial banking markets to satisfy the Government's burden. The Government must demonstrate more accurately than is possible solely with SMSA's the localized banking markets, or areas of significant competitive influence, surrounding the sites where CNB and FNH maintain their banking offices.

*United States v. Conn. Nat'l Bank*, 418 U.S. 656, 670 (1974) (internal citations omitted).[30]

Indeed, the Complaint itself contains internal contradictions regarding geographic markets.  For example, the Plaintiffs assert in Paragraph 28 of the Complaint that the western and central Upper Peninsula constitutes an entire market, while in other sections of the Complaint, the Plaintiffs appear to treat Marquette County, which is located in the Upper Peninsula, as a separate market.  (*See* Compl. ¶ 50 ("Blue Cross is by far the largest commercial health insurer in the Marquette area.").)  Moreover, the Complaint fails to address issues specific to the various alleged markets that are apparent on the face of the Complaint itself.  For example, the Complaint's market allegations ignore and are inconsistent with its factual allegations that many Blue Cross customers travel across state lines for health care.  (*See* Compl. ¶ 11.)  It further ignores that courts have held that health care financing markets are regional or even national.[31]

---

[30] MSAs have been held to be too crude to serve as a proxy for relevant markets by many other courts, in many other contexts, as well.  *See, e.g.*, *White & White*, 723 F.2d at 504; *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 980 (2d Cir. 1984); *Arnett Physician Grp., P.C. v. Greater LaFayette Health Servs., Inc.*, 382 F. Supp. 2d 1092, 1095 (N.D. Ind. 2005) (granting motion to dismiss); *United States v. Country Lake Foods, Inc.*, 754 F. Supp. 669, 673-74 (D. Minn. 1990).

[31] *See, e.g., Ball Mem'l Hosp. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1335 (7th Cir. 1986) (finding, "[t]he 'productive asset' of the insurance business is money, which may be supplied on a moment's notice, plus the ability to spread risk, which many firms possess and which has no geographic boundary"); *see also Lifeline Ltd. No. II v. Conn. Gen. Life Ins. Co.*, 821 F. Supp. 1201, 1209 (E.D. Mich. 1993) (noting "[w]here products are sold across the nation and transportation costs are not significant, courts frequently define the geographic market as the entire nation").

It is axiomatic that Plaintiffs must plead facts that put Blue Cross on notice of the basis of each claim that it asserts, including pleading each relevant geographic area and sufficient facts establishing that named geographic areas are ones of competitive significance relative to the distinct product markets being alleged.  Quantity does not equal quality: Plaintiffs cannot avoid this burden by pleading multiple markets, but alleging insufficient facts with respect to any.  *See*, *e.g.*, *Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*, 623 F.3d 281, 286 (6th Cir. 2010) ("To state a claim under the rule-of-reason test, a plaintiff must allege … that the purportedly unlawful contract, combination, or conspiracy produced adverse, anticompetitive effects ***within relevant product and geographic markets***." (emphasis added)).  Accordingly, the Complaint must be dismissed.

**B.**     **The Complaint Fails Plausibly to Allege Anticompetitive Effects Arising From the Use of MFNs in any Relevant Market**

"The foundation of an antitrust claim is the alleged adverse effect on the market."  *Care Heating*, 427 F.3d at 1014.  The failure to plead proper geographic and product markets requires a finding that the Plaintiffs have failed to plead anticompetitive effects because without coherently defined areas of competitive significance (markets) the Court cannot even begin to assess the validity of any alleged competitive impact of the challenged conduct; here, the MFNs.  *See*, *e.g.*, *Warrior Sports*, 623 F.3d at 286; *Apani*, 300 F.3d at 626-27; *In re Ins. Brokerage Litig.*, 618 F.3d 300, 315 (3d Cir. 2010) ("[T]he plaintiff bears the initial burden of showing that the alleged agreement produced an adverse, anticompetitive effect ***within the relevant geographic market***." (emphasis added)).  The competitive significance of an area turns on the relationship of the alleged conduct to properly defined product and geographic markets.  Plaintiffs cannot lump together facts and circumstances from unrelated product and geographic markets in order to meet their pleading obligations.

Moreover, although the Plaintiffs recognize that any anticompetitive effects must be weighed against the procompetitive benefits of the MFNs in a properly defined product and geographic market, Plaintiffs conclusorily allege that, as to each and every MFN in each and every possible market, there is an identical lack of procompetitive benefits.  (*See* Compl. ¶ 81.)  This is facially implausible, especially given the wealth of case law upholding the use of MFNs, and is yet another manifestation of the pleading failure caused by Plaintiffs' improper combination of every one of their claims into a single incoherent omnibus Sherman Act claim.[32]

Finally, the Complaint fails to allege market power properly in any relevant market.  It does conclusorily allege that "Blue Cross has market power in the sale of commercial health insurance in each of the alleged geographic markets," (Compl. ¶ 33), and makes other conclusory allegations about barriers to entry in "commercial health insurance," (*id*. ¶¶ 34-35).  But as shown above, "commercial health insurance" is not alleged, and can cannot be alleged, to be a relevant market.  Alleging market power in something that is not a market does not adequately allege an antitrust claim.[33]

––––––––––––––––––––

[32] The Complaint also contains a number of conclusory and generalized allegations that, in agreeing to MFNs, Blue Cross has "increased its own costs," "rais[ed] Blue Cross's own costs and its customers' costs," "obtained MFN-plus clauses when hospitals have sought significant rate increases," and "[h]ad a hospital not agreed to an MFN, Blue Cross likely would not have agreed to pay the higher rates sought by the hospital."  (*See, e.g.*, Compl. ¶¶ 4, 5, 44.)  The Complaint appears to allege that the MFNs did not reduce Blue Cross's costs relative to what those costs would be if it did not seek any MFNs.  But the Complaint says nothing about what Blue Cross should have paid as the hospital reimbursement rate at any given hospital, and it says nothing about what would have happened had a hospital sought a rate increase and Blue Cross simply refused to pay the higher rate sought.

[33] Plaintiffs simply assert in paragraph 24 of the Complaint that "Blue Cross' MFNs apply to hospital services procured for both group and individual commercial health insurance plans, and … affect purchasers of both group and individual commercial health insurance."  Plaintiffs then proceed to allege approximate market shares averaged across all product markets in paragraph 28.  But this is clearly insufficient.  Moreover, it provides no basis for the Court to

### C.      The Complaint Fails To Plausibly Allege Facts Supporting A Viable Legal Theory of Harm

This case attacks Blue Cross's negotiated discounts.  The Complaint tries to obfuscate this by pleading that when hospitals seek "significant rate increases," (Compl. ¶ 4(A)), and Blue Cross in turn seeks an MFN, the price on which Blue Cross and the hospitals settle may rise compared to where it was before the negotiations began; but the Complaint cannot deny that the ultimate price is a *discount* from the hospital's list prices.  (*Compare* Compl. ¶ 17 *with id.* ¶ 36.) The Complaint seeks to dodge this issue by using as its baseline the prices Blue Cross was charged in the past—*not* the prices the hospitals sought, or charged in their list prices (whether described as based on a "chargemaster," "diagnosis-related groups," "or on another basis").  (*Id.* ¶ 17)).  But when a hospital raises prices, and Blue Cross seeks and obtains a discount from that increased price, *Blue Cross has obtained a discount*, regardless of what it was paying before negotiations began.  There is no escaping the fact that this case attacks the legality of a discount. (Compl. ¶ 17).  *See, e.g.*, *Marshfield Clinic*, 65 F.3d at 1415 (MFNs are discounts); *Kitsap*, 671 F. Supp. at 1269 (same).

Antitrust cases challenging discounts (*i.e.*, price competition) are especially difficult to prosecute.  As the Supreme Court has explained:

> Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, *they do not threaten competition.  Hence, they cannot give rise to antitrust injury*.
>
> We have adhered to this principle regardless of the type of antitrust claim involved.

---

analyze Plaintiffs' claims.  This is yet another reason why the Complaint is insufficient and should be dismissed.

*Atl. Richfield*, 495 U.S. at 340 (emphasis added); *see also Brooke Group Ltd. v. Brown &*
*Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993). Indeed, "'[i]t is in the interest of
competition to permit dominant firms to engage in vigorous competition, *including price*
*competition.*'" *Atl. Richfield*, 495 U.S. at 341 (emphasis added) (quoting *Cargill Inc. v. Monfort*
*of Colo., Inc.*, 479 U.S. 104, 116 (1986)). The Supreme Court has explained that it is
"particularly wary of allowing recovery for above-cost price cutting because allowing such
claims could, perversely, 'chill legitimate price cutting,' which directly benefits consumers."
*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 319 (2007) (quoting
*Brooke Group*, 509 U.S. at 223-24). Because the actions being challenged are often identical to
those that are "the very essence of competition," challenges to discounts require extremely
specific allegations and proofs. *E.g.*, *Weyerhaeuser*, 549 U.S. at 323; *see also Brooke Group*,
509 U.S. at 222-23 ("[It] is beyond the practical ability of a judicial tribunal to control [price
competition] without courting intolerable risks of chilling legitimate price cutting."); *Indeck*
*Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 977-78 (6th Cir. 2000) ("[E]ven if
Indeck were able to establish the preemption from the relevant market that it asserts, it has failed
to allege how such acts have injured competition, *especially in light of the discounted rates*
*offered to the customers*, in light of the fact that the exclusive contracts were of limited duration,
and in light of the fact that the customers were free to seek other power generators at the
conclusion of the contracts." (emphasis added)); *Cascade Health Solutions v. Peacehealth*, 515
F.3d 883, 896 (9th Cir. 2008) ("Not surprisingly, the Supreme Court has instructed that, because
of the benefits that flow to consumers from discounted prices, price cutting is a practice the
antitrust laws aim to promote."). Specifically, without alleging facts that would plausibly
support that Blue Cross could recoup any alleged "lower" discounts it left on the table in seeking

MFNs, or that the MFNs sufficiently foreclosed competition to cause specific—not "likely"—anticompetitive effects, the Complaint cannot stand.

       1.       **Recoupment**

Though not clearly articulated, the Complaint appears to be claiming that Blue Cross "overpaid" for hospital services so that its competitors would have to pay the same or more, and would therefore be competitively weakened or foreclosed entirely. This is strikingly similar to a claim that Blue Cross "bid[] up the market price of a critical input to such high levels that rival buyers cannot survive (or compete as vigorously)…" *Weyerhaeuser*, 549 U.S. at 320 (internal quotations omitted). But as the Supreme Court has held, such claims cannot succeed unless "the defendant has a dangerous probability of recouping the losses incurred in bidding up input prices through the exercise of monopsony power." *Id*. at 325. That is, the Plaintiffs must allege first that the overpayment for inputs will drive the defendant's "competitors out of business," and second that the defendant could later recover the amount it overpaid by buying less or paying less. *See Id*., 549 U.S. at 318-19.

To make such a showing, Plaintiffs here would have to allege that some obstacle would prevent competitors from increasing their purchases of hospital services if, in the future, Blue Cross cut the prices it was willing to pay. But they make no such allegation. In fact, the handful of allegations that touch on this point undermine any arguments Plaintiffs may make—they allege that competitors are ready and willing to purchase hospital services at prices comparable to the purportedly elevated prices Blue Cross pays now. (Compl. ¶ 56.) Plaintiffs thus do not, and cannot, allege a plausible claim because they do not, and cannot, allege that Blue Cross's conduct will either drive its rivals out of business or that if its rivals were to be driven from the market, Blue Cross could then keep them out for a sufficient amount of time to recoup its losses. 549 U.S. at 325-26.

## 2.     Foreclosure

The Complaint appears to allege that Blue Cross's MFNs reduced competition by making the cost of hospital services (again, not a plausibly pled market) to commercial health insurers the same, or in some cases more, than those services cost Blue Cross.[34]  Hospital services, in turn, are alleged to be one of many factors affecting the rates Blue Cross and its competitors charge subscribers.  (Compl. ¶ 16.)  The Complaint claims that the cost of hospital services in turn allegedly made it harder for commercial health insurers to cut prices to subscribers, and thus weakened their competitive vigor, or excluded them, or merely reduced their profits (the Complaint is unclear as to which).  (*Id.* ¶¶ 41-48.)  Thus, the MFNs are in essence alleged to be weakened versions of exclusive contracts: they do not exclude on their face, but eventually, by second-order and third-order effects, might result in some competitors being excluded.

Plaintiffs challenging exclusive contracts—which absolutely preclude competitors from obtaining the desired input at *any* price—are required to make clear factual allegations substantiating the manner and degree to which they are foreclosed from competing in *each affected relevant market*, because there is no violation unless "the competition foreclosed by the contract … constitute[s] a substantial share of the relevant market."  *Tampa Elec.*, 365 U.S. at 328; *E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.* 357 F.3d 1, 9 (1st Cir. 2004) ("There is no indication that Eastern has any hope of showing substantial foreclosure in a properly defined market."); *Compliance Mktg., Inc. v. Drugtest, Inc.*, No. 09-cv-01241-JLK, 2010 WL 1416823, at *7 (D. Colo. Apr. 7, 2010) ("In order to establish that an exclusive dealing arrangement is an unreasonable restraint on trade in violation of § 1, the Plaintiffs must plead a

---

[34] Of course, as the Michigan legislature intended, Blue Cross was designed so that it could obtain *better* pricing than commercial insurers.  House Bill 4555 First Analysis at 6 (Nov. 28, 1979) (App. 14).

relevant market and that the agreement substantially forecloses their ability to compete in the relevant market."). Here, with contracts that are not exclusive, Plaintiffs must at the very least meet the pleading requirements that would be imposed if Blue Cross had actually signed an exclusive contract with each hospital— that is, alleging facts showing the specific degree of foreclosure competitors ostensibly face in each different market pled. *See generally Masimo Corp. v. Tyco Health Care Group, L.P.*, 350 F. App'x 95, 97 (9th Cir. 2009) (unpublished) (applying exclusive dealing framework to a discount conditioned on customers purchasing 90-95% of their requirements from Tyco); *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 262 F.R.D. 58, 68 (D. Mass. 2008). No such facts, however, are alleged for any market.

For the same reasons, Plaintiffs must also make factual allegations plausibly showing *how* the MFNs foreclosed competition. That is, they must allege that merely having to pay the same or somewhat higher prices than Blue Cross for hospital services (but not the services of other providers)—one of many factors affecting subscriber rates—is sufficient to foreclose competition. *See Wellnx Life Sciences Inc. v. Iovate Health Sciences Research, Inc.*, 516 F. Supp. 2d 270, 293 (S.D.N.Y. 2007) ("Without any allegation as to how market-wide competition will be affected, the complaint fails to allege a claim on which relief can be granted."). Plaintiffs do not even attempt to make this showing.

## IV.   The Michigan Antitrust Law Claims Should Be Dismissed Because Those Laws Specifically Exempt Blue Cross's Alleged Conduct From Their Reach

The Michigan antitrust claims in Count II fail for all of the above reasons. They are also precluded under Michigan law for three separate and independent reasons.

First, the Michigan state antitrust statute exempts any transaction or conduct that "is the subject of a legislatively mandated pervasive regulatory scheme, including but not limited to, the insurance code of 1956, being sections 500.100 to 500.8302 of the Michigan Compiled Laws,

which confers exclusive jurisdiction on a regulatory board or officer to authorize, prohibit or regulate the transaction or conduct."[35]  Mich. Comp. Laws § 445.774(5).  Michigan's HMO statute falls within the explicit statutory scope set out in this exemption.  *See id.* §§ 500.3501-3580.  In addition, both P.A. 350 and the PPA meet the criteria for this exemption.  Both Acts create legislatively mandated pervasive regulatory schemes and direct OFIR to regulate conduct within those schemes.  *See supra* pp. 20-25.

Second, OFIR's review of the Provider Class Plan containing the MFN clause alone provides an exemption from the Michigan antitrust act.  Acts specifically authorized by regulations "or orders administered, promulgated, or issued by a regulatory agency, board, or officer" are exempt from Michigan state antitrust liability.  *Id.* § 445.774(4).

Third, even if OFIR had not issued its Order explicitly acknowledging the existence of the MFN clauses, Blue Cross would still be shielded by the state antitrust exemption in § 445.774(6).  *See BPS Clinical Labs v. BCBSM*, 217 Mich. App. 687, 552 N.W.2d 919, 925 (Mich. Ct. App. 1996) ("Although the Insurance Commissioner did not approve the plan at the time that this suit was filed, the commissioner did not reject the plan either.").  The Michigan antitrust act does "not apply to a transaction or conduct of an authorized … health care corporation when the transaction or conduct is to reduce the cost of health care and is permitted by the commissioner."  Mich. Comp. Laws § 445.774(6).  Blue Cross is an "authorized health

---

[35] During deliberations regarding the 1984 Michigan Antitrust Reform Act, Blue Cross expressed concern that the Act, as originally drafted, could apply to its cost containment efforts. *See* House Bill 4994 First Analysis, at 4-5 (Nov. 9, 1983).  (App. 22).  The Legislature subsequently added § 445.774(5).  *See* House Bill 4994 First Analysis, at 4 (Dec. 3, 1984). (App. 23).  Blue Cross's objection was dropped from the legislative history following this addition.  *Compare id.*; House Bill 4994 Third Analysis, at 3 (Jan. 14, 1985) (App. 24), *with* House Bill 4994 Second Analysis, at 3 (Nov. 23, 1983) (App. 25); House Bill 4994 First Analysis, at 4-5 (Nov. 9, 1983).  (App. 22).  As noted, the Act also includes a specific exemption for cost containment efforts.  Mich. Comp. Laws § 445.774(6).

care corporation;" the MFNs are designed to reduce Blue Cross's health care costs (*see* Compl. ¶ 17, acknowledging that the MFNs apply to discounts off hospitals' published rates); and OFIR permitted Blue Cross's use of MFN provisions.  *See supra* at 24-25.

## CONCLUSION

For the foregoing reasons, Defendant Blue Cross Blue Shield of Michigan respectfully requests that Plaintiffs' Complaint be dismissed with prejudice.

__/s/ Todd Stenerson_____

Hunton & Williams LLP
1900 K Street, N.W.
Washington, DC  20006
tstenerson@hunton.com
P51953

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2010, I electronically filed the foregoing Motion and Memorandum with the Clerk of the Court using the ECF system which will send notification of such filing to the individuals registered to receive electronic service in this docket, and I hereby certify that there are no individuals listed on the court's manual service list.  Below is the court's Electronic Mail Notice List for Civil Action No. 10-cv-14155-DPH-MKM.

**Farayha J. Arrine**
farrine@dickinsonwright.com

**Ryan Danks**
ryan.danks@usdoj.gov,richard.liebeskind@usdoj.gov,david.gringer@usdoj.gov,steven.kramer@usdoj.gov,audrey.pak@usdoj.gov,barry.joyce@usdoj.gov,ann.blaylock@usdoj.gov,peter.j.mucchetti@usdoj.gov

**Joseph A. Fink**
jfink@dickinsonwright.com,lpage@dickinsonwright.com

**Mary Elizabeth Lippitt**
lippitte@michigan.gov,gauthierb@michigan.gov,geem1@michigan.gov

**Thomas G. McNeill**
TMcNeill@dickinsonwright.com,LMolisee@dickinsonwright.com

**Robert A. Phillips**
rphillips@bcbsm.com,dbonaudo@bcbsm.com,vburnett@bcbsm.com

**Todd M. Stenerson**
tstenerson@hunton.com,iconner@hunton.com,csmoot@hunton.com

        /s/ Todd Stenerson
Hunton & Williams LLP
1900 K Street, N.W.
Washington, DC  20006
tstenerson@hunton.com
P51953