1                  UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF MICHIGAN

3                       SOUTHERN DIVISION

4    UNITED STATES OF AMERICA,

5    STATE OF MICHIGAN,

6              Plaintiffs,

7       -v-                           Case No.  10-14155

8    BLUE CROSS BLUE SHIELD

9    OF MICHIGAN

10             Defendant.

11   _____/

12             DEFENDANT'S MOTION TO DISMISS

13        BEFORE THE HONORABLE DENISE PAGE HOOD

14             United States District Judge

15       237 U.S. Courthouse and Federal Building

16             231 Lafayette Boulevard West

17             Detroit, Michigan 48226

18             Tuesday, April 19, 2011

19   APPEARANCES:

20   FOR THE UNITED STATES:   JOSEPH F. WAYLAND,

21                            DEPUTY ASSISTANT ATTY. GEN'L.

22                            DEPARTMENT OF JUSTICE

23                            950 PENNSYLVANIA AVE, NW #3121

24                            WASHINGTON, DC 20530

25

```
 1                   (APPEARANCES CONTINUED)

 2                              and

 3                         RICHARD LIEBESKIND,

 4                         BARRY JOYCE,

 5                         U.S. DEPARTMENT OF JUSTICE

 6                         WASHINGTON, DC

 7   FOR THE STATE OF MICHIGAN:  DEE J. PASCOE,

 8                         MI DEPT OF ATTORNEY GENERAL

 9                         SOCIAL SERVICES

10                         P.O. BOX 30758

11                         LANSING, MI 48909

12                         MARY ELIZABETH LIPPITT,

13                         MICHIGAN ATTORNEY GENERAL

14                         515 WEST OTTAWA

15                         P.O. BOX 30754

16                         LANSING, MI 48909

17

18   FOR THE DEFENDANT:      DONALD BRUCE HOFFMAN,

19                         TODD M. STENERSON,

20                         DAVID HIGBEE,

21                         HUNTON & WILLIAMS

22                         1900 K STREET, N.W.

23                             SUITE 1200

24                         WASHINGTON, DC 20006-1109

25                              and
```

```
 1
 2              (APPEARANCES CONTINUED)
 3                            THOMAS J. McNEILL,
 4                            DICKINSON WRIGHT
 5                            500 WOODWARD AVENUE
 6                                SUITE 4000
 7                            DETROIT, MI 48226
 8                                   and
 9                            JEFFREY RUMLEY,
10                            ROBERT A. PHILLIPS,
11                            BLUE CROSS BLUE SHIELD
12                            600 LAFAYETTE BOULEVARD
13                                SUITE 1925
14                            DETROIT, MI 48226
15
16
17
18
19
20
21
22
23
24
25
```

1

2                    UNITED STATES DISTRICT COURT

3                    EASTERN DISTRICT OF MICHIGAN

4                         SOUTHERN DIVISION

5    THE SHANE GROUP and

6    BRADLEY A. VENEBERG,

7              Plaintiffs,

8        -v-                          Case No.  10-14360

9    BLUE CROSS BLUE SHIELD

10   OF MICHIGAN

11             Defendant.

12   _____/

13              PLAINTIFFS' MOTION HEARING

14        BEFORE THE HONORABLE DENISE PAGE HOOD

15             United States District Judge

16        237 U.S. Courthouse and Federal Building

17             231 Lafayette Boulevard West

18             Detroit, Michigan 48226

19               Tuesday, April 19, 2011

20   APPEARANCES:

21   FOR THE SHANE GROUP:        E. POWELL MILLER

22                               THE MILLER LAW FIRM

23                               950 W. UNIVERSITY DRIVE

24                                  SUITE 300

25                               ROCHESTER, MI 48307

```
 1              (APPEARANCES CONTINUED)

 2                              and

 3                              FRED ISQUITH,

 4                              WOLF HALDENSTEIN

 5                              270 MADISON AVENUE

 6                              NEW YORK, NY 10016

 7                              and

 8                              DAVID H. FINK,

 9                              FINK & ASSOCIATES

10                              100 WEST LONG LAKE ROAD

11                              SUITE 111

12                              BLOOMFIELD HILLS, MI 48304

13                              and

14                              MARY JAME FAIT,

15                              WOLF, HALDENSTEIN

16                              55 W. MONROE STREET

17                              SUITE 1111

18                              CHICAGO, IL 60603

19   FOR THE DEFENDANT:        DONALD BRUCE HOFFMAN,

20                              TODD M. STENERSON,

21                              DAVID HIGBEE,

22                              HUNTON & WILLIAMS

23                              1900 K STREET, N.W.

24                              SUITE 1200

25                              WASHINGTON, DC 20006-1109
```

```
 1                (APPEARANCES CONTINUED)
 2   FOR THE DEFENDANT:           THOMAS J. McNEILL,
 3                                DICKINSON WRIGHT
 4                                500 WOODWARD AVENUE
 5                                    SUITE 4000
 6                                DETROIT, MI 48226
 7   FOR THE DEFENDANT:                And
 8                                JEFFREY RUMLEY,
 9                                ROBERT A. PHILLIPS,
10                                BLUE CROSS BLUE SHIELD
11                                600 LAFAYETTE BOULEVARD
12                                    SUITE 1925
13                                DETROIT, MI 48226
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF MICHIGAN

 3                   SOUTHERN DIVISION

 4  MICHIGAN REGIONAL CARPENTERS

 5  EMPLOYEE BENEFITS FUND, et al,

 6            Plaintiffs,

 7       -v-                        Case No. 10-14887

 8  BLUE CROSS BLUE SHIELD OF

 9  MICHIGAN,

10            Defendant.

11  _____/

12                  MOTION HEARING

13      BEFORE THE HONORABLE DENISE PAGE HOOD

14            United States District Judge

15      237 U.S. Courthouse and Federal Building

16            231 Lafayette Boulevard West

17            Detroit, Michigan 48226

18            Tuesday, April 19, 2011

19  APPEARANCES:

20  FOR THE PLAINTIFF:          DANIEL A. SMALL,

21                              COHEN, MILSTEIN

22                              1100 NEW YORK AVE,  NW

23                                 SUITE 500

24                              WASHINGTON, DC 20005

25
```

```
 1                 (APPEARANCES CONTINUED)
 2   FOR THE DEFENDANT:           DONALD BRUCE HOFFMAN,
 3                                TODD M. STENERSON,
 4                                DAVID HIGBEE,
 5                                HUNTON & WILLIAMS
 6                                1900 K STREET, N.W.
 7                                SUITE 1200
 8                                WASHINGTON, DC 20006-1109
 9                                      and
10                                THOMAS J. McNEILL,
11                                DICKINSON WRIGHT
12                                500 WOODWARD AVENUE
13                                   SUITE 4000
14                                DETROIT, MI 48226
15                                       and
16                                JEFFREY RUMLEY,
17                                ROBERT A. PHILLIPS,
18                                BLUE CROSS BLUE SHIELD
19                                600 LAFAYETTE BOULEVARD
20                                   SUITE 1925
21                                DETROIT, MI 48226
22
23
24
25
```

```
 1                    UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF MICHIGAN

 3                         SOUTHERN DIVISION

 4    SCOTT STEELE,

 5             Plaintiff,

 6       -v-                              Case No.  11-10375

 7    BLUE CROSS BLUE SHIELD

 8    OF MICHIGAN

 9             Defendant.

10    _____/

11                      MOTION HEARING

12       BEFORE THE HONORABLE DENISE PAGE HOOD

13               United States District Judge

14        237 U.S. Courthouse and Federal Building

15               231 Lafayette Boulevard West

16               Detroit, Michigan 48226

17               Tuesday, April 19, 2011

18    APPEARANCES:

19    FOR THE PLAINTIFF:       DANIEL E. GUSTAFSON,

20                             GUSTAFSON GLUEK PLLC

21                             650 NORTHSTAR EAST

22                             608 SECOND AVENUE SOUTH

23                                 SUITE 650

24                             MINNEAPOLIS, MN 55402

25                                   and
```

```
 1              (APPEARANCES CONTINUED)
 2   FOR THE PLAINTIFF:        ALYSON L. OLIVER,
 3                             24100 SOUTHFIELD ROAD
 4                                SUITE 305
 5                             SOUTHFIELD, MI 48075
 6   FOR THE DEFENDANT:        DONALD BRUCE HOFFMAN,
 7                             TODD M. STENERSON,
 8                             HUNTON & WILLIAMS
 9                             1900 K STREET, N.W.
10                             SUITE 1200
11                             WASHINGTON, DC 20006-1109
12                                   and
13                             THOMAS J. McNEILL,
14                             DICKINSON WRIGHT
15                             500 WOODWARD AVENUE
16                                SUITE 4000
17                             DETROIT, MI 48226
18                                   and
19                             JEFFREY RUMLEY,
20                             ROBERT A. PHILLIPS,
21                             BLUE CROSS BLUE SHIELD
22                             600 LAFAYETTE BOULEVARD
23                                SUITE 1925
24                             DETROIT, MI 48226
25
```

```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF MICHIGAN

 3                     SOUTHERN DIVISION

 4   CITY OF PONTIAC,

 5            Plaintiff,

 6       -v-                          Case No.  11-10276

 7   BLUE CROSS BLUE SHIELD

 8   OF MICHIGAN, et al

 9            Defendants.

10   _____/

11                   MOTION HEARING

12       BEFORE THE HONORABLE DENISE PAGE HOOD

13              United States District Judge

14       237 U.S. Courthouse and Federal Building

15             231 Lafayette Boulevard West

16             Detroit, Michigan 48226

17             Tuesday, April 19, 2011

18   APPEARANCES:

19   FOR THE PLAINTIFF:      AMY E. KELLER,

20                           WEXLER WALLACE

21                           55 W. MONROE ST., SUITE 3300

22                           CHICAGO, IL 60603

23                                and

24

25
```

```
 1                  (APPEARANCES CONTINUED)
 2   FOR THE PLAINTIFF:      LANCE C. YOUNG,
 3                           43311 JOY ROAD, SUITE 244
 4                           CANTON, MI 48187
 5                                  and
 6                           ERIC S. GOLDSTEIN
 7                           BERRY, JOHNSTON
 8                           1301 W. LONG LAKE, SUITE 250
 9                           TROY, MI 48098
10                                  and
11                           ROBERT ANTHONY ALVAREZ,
12                           MARIO CASCANTE,
13                           AVANTI LAW GROUP, PLLC
14                           600 28TH ST., SW
15                           WYOMING, MI 49509
16                                  and
17                           JASON J. THOMPSON,
18                           SOMMERS SCHWARTZ, P.C.
19                           2000 TOWN CENTER, SUITE 900
20                           SOUTHFIELD, MI 48075
21
22
23
24
25
```

```
 1                (APPEARANCES CONTINUED)

 2   FOR THE DEFENDANT

 3   BLUE CROSS BLUE SHIELD:  DONALD BRUCE HOFFMAN,

 4                            TODD M. STENERSON,

 5                            DAVID HIGBEE,

 6                            HUNTON & WILLIAMS

 7                            1900 K STREET, N.W.

 8                            SUITE 1200

 9                            WASHINGTON, DC 20006-1109

10                                   and

11                            THOMAS J. McNEILL,

12                            DICKINSON WRIGHT

13                            500 WOODWARD AVENUE

14                               SUITE 4000

15                            DETROIT, MI 48226

16                                   and

17                            JEFFREY RUMLEY,

18                            ROBERT A. PHILLIPS,

19                            BLUE CROSS BLUE SHIELD

20                            600 LAFAYETTE BOULEVARD

21                               SUITE 1925

22                            DETROIT, MI 48226

23

24

25
```

```
 1              (APPEARANCES CONTINUED)

 2    FOR DEFENDANT

 3    ASCENSION, ET AL:          MELISSA GORSALAND,

 4                               KEEFE A. BROOKS,

 5                               BROOKS WILKINS,

 6                               401 S. OLD WOODWARD

 7                                  SUITE 400

 8                               BIRMINGHAM, MI 48009

 9    FOR DEFENDANT BOTSFORD:    BRIAN M. ZIFF,

10                               PAUL W. COUGHENOUR,

11                               CLARK HILL

12                               500 WOODWARD, SUITE 3500

13                               DETROIT, MI 48226

14    FOR DEFENDANT GRATIOT HOSPITAL,

15    ET AL:                     DAVID A. ETTINGER,

16                               HONIGMAN, MILLER

17                               660 WOODWARD AVENUE

18                                  SUITE 2290

19                               DETROIT, MI 48226

20    FOR DEFENDANT MUNSON

21    AND SPARROW HOSPITALS:     RICHARD C. KRAUS,

22                               FOSTER, SWIFT

23                               313 S. WASHINGTON SQ.

24                               LANSING, MI 48933

25
```

```
 1                    (APPEARANCES CONTINUED)

 2   FOR DEFENDANT BEAUMONT:      BRUCE SENDEK,

 3                                SHELDON KLEIN,

 4                                BUTZEL LONG

 5                                41000 WOODWARD AVENUE

 6                                STONERIDGE WEST

 7                                BLOOMFIELD HILLS, MI 48034

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    I N D E X                    PAGE

2   DEFENDANT BLUE CROSS BLUE SHIELD'S

3   MOTION TO DISMISS

4     BY MR. HOFFMAN                              25

5     BY MR. STENERSON                            55

6     RESPONSE BY MR. WAYLAND                     76

7     RESPONSE BY MR. PASCOE                     105

8     REBUTTAL BY MR. HOFFMAN                    110

9     REBUTTAL BY MR. STENERSON                  117

10  MOTION TO APPOINT INTERIM CLASS ATTORNEY    125

11

12

13

14

15

16

17

18                 E X H I B I T S

19

20

21  NONE MARKED NOR RECEIVED

22

23

24

25

```
 1                  Tuesday, April 19, 2011
 2                  Detroit, Michigan.
 3                  At approximately 2:30 p.m.
 4                  THE CLERK:  Calling civil case number
 5  10-14155, United States and State of Michigan versus
 6  Blue Cross Blue Shield of Michigan; case number
 7  10-14360, The Shane Group, Inc., et al versus Blue Cross
 8  Blue Shield of Michigan; case 10-14887, Michigan
 9  Regional Council of Carpenters Employee Benefits Fund,
10  et al, versus Blue Cross Blue Shield; case number
11  11-10375, Scott Steele versus Blue Cross Blue Shield of
12  Michigan; case number 11-10276, City of Pontiac versus
13  Blue Cross Blue Shield of Michigan and various Defendant
14  Hospitals.
15                  THE COURT:  I have some appearances here.
16                  David Gringer, Ryan Danks.
17                  MR. GRINGER:  He is not here.
18                  THE COURT:  Dee Pascoe.
19                  MR. PASCOE:  Yes, Your Honor.
20                  THE COURT:  Joseph Wayland.
21                  MR. WAYLAND:  Yes, Your Honor.
22                  THE COURT:  And who is also at counsel
23  table?
24                  Elizabeth Lippitt; is that right?
25                  MS. LIPPITT:  Yes.
```

1                    THE COURT:  And the two gentlemen behind

2      you, are they also with you?

3                    MR. LEIBSKIND:  Richard Liebskind, Your

4      Honor, for the Government.  L I E B E S K I N D.

5                    THE COURT:  And who else?

6                    MR. JOYCE:  Barry Joyce also --

7                    THE COURT:  Joyce; J O Y C E?

8                    THE COURT: And are you all with the

9      Department of Justice?

10                    MR. JOYCE:  Yes, Ma'am.

11                    THE COURT: Is that everyone for the

12      Government?

13                    MR. WAYLAND:  Yes.

14                    THE COURT:  And then I have in the jury box,

15      Counsel for the Shane Group and Bradley Veneberg, and I

16      have E. Powell Miller.

17                    MR. MILLER:  Yes, Your Honor.

18                    THE COURT: And someone from New York?

19                    MR. ISQUITH:  Fred Isquith, Your Honor, way

20      in the back.  It is Fred Isquith; I S Q U I T H.

21                    THE COURT:  And you're with whom?

22                    MR. ISQUITH:  Wolf Haldenstein.  We're in

23      the New York office.

24                    THE COURT:  And you're with the Shane Group?

25                    MR. ISQUITH:  I am.

          1               THE COURT:  But you don't want to sit up

          2    there with them?

          3               MR. ISQUITH:  When it is our turn, I will

          4    come right up.

          5               THE COURT:  Come up, Counsel, and have a

          6    seat in the jury box.

          7               Anybody else here for the Shane Group?  Oh,

          8    David Fink, right?

          9               MR. FINK:  Yes, Your Honor.

         10               THE COURT:  Anybody else?  Okay.

         11               And Counsel for the Michigan Regional

         12    Council of Carpenters Employee Benefits Fund, Daniel

         13    Small?

         14               MR. SMALL:  Yes, Your Honor.

         15               THE COURT:  Are you the only one?

         16               MR. SMALL:  I believe so.

         17               THE COURT:  And for Scott Steele, Daniel

         18    Gustafson?

         19               MR. GUSTAFSON:  Yes, Your Honor.  Good

         20    afternoon.

         21               THE COURT:  Good afternoon.

         22               And is Daniel Hedlund also here?

         23               MR. GUSTAFSON:  He is not here, Your Honor.

         24               THE COURT: And then Alyson Oliver.

         25               MS. OLIVER:  Yes, Your Honor.

1                THE COURT:  How are you, Ms. Oliver?

2                MS. OLIVER:  Fine, Your Honor, thank you.

3                THE COURT:  Is that all for Scott Steele?

4                MS. OLIVER:  Yes, Your Honor.

5                THE COURT:  Then Counsel for the city of

6    Pontiac, I have Amy Keller.

7                MS. KELLER:  Yes, Your Honor.

8                THE COURT:  And then Lance Young.

9                MR. YOUNG:  Good morning.

10               THE COURT:  Good afternoon.  Don't throw me

11   off here.

12               Eric Goldstein.

13               MR. GOLDSTEIN:  (Nods head yes).

14               THE COURT:  Robert Anthony Alvarez.

15               MR. ALVAREZ:  Yes, Your Honor.

16               THE COURT:  And Mario Cascante.  How are

17   you?

18               MR. CASCANTE:  Fine, Your Honor.

19               THE COURT:  And who else is in the jury

20   box?

21               MR. THOMPSON:  Jason Thompson, Your Honor,

22   for Pontiac.

23               THE COURT:  Jason Thompson, and for whom?

24               MR. THOMPSON:  Pontiac.

25               THE COURT:  And then I have for Blue Cross

1   Blue Shield and the Hospital Defendants on this side.

2   Everyone is smiling.

3                Okay, Donald Bruce Hoffman.

4                MR. HOFFMAN:  Here, Your Honor.

5                THE COURT:  Todd Stenerson.

6                MR. STENERSON:  Here, Your Honor.

7                THE COURT:  Is that a correct pronunciation?

8                MR. STENERSON:  Yes, Your Honor.

9                THE COURT:  And then I have Robert Phillips.

10               MR. PHILLIPS:  Yes, Your Honor.

11               THE COURT:  You don't want to be at the

12   table?

13               MR. PHILLIPS:  I think Blue Cross has enough

14   lawyers up there.

15               THE COURT:  And then Joseph Fink.

16               MR. FINK:  Here, Your Honor.

17               THE COURT: You don't want to be here,

18   either?

19               MR. FINK:  It would be surplusage.

20               THE COURT:  Thomas McNeill.  How are you?

21               MR. McNEILL:  Thanks, Your Honor.

22               THE COURT:  And that's all I have, right.

23               One other?

24               MR. HIGBEE:  David Higbee.

25               THE COURT:  For Blue Cross?

```
 1              MR. HIGBEE:  Yes.  H I G B E E.
 2              THE COURT:  And then I have for Ascension,
 3    Genesis and others.  Do I have anybody else for Blue
 4    Cross?
 5              MR. LASKEN:  Jonathan Lasken.
 6              THE COURT:  Jonathan --
 7              MR. LASKEN:  Lasken; L A S K E N.
 8              THE COURT: Alright, is that all?
 9              MR. RUMLEY:  Your Honor, Jeffrey Rumley --
10    R U M L E Y -- General Counsel for Blue Cross.
11              THE COURT:  What is your first name again?
12              MR. RUMLEY:  Jeffrey.
13              THE COURT:  Thank you.
14              And then Ascension and others, there is
15    Melissa Gorsaland?
16              MS. GORSALAND:  Yes, Your Honor.
17              THE COURT:  And Keefe Brooks.
18              MR. BROOKS:  That's correct, Your Honor.
19              THE COURT:  Anybody else for that Group?
20              MR. BROOKS:  No, Your Honor.
21              THE COURT:  And for Botsford, Brian Ziff.
22              MR. ZIFF:  Yes, Your Honor.
23              THE COURT:  And Paul Coughenour.
24              MR. COUGHENOUR:  Yes, Your Honor.
25              THE COURT:  Anybody else with you?
```

```
 1                MR. ZIFF:  No, Your Honor.
 2                THE COURT:  And for Gratiot Community
 3   Hospital, Marquette General Hospital and others, I have
 4   David Ettinger.
 5                MR. ETTINGER:  Yes, Your Honor.
 6                THE COURT:  And are you only one?
 7                MR. ETTINGER:  Yes, Your Honor.
 8                THE COURT:  And then for Munson, I have
 9   Richard Kraus.
10                MR. KRAUS:  Yes, Your Honor.
11                THE COURT:  Anyone else?
12                MR. KRAUS:  And I'm here for Sparrow as
13   well.
14                THE COURT:  I'm sorry, yes, Sparrow as well.
15                And then for Beaumont, Bruce Sendek.
16                MR. SENDEK:  Good afternoon, Your Honor.
17                THE COURT:  And Sheldon Klein.
18                MR. KLEIN:  Yes, Your Honor.
19                THE COURT:  Is there anyone at that table
20   that I missed?  No.
21                Any other representatives that I missed?
22   No.
23                Okay, very good.  Welcome.
24                We have some Motions here, and I have a
25   Motion to Dismiss, and a Motion to Stay Discovery
```

1    pending a ruling on the Defendant's Motion to Dismiss.

2    It is Blue Cross's Motion to Dismiss and Motion to Stay.

3    Blue Cross's Motion to Strike the Michigan Attorney

4    General's Statement, Docket Number 34.  And the United

5    States and Michigan's Motion to Compel Production of

6    Documents and a scheduling conference.  And also a

7    Motion to Consolidate; is that right?  And to appoint an

8    Interim Class and Liaison Counsel. Should I have

9    anything else?

10              Somebody filed some motions yesterday after

11   the close of business -- well, the close of the Court,

12   if I'm not mistaken; is that right?

13              MR. STENERSON:  The Hospital Defendants did,

14   Your Honor. Obviously not with the expectation that we

15   will address it today.

16              THE COURT:  Right.  I just wanted to note

17   that I have those; to recognize that I do have them.

18              I need to make a couple disclosures, and

19   that is I have listed on here some people who used to be

20   former interns, and I do this by way of disclosing.  I

21   don't think it creates a conflict, if you all see

22   otherwise, please let me know.  But I have on the

23   pleadings Farayha Arrine, and Mario Cascante and Amy

24   Keller.   And if you think that creates a conflict, you

25   can let me know that in writing.  I don't think it does.

1            Ms. Arrine, when were you here?

2            MS. ARRINE:  I was here in 2008 and 2009;

3  part of each.

4            THE COURT:  And Ms. Keller?

5            MS. KELLER:  In 2004, Your Honor.

6            THE COURT:  And Mr. Cascante?

7            MR. CASCANTE:  In 2008, Your Honor.

8            THE COURT:  Very good, then I'm ready to

9  proceed if you're ready to proceed.

10            MR. WAYLAND:  Yes, Your Honor.

11            THE COURT:  I have some documents, who

12  brought those?

13            MR. WAYLAND:  The presentation, Your Honor,

14  submitted by the Government.

15            I will go through that when it is my turn.

16  I believe Blue Cross probably wants to take the lead on

17  the Motions.

18            MR. McNEILL:  Your Honor, Tom McNeill from

19  Dickinson Wright.  Unless you direct otherwise, we would

20  propose the Motion to Dismiss the Government's case, and

21  handling the Motion on those issues would be Bruce

22  Hoffman and also Todd Stenerson.

23            THE COURT:  Mr. Hoffman and who else?

24            MR. McNEILL:  Mr. Stenerson.

25            THE COURT:  And then what would you like to

1   do, Mr. McNeill?

2           MR. McNEILL:  We're really at the direction

3   of the Court.  We have some ideas on how we might

4   address the Motion to Dismiss, and maybe I could turn

5   over the speaking part here to Mr. Hoffman to make that

6   proposition.

7           THE COURT:  Do you have any objection to

8   allowing them to go first?

9           MR. WAYLAND:  Not at all, Your Honor.

10           THE COURT:  Very good.

11           MR. HOFFMAN:  Thank you, Your Honor.

12           THE COURT:  Everybody here on all the cases,

13   right?  All the Motions set for 2:30, 3:30 and 4

14   o'clock, right?  And all those appearances are already

15   on, right?

16           Very good, then I'm ready for you to tell me

17   how you would like me to proceed.

18           MR. HOFFMAN:  Let me, with your permission,

19   we have some materials as well, and I thought I would

20   come up --

21           THE COURT:  Are all of those for me?

22           MR. HOFFMAN:  These are actually three sets

23   of copies of materials, and they consist of my

24   presentation, and then some consist of documents that

25   have been previously submitted as Appendices, and extra

1    copies in case you don't have them readily accessible

2    with you that we might spend a couple of minutes talking

3    about, or might not depending on where we're at.

4                    THE COURT:  Everyone has that?

5                    MR. HOFFMAN:  We're about to pass it out.

6                    And Your Honor, with your permission, I'm

7    also going to flip this board around.  This particular

8    board, Your Honor, which is the only one I'm going to

9    refer to, does not contain any particular rocket science

10   on it, and I'm going to read it out in any event.  So I

11   think that everybody will have sufficient access to it.

12                   Your Honor, if everybody is ready, thanks

13   again for giving us the time to come in today.  As

14   previously mentioned, I'm Bruce Hoffman from the Hunton

15   Williams law firm here representing Blue Cross Blue

16   shield of Michigan.

17                   Your Honor, we are obviously happy to

18   proceed in discussing the Motion to Dismiss in any

19   sequence that you would prefer or answer any questions

20   you might have. However, we had a suggestion.

21                   The Motion raises what you might think of as

22   two really different sets of issues.

23                   The first set of issues, which you might

24   call the regulatory issues, have to do with state action

25   immunity and abstention.

1          The second set of issues have to do with

2   pleading deficiencies.  Issues that we raise under

3   Twombly and its progeny and Weyerhaeuser and its

4   progeny.

5          Our suggestion would be that we argue them

6   that way.  In other words, we proceed in arguing the

7   regulatory defenses, which I'm going to handle, and then

8   the Government would respond, and I would like to

9   reserve a little bit of time, couple of minutes, for

10  rebuttal.

11         After that, Mr. Stenerson will address the

12  pleading issues, and then again, the Government can

13  respond.  And we can wrap up by dealing with the state

14  law claims, depending on how time goes, which I don't

15  think will take very long.

16         THE COURT:  And is that how you would like

17  to proceed?

18         MR. WAYLAND:  Your Honor, I will be arguing

19  all of the Government's case, and I will prefer to do it

20  at one time.  But I am happy to accommodate Counsel if

21  it is more convenient for them.

22         THE COURT:  I think you should do it by

23  arguing your part and let your Co-counsel argue his

24  part, and then let the Government respond.  I would

25  like the Government to respond in the same order that

 1   they argue.  That way, you can have the two pieces and

 2   then you can both have a rebuttal.

 3              MR. HOFFMAN:  Certainly, Your Honor.  Thank

 4   you.

 5              THE COURT:  You don't feel double teamed by

 6   them?

 7              MR. WAYLAND:  Not at all, Your Honor.  I

 8   welcome the opportunity.

 9              MR. HOFFMAN:  He has us surrounded, Your

10   Honor.

11              THE COURT:  Well, I prefer to do it that

12   way, so I have all your arguments together in my notes.

13              MR. HOFFMAN:  Certainly.  And thank you

14   again for the opportunity.

15              Let me start with this point, and really

16   this is, I think, the fundamental point of all the

17   issues that we raise in certainly the regulatory portion

18   of the Motion to Dismiss.

19              There should be no mistake that this case is

20   a direct attack on Michigan's extremely comprehensively

21   regulated system for providing health care.  A system,

22   Your Honor, that has worked.

23              As the White House noted in the report that

24   we attach as Appendix 4 to our Motion to Dismiss, in

25   Michigan, for the last decade, the State experienced the

1    lowest rate of increase of health insurance premiums of

2    any state in America.

3              That is the system, the system that produced

4    that result, that is under attack by the case that has

5    been filed by the Government.

6              Now, Your Honor, to delve into that just a

7    little bit, I would like to invite the Court's attention

8    to the second page of the packet I handed out where I

9    point where we provide a little bit of background, just

10   a couple of quotes describing the regulatory system here

11   for health care.

12             THE COURT:  This packet (indicating)?

13             MR. HOFFMAN:  That's correct, Your Honor.

14             THE COURT:  Okay.

15             MR. HOFFMAN:  And page 2 has a title, which

16   says, "This is An Attack On Michigan's Heavily Regulated

17   Health Care System."

18             The first quote comes from a case called

19   Genord from the Sixth Circuit, and it says, quote:

20                  "Blue Cross is a 'health care corporation'

21                  that is regulated extensively by the

22                  Michigan Commissioner of Insurance under the

23                  Nonprofit Health Care Corporation Reform

24                  Act."

25                  Which, Your Honor, is what we refer to as

1   P.A. 350.

2              The second quote comes from a decision last

3   January by the Michigan Court of Appeals, and it talks

4   about how P.A. 350 is administered.  And the appellate

5   court said:

6              "The Legislature intended that the

7              commissioner...

8              And that is the commissioner of insurance,

9   the head of OFIR.

10             "...be primarily responsible for regulating

11             {Blue Cross}.  Balancing the often

12             conflicting goals of P.A. 350 requires

13             considerable expertise.  The statutory goals

14             of that statute are defined in terms of

15             reasonableness, and the commissioner is

16             granted wide discretion to determine what is

17             reasonable.  The commissioner's

18             exercise of that discretion must be

19             respected."

20             Now, Your Honor, that is going to frame up

21   most of the issues that I'm going to address.  But there

22   are two separate ways you can dismiss this case because

23   of its attack on Michigan's health care system.  The

24   first is state action immunity.  The second is Burford

25   abstention.

 1              I'm going to speak today on four basic

 2    points, which is what this board says that we have on

 3    display over there.

 4              First, Blue Cross is heavily regulated under

 5    P.A. 350, and a whole bunch of other statutes, which are

 6    mostly described in our briefs.  And, conduct of the

 7    type challenged here was clearly foreseeable under that

 8    extensive statutory regulatory scheme.

 9              Second, because Blue Cross is a quasi-public

10    state created tool of state policy, all that it needs to

11    show for state action immunity is that it was heavily

12    regulated and its conduct was foreseeable.

13              But third, if needed, Blue Cross's conduct

14    easily meets the active supervision test for state

15    action immunity.

16              And fourth, and finally, the Court should

17    abstain from hearing this case because it would disrupt

18    Michigan's complex regulatory scheme.

19              Your Honor, any of those is sufficient for

20    this Court to dismiss this case.  Obviously, all of

21    them would be more than enough to dismiss the case, but

22    any of those would suffice.

23              Let me turn, Your Honor, to state action

24    immunity.

25              I think, Your Honor, the first point to bear

1    in mind in terms of state action immunity, and this has

2    been extensively briefed, there is a lot of discussion,

3    there is a lot of Appendices, there are a lot of

4    documents.  The statutory provisions at issues here are

5    quite long.

6           The Department of Justice, in its response

7    here, points to no case with regulation even remotely

8    close to the extent and detail of the regulatory scheme

9    at issue here where state action immunity was denied.

10          Now, the first question under state action

11   immunity is simply this:  Was there a clearly

12   articulated state policy to displace competition with a

13   regulatory structure and was the conduct at issue a

14   foreseeable result of that policy.

15          And if Your Honor flips to the next page

16   which we have, to page 3, I'm not going to belabor this

17   point.  It was extensively discussed in our briefs, and

18   I don't think, frankly, it is seriously disputed.

19          It is quite clear, and this comes from both

20   the Michigan Supreme Court and the relevant statutes,

21   that unfettered competition has been displaced by an

22   extensive regulatory structure in Michigan governing

23   health care.

24          The Michigan Supreme Court said, quote:

25          "It is widely recognized that the health

1                care system does not, and has not, operated

2                as a competitive market."

3                And that Michigan's regulatory structure is,

4  quote:

5                "...a unique statutory scheme which combines

6                both free-market and government regulatory

7                methods of control."

8                P.A. 350 was the primary legislation aimed

9  at creating that mixed regulatory competitive structure

10  in which there is not unfettered competition but rather

11  you have a regulatory system with some competition along

12  with it.

13                If you turn the page to the next slide, Your

14  Honor, which we have as number four, this points out a

15  second component of Michigan's extensive regulation of

16  health care, and it is very simply this:  Blue Cross is

17  not just intensively regulated, it is the instrument of

18  the State's regulatory structure.

19                As the Michigan legislature stated in P.A.

20  350, in order to assure that all people of this State

21  reasonable access to health care, quote, at a fair and

22  reasonable price, quote, it is the intention of the

23  legislature to provide for the regulation and

24  supervision of Blue Cross.

25                And as the Michigan Supreme Court said, Blue

1   Cross is, quote, not carried on as an insurance

2   business, but rather provides a method for promoting the

3   public health and welfare, closed quote.

4              And as part of that, and as the other points

5   we make on this slide show, Blue Cross is provided with

6   a number of specific obligations, and mainly, Your

7   Honor, those take the form of an obligation to provide

8   comprehensive health care coverage.  In every part of

9   Michigan.  Available to everybody.  Without

10  underwriting.  Without the ability to turn down people

11  because they're sick.  Without the ability to say well,

12  we're not going to serve some large part of the State of

13  Michigan because it is not profitable to be there.  Blue

14  Cross has to been there and has to offer service.

15             In exchange for that, or better put, in

16  order to make that possible, Blue Cross is given a

17  number of statutory tools, and those are what we're

18  going to talk about later, some of them are described

19  here.

20             That's all that is necessary, Your Honor, to

21  show that unfettered competition is displaced with a

22  regulatory structure in Michigan.  I don't think that

23  can be seriously disputed.

24             The next question is simply whether the

25  conduct at issue was foreseeable under that regulatory

1    structure.

2              Well, the first question there is simply

3    this:  What is the conduct at issue?  The answer is very

4    simple.  The conduct challenged in the Department of

5    Justice's Complaint is Blue Cross's use of its size in

6    order to obtain competitive advantages over commercial

7    insurers in the form of better prices or equal prices

8    from hospitals.  In other words, Blue Cross is using its

9    size to obtain competitive advantages.

10             Well, Your Honor, if you turn to the next

11   page, which we have as page number five, we have

12   outlined here a couple of quotes, and there are many

13   cited in our brief, which illustrate that conduct was

14   not only a foreseeable outcome of the extensive

15   regulatory structure here, it was, in fact, foreseen.

16             As the House of Representatives stated in

17   House Bill 4555's First Analysis back when P.A. 350 was

18   being actively debated, quote:

19             "If the Blues did not cover so many

20             people..."

21             -- If Blue Cross was not large --

22             "...they would find it difficult to

23             negotiate the discounts and lower rates of

24             reimbursement for hospitals and physicians

25             they enjoy as advantages over the commercial

1          insurers."

2          Closed quote.

3          The statute states:

4          "No portion of {Blue Cross's} fair share of

5          hospitals' reasonable financial requirements

6          shall be borne by other health care

7          providers.  However, this subdivision shall

8          not preclude reimbursement arrangements

9          which include financial incentives and

10         disincentives."

11         And:

12         "Subject to that, and to balancing cost

13         against availability and quality, the

14         {insurance) Commissioner is tasked with

15         ensuring that Blue Cross's provider

16         contracts do not shift more than Blue

17         Cross's fair share of costs..."

18         So Your Honor, the Legislature foresaw that

19   Blue Cross would, quote, use its size to obtain

20   competitive advantages over commercial insurers and that

21   in doing so, in its contracts with hospitals, costs

22   could be shifted to those commercial competitors.

23         That could not be more clear evidence of

24   foreseeability.  And actually, in fact, foresees the

25   conduct.

1                On our next slide, Your Honor, we have a few

2    quotes from the Supreme Court and the Sixth Circuit, and

3    a Michigan appellate court case, I think, underscoring

4    the point, which again can't seriously be debated, that

5    evidence of this nature vastly exceeds the type of

6    evidence necessary to establish the foreseeability

7    aspect of the clearly articulated state policy planned.

8                Now Your Honor, the Department of Justice

9    doesn't, I think, make a serious argument against the

10   conduct at issue.  This is no mere broad authority to

11   contract or home rule statute as was at issue in, for

12   example, the First American Title case that the

13   Department tries to lean on in its brief.  Those kinds

14   of statutes say nothing about the conduct at issue.

15               Here, we have a statutory structure and

16   specific legislative commentary contemplating exactly

17   the kind of conduct at issue.

18               It doesn't matter, Your Honor, contrary to

19   the Department of Justice's argument, that the State has

20   allowed some limited heavily regulated competition to

21   co-exist in this regulatory structure.  You don't need

22   to have a command-controlled-government-run economy in

23   order to have state action immunity.

24               The Government said, well, there is some

25   competition here, and they point to a couple of

```
1    statutes, which taken together, show no more than the
2    Government has not abolished competition, and they say
3    that means there is no clearly articulated state policy.
4    But as this District held in rejecting this exact
5    argument in the Miranda versus Michigan case, quote:
6                   "Plaintiffs assert that the relevant
7                   state policy in this case as expressed by
8                   Michigan's Telecommunications Act, which
9                   was enacted in an effort to allow and
10                  encourage competition.  According to
11                  Plaintiffs, based on the plain language of
12                  the {Act}, suppression of competition cannot
13                  be considered a foreseeable result.  The
14                  relevant question, however, is
15                  not whether the State of Michigan has a
16                  general policy disfavoring anticompetitive
17                  conduct, a fact which Defendants themselves
18                  do not dispute, but rather, whether, despite
19                  its general policy disfavoring
20                  anticompetitive conduct, the State of
21                  Michigan has granted the {regulator} the
22                  authority to take action that would
23                  foreseeably result in anticompetitive
24                  effects."
25                  And that is at page 754 of the Miranda
```

1   decision.

2           Finally, Your Honor, the Department's

3   argument that Michigan was required to expressly

4   anticipate and specifically allow not just any

5   competitive conduct, but the exact conduct at issue with

6   the exact effect alleged is just wrong.

7           First of all, Your Honor, Michigan did

8   exactly that, which is what the point I made above

9   illustrates, but it is just not the law.

10          If you turn to the next slide, which is

11  number 7, we just recite here the Supreme Court and the

12  Sixth Circuit over and over and over again rejecting

13  this exact argument expressed in exactly the same words

14  written in the Department of Justice's brief.  It is a

15  multiple loser in the Sixth Circuit; a multiple loser at

16  the Supreme Court.

17          It is enough that the statute generally

18  contemplates that there could be anticompetitive

19  results; that the results of the regulatory structure

20  might differ from where you would get under competition.

21  That is enough.  We have vastly more than that here.

22          That, Your Honor, is my first main point.

23  The second is that this is all Blue Cross needs to show.

24  In other words, as you might put it in terms of the

25  Prong One and Prong Two of state action, that Blue Cross

1   is a Prong One entity, all it needs to show is a clearly

2   articulated pay policy.

3           And again, Your Honor, we think this is a

4   pretty simple issue.

5           As outlined in great detail in our briefs,

6   courts considering similar facts have repeatedly held

7   that entities like Blue Cross, quasi-public, in those

8   words, state created entities, that serve as tools of

9   state policy, particularly in health care, need only

10  show clear articulation.

11          The Department answers none of the cases we

12  cite.  They point to no case in which a quasi-public

13  health care authority was found to have to be actively

14  supervised by the State.

15          They don't address any of the factors that

16  the various courts considered in determining whether or

17  not an entity is entitled to state action immunity on a

18  mere showing of clear articulation.  None of them.

19          We have compiled some of them, Your Honor,

20  at the next page, page 8, wherein one column outlines a

21  number of factors considered by a number of courts from

22  the Sixth Circuit, the Seventh Circuit and the Eleventh

23  Circuit on when an entity need only show clear

24  articulation to have state action immunity.  And we

25  compare those with the facts in the Sixth Circuit

1    Consolidated Television case and with the facts here.

2              And as you can see, Your Honor, I won't

3    spend additional time on this slide, but Blue Cross

4    lines up with the authorities on the factors that

5    demonstrate it need only show clear articulation across

6    the board.

7              Now, the Department of Justice tries to use

8    the Sixth Circuit decision in the Riverview case to say,

9    well, Blue Cross is not a Prong One entity.

10             Our next page, Your Honor, which is page 9,

11   goes in detail through all the reasons why Riverview is

12   completely off point here.

13             Fact after fact after fact, it is

14   inconsistent with the facts present here, which,

15   instead, line up with Consolidated Television where the

16   entity was found by the Sixth Circuit to be a Prong One

17   only entity.

18             There is only really one of these, though,

19   that the Department of Justice talks about at all, and

20   that is this one I'm going to focus on.

21             The Department of Justice says well, in the

22   Riverview case, 40 percent of the board had to be public

23   employees, so that has much more connection to the State

24   than Blue Cross has.

25             That is dead wrong, Your Honor.  In the

 1  Riverview case, all that occurred was that the enabling

 2  municipal ordinance actually said that 40 percent of the

 3  board of the entity, a minority, had to be public

 4  officials, but it said nothing about who they were.  It

 5  said nothing about how they were appointed.  It

 6  exercised no control over it whatsoever.

 7            So the majority of the board was completely

 8  unregulated, and out of that 40 percent, the composition

 9  was picked by the entity itself with the sole

10  requirement that they be public officials of some sort

11  from somewhere.

12            In contrast, both here and in Consolidated

13  Television, the enabling legislation dictates 100

14  percent the entire composition of the board.

15            Blue Cross's board is statutorily dictated

16  down to a very minute level of detail over exactly who

17  the board members should be.  It doesn't name them, but

18  it says they have to represent, for example, public

19  units, small employers of size less than X, physicians,

20  et cetera, et cetera.  And beyond that -- and beyond

21  that -- the State itself, the governor appoints four of

22  Blue Cross's board members.  Nothing like that was

23  present in the Riverview case.

24            Now, the Department of Justice's main

25  argument as to why Blue Cross isn't a Prong One entity

1    is that Blue Cross has correctly argued that it is not a

2    quote, state actor, closed quote, under 42 USC Section

3    1983.

4              The Sixth Circuit and many others courts

5    have made it clear over and over again that the state

6    actor test under Section 1983 does not determine whether

7    an entity is a Prong One entity under state action

8    immunity.  And frankly, Your Honor, you need look no

9    further than the Sixth Circuit decision in the McCarthy

10   decision, McCarthy versus Middle Tennessee Electric

11   Membership Corp., which addresses this issue head-on.

12             Now, it addressed it in dicta, but it is

13   pretty clear in that case, and if you turn to page 10 of

14   our slides, first, the Sixth Circuit pointed out that

15   the semi-public electric cooperatives at issue in that

16   case were not state actors under Section 1983.

17             But then the court went on to say

18   nevertheless, quote:

19                  "We agree with the Seventh Circuit that the

20                  Cooperatives are neither state agencies nor

21                  purely private parties..."

22                  And as a result of that, the law requires --

23                  "...a grant of antitrust immunity in spite

24                  of a lack of supervision."

25                  And that agrees with the Seventh Circuit

1    decision in the Hughes case, which reaches the same

2    conclusion that semi-private, semi-public entity that is

3    acting to effectuate state policy need only show clear

4    articulation.

5            This is, of course, consistent with the

6    long, long string of cases, and we also cite the

7    Broderick case, which in 1976, pointed out that Section

8    1983 is not dispositive on the question of whether

9    somebody gets Prong One treatment.

10           So that, Your Honor, answers my second key

11   point.  All Blue Cross needs to show is clear

12   articulation, and it plainly is present here, Your

13   Honor.

14           Let me turn now to active supervision.  This

15   is the next page of our handout.  It is actually a

16   pretty simple question.  Active supervision merely

17   requires that state officials have and exercise power to

18   review particular anticompetitive acts of private

19   parties and disapprove those that fail to accord with

20   state policy.  That's the Supreme Court Patrick v Burget

21   case.

22           How is that established?  How do you know if

23   the state act can be supervised?  Well, there is a long

24   line of cases on how you know that, but here are

25   examples of the kinds of conduct that have been found to

1    cause active supervision:

2              (1) Acknowledging the presence of challenged

3    provisions in regulatory orders.

4              There is no requirement that the regulator

5    opine one way or the other, the regulator discussing

6    provisions suffices.

7              (2) Reviewing similar conduct in the past

8    with the ability to act in the future.

9              (3) Carrying out regular reviews of the

10   defendant's conduct.

11             (4) Providing a forum to receive and act on

12   complaints.

13             Case after case after case, Your Honor, and

14   these cases post-date the FCC versus Ticor case that the

15   Department of Justice tries to lean on.

16             Now, Your Honor, the Department says, well,

17   Blue Cross has to show that the Commissioner of

18   Insurance reviewed and approved the exact conduct in

19   question.  Not just similar conduct and could review the

20   exact conduct, that is flatly contradicted by the

21   Supreme Court in the Patrick case but that is what they

22   say.

23             Then they say, not only that, but the

24   Commissioner had to review that exact conduct at some

25   exact magical moment.  It can't be retrospective.  It

1    can't be that, oh, the Commissioner looked back at Blue

2    Cross's conduct to evaluate it.  And they say it can't

3    be prospective.  The Commissioner can't look at a

4    conduct clause that hasn't yet taken effect and I say I

5    see this clause is fine.

6             According to the Department of Justice,

7    there is some magic moment at which this review has to

8    occur.

9             And not only that, they say the review must

10   be done with some specific set of procedural hoops

11   imposed on state regulators by federal law where the

12   state has to hold hearings, give notice, take testimony,

13   issue findings and all these things.

14            They're simply wrong on every single point.

15            Now, first of all, the exact conduct, as the

16   Supreme Court pointed out in Patrick, does not need to

17   be reviewed or approved, but it was.

18            And in this case, Your Honor, I would just

19   like to invite your attention to the handout I gave,

20   which is Appendix 2 to our Motion to Dismiss.  It is the

21   Commissioner's Order Approving Blue Cross's Provider of

22   Class Plan.  And I would particularly like to direct

23   your attention, Your Honor, to pages 5 and 15.

24            THE COURT:  This is a separate document?

25            MR. HOFFMAN:   Yes, this is a separate

1    document.  It is titled, Order Issuing Determination

2    Report, and it was entered on July 8th, 2009.

3            In that Order, Your Honor, on page 5, the

4    Commissioner specifically describes a Blue Cross Equal

5    to MFN that are applicable to about half of the hospital

6    contracts at issue here, the Peer Group 5 Hospitals,

7    which are largely the rural hospitals.

8            The Department of Justice attempts to brush

9    the fact that the Commissioner specifically recites the

10   exact cause they're challenging in the Commissioner's

11   Order approving Blue Cross's plan.

12           They try to say, oh, well, the Commissioner

13   wasn't really reviewing anything, he was apparently

14   asleep at the switch and just wrote this by accident in

15   the Order.

16           It is an unbelievably dismissive treatment

17   of the state regulator, but more to the point, it is

18   just wrong.

19           This is where, if you turn to page 15 of the

20   same document, what you will see is the Commissioner

21   describing why he was looking at Blue Cross's

22   reimbursement mechanism including the Equal-to MFNs.

23           And what he says is that Blue Cross's

24   reimbursement methodology is designed to be equitable to

25   ensure and maintain appropriate provider participation

1    levels.  Those policies are described on pages 4 and 5

2    of this Report, which is where he described the MFN.

3             Blue Cross has revised it, and then he

4    describes all this because he was finding that Blue

5    Cross complied with its requirement to provide

6    comprehensive health care access across the State of

7    Michigan.  And one of the tools used to do that was its

8    reimbursement methodology.

9             THE COURT:  You're referring to page 15 of

10   55 or 15 at the bottom of the page?

11            MR. HOFFMAN:   I'm referring to page 15, and

12   I'm hoping we're looking at the right document here.  It

13   is titled at the top, Order Number 09-019-BC.

14            THE COURT:  Mine has across the top the

15   document number from our Court 153, and then page

16   number.  Are you referring to that page 15 or the page

17   15 at the bottom right-hand side of the document?

18            MR. HOFFMAN:  Got it, Your Honor.  Page 15

19   at the bottom right-hand side.

20            THE COURT:  Which starts with, "During

21   2007".

22            MR. HOFFMAN:   Correct.  And the paragraph

23   I'm quoting from here, Your Honor, is the third

24   paragraph in.

25            THE COURT:  Okay.

1          MR. HOFFMAN:  So in other words, Your Honor,

2    this is not just some one-liner in the report, although

3    that would plainly suffice, this review was because the

4    Commissioner's determining Blue Cross's reimbursement

5    policies were designed to enable it to meet its

6    requirement to provide comprehensive universal health

7    care access.

8          Your Honor, the other documents I provided

9    to you tell you a number of things, and what I would

10   invite your attention to specifically are the documents,

11   and this is Document 12-11 and 12- -- I'm sorry, 12-12

12   and 12-13.

13         These are submissions to the Commissioner by

14   the Michigan Association of Health Plans, a collection

15   of Blue Cross competitors, specifically challenging in

16   words that could be quoted from the Department of

17   Justice's Complaint, all of the Blue Cross MFNs at issue

18   here, including the ones the Department of Justice calls

19   Differential MFNs and what I would describe as MFNs that

20   say Blue Cross gets the lowest terms.  And the issues

21   they raise are exactly the issues raised here.

22         Now, the Commissioner didn't see fit to act

23   on that.  But that doesn't mean that the Commissioner

24   was asleep at the switch or not doing his job, as the

25   Department of Justice would have you believe.

 1            The Department of Justice's position here is

 2   no different than if somebody asked the court for relief

 3   and the court doesn't grant it that somehow the court

 4   didn't do anything.

 5            Now, let me just touch briefly on the timing

 6   of the review.

 7            There is no magical moment.  Prospective

 8   review is sufficient.

 9            If you turn, Your Honor, to page 12, and I'm

10   sorry, Your Honor, I'm going to go back to the handout I

11   gave out of our presentation.  Here, we contrast this

12   review that the Department of Justice said suffices for

13   state action in Pennsylvania.  And Pennsylvania, as the

14   Department of Justice said in its briefs, the relevant

15   statute requires the Commissioner to approve contracts

16   before they take effect.

17            And of course, that statute did.  But Your

18   Honor, it didn't require any review of MFN clauses.  It

19   had no requirement that these clauses be addressed in

20   any order.  And there is no evidence that any order ever

21   even mentioned MFN clauses much less review them at

22   issue here.

23            But, as the Department of Justice said then,

24   correctly, quote, a court would likely rule that the

25   policy at issue is exempt from federal antitrust

1    scrutiny.  There is also no set of particular procedural

2    requirements that are imposed on state regulators.

3              Now, Your Honor, if you look at the

4    documents I gave you, and I'm not going to spend time

5    going through them right now, simply reading them, I

6    think, will more than suffice to show you that, in fact,

7    here there were hearings, there was an investigation,

8    there were public decisions.  Every criteria the

9    Department says is required -- wrongly -- was present.

10   But also, Your Honor, if you look at page 13 of our

11   handout, you will see that court after court from the

12   Supreme Court through the Sixth Circuit on down has said

13   by the very nature of the state action doctrine, it

14   imposes no particular procedural straight-jacket on

15   state regulators that would entrench on the federalism

16   justification for state action immunity.

17             So that is my third point, Your Honor.

18   State action, if Blue Cross had to show active

19   supervision, which it doesn't, it plainly is present

20   here.

21             Let me turn to abstention, the last point.

22             Quote, under the Burford doctrine, federal

23   courts abstaining from deciding cases when there is a

24   need to defer to complex state administrative

25   procedures.  That is from the McDonald case from the

 1     Sixth Circuit in 1999.  McDonald versus Village of

 2     Northport.

 3               Page 14 of our handout, Your Honor, lays out

 4     the test. There is no dispute about this test. It is

 5     simply that, as the slide illustrates, that courts

 6     sitting in equity -- and that is important -- must

 7     decline to interfere with procedural orders of the state

 8     agencies if there are difficult questions of state law

 9     or if excise of federal review will disrupt state

10     policy, and that state policy was important.

11               Now, first, Your Honor, health care is

12     clearly a compelling state interest.  The Michigan

13     Constitution says so. Its statutes say so. The

14     regulations say so. The Michigan Supreme Court has said

15     so, as well as other courts.  And if you turn to page 15

16     of our handout, we have collected a whole series of

17     quotes to this effect.

18               It would be preposterous for the Department

19     of Justice to come in and argue that providing

20     comprehensive health care coverage is not a compelling,

21     overwhelmingly important state interest.  And we don't

22     understand them to take that position here.

23               They do say that, well, there is federal

24     antitrust interest at stake here, but Your Honor, that

25     is an irrelevancy.

1                    Abstention is granted in antitrust cases,

2    and moreover, what you should focus on in connection

3    with this issue is what is the relief they're seeking?

4    The relief they're seeking is that Blue Cross be ordered

5    not to enter into MFNs.  That relief could be granted by

6    the Commissioner or by Michigan courts, and there is no

7    argument to the contrary.

8                    So all the relief that the Department of

9    Justice seeks could be afforded by Michigan, which would

10   be the appropriate avenue for that to occur.  There is

11   no compelling federal interest in obtaining anything

12   other than what Michigan could provide.

13                   Now, the Department says, well, we can't

14   bring, we the Department of Justice, can't bring a

15   federal antitrust case in state court review, or in

16   state court.  They don't challenge that there is plenty

17   of avenues for state court review of Blue Cross's

18   conduct or even the Commissioner's Orders, they simply

19   say they can't bring an antitrust case in state court.

20                   That is an irrelevancy.

21                   As the Sixth Circuit said, quote:

22                   "Abstention from exercise of federal

23                   jurisdiction is not improper simply because

24                   the United States is the party seeking a

25                   federal forum."  Closed quote.

 1               That is U.S. versus Ohio, 614 F.2d 101.

 2               The court went on to say:

 3               "The presence of the United States as a

 4               party to the district court proceeding is

 5               irrelevant to the issue of applicability of

 6               federal abstention doctrine."

 7               And in fact, Your Honor, as stated in the

 8    Burford case itself, where the Supreme Court recognized

 9    that the defining issue in equity cases is can the same

10    relief be given in the state proceedings.  And that is

11    not challenged here.

12               The remainder of the Burford test is are

13    there difficult questions of state law and would federal

14    review disrupt coherent state policy.

15               And on that point, Your Honor, I think we

16    have pretty much covered it.

17               Let me just go back to where I began.

18               THE COURT:  Briefly.

19               MR. HOFFMAN:  If you look at page 16, we

20    quote again the Michigan Chiropractic case, which

21    explains why this kind of review is disruptive.  And we

22    quote also from the Accident Fund case from the Western

23    District of Michigan where the Court abstained under

24    Burford from a review of the Commissioner's regulation

25    of worker's compensation insurance because of a

1    disruptive effect of federal review on state insurance

2    as administered by the Insurance Commissioner.

3              Your Honor, this case poses a challenge to

4    and a threat to Michigan's health care system.  Blue

5    Cross is Michigan's insurer of last resort.  It is

6    charged by the state with providing health care service

7    everywhere in the state to everyone in the state, sick

8    or healthy, rural/urban, profitable or unprofitable.

9              If Blue Cross can't insure that it is paying

10   less than commercial competitors who bear no such

11   burden, their competitors could cherry-pick away Blue

12   Cross's profitable insurers, which would drive Blue

13   Cross's costs up, and threaten Michigan's successful

14   health care system.  Thank you.

15             MR. STENERSON:  Good afternoon, Your Honor.

16   Todd Stenerson on behalf of Blue Cross Blue Shield of

17   Michigan.  I will address the pleading deficiencies in

18   the Government's Complaint.

19             First, Your Honor, I think it is important

20   to step back and talk about what is at heart of the

21   dispute here between the Department of Justice and Blue

22   Cross, and that is Most Favored Nation clauses that are

23   contained in hospital reimbursement contracts.

24             And the Complaint that was filed here, Your

25   Honor, followed a several-year, over two different

1    investigations that the Government did of Blue Cross

2    pre-filing.

3            The Government here had hundreds of

4    thousands of pages of Blue Cross materials, subpoenaed a

5    number of -- dozens of third parties, and it had

6    substantial facts at its disposal.

7            Yet, it recognizes that the use of MFN

8    clauses are ubiquitous in the economy.  In fact, the

9    U.S. Government and the State of Michigan uses MFN

10   clauses.

11           Because of the frequency of their use, the

12   Government recognizes, as it must, that an antitrust

13   violation can only be found here and pled here if they

14   violate what is called the so-called Rule of Reason.

15           Under the Rule of Reason, Your Honor, the

16   Government challenges the Blue Cross MFN under Section 1

17   of the Sherman Act.  And in order to do so, it must

18   plead a number of material elements, including the

19   claimed illegal conduct; the relevant product market at

20   issue; the relevant geographic market at issue; the

21   market share of Blue Cross in those markets; and

22   finally, the anticompetitive effect in the relevant

23   markets.

24           On a motion to dismiss, Your Honor, simply

25   the pleading that the existence of MFNs operate as

1   written does not survive a motion to dismiss.

2          In fact, this Court in Blue Cross Blue

3   Shield versus Michigan Association of Psychotherapy

4   Clinics 1980 West Law 1848, Eastern District of Michigan

5   in 1980, held that MFNs do not create price forms.  It

6   is not a form of price fixing.  And that is this Court's

7   own prior ruling.

8          With that backdrop, Your Honor, it is clear

9   that the Complaint here does not allege sufficient facts

10  to plausibly state a claim under both Supreme Court and

11  Sixth Circuit authority.

12         And I would invite Your Honor to

13  specifically look at Twombly versus Bell Atlantic, 2007

14  Supreme Court; Weyerhaeuser versus Ross-Simmons, 2007

15  Supreme Court; and the Sixth Circuit's own opinion in

16  Total Benefits Planning Agency -- And I'm on page 18 of

17  the slideshow -- in which the Sixth Circuit says the

18  Supreme Court requires plaintiffs to identify the

19  relevant product and geographic markets so the district

20  court can assess what the area of competition is and

21  whether the alleged unlawful acts have anticompetitive

22  effects in the market.

23         So here, what does the Government allege?

24  Or more importantly, what do they fail to allege?

25         And Your Honor, Blue Cross submits that the

1   Complaint here fails to plausibly allege product market.

2   It fails to plausibly allege geographic market.  And it

3   fails to plausibly allege Blue Cross's market shares in

4   those markets.

5            Each one of those failures is an independent

6   reason upon which the Complaint should be dismissed here

7   today.

8            THE COURT:  If I find that they fail to do

9   that, why wouldn't I just allow them to amend to do

10  that?

11           MR. STENERSON:  That is a possibility, Your

12  Honor; however, if they were to do that, they would have

13  to meet the required standards to do that.  And as

14  hopefully will become clear, the scope of the markets at

15  issue, both product and geographic, are critical to

16  assessing both the outcome of the case, Blue Cross's

17  defense of the conduct, as well as the discovery that

18  would be appropriate and relevant to both prosecute and

19  defend the case.

20           So these pleading deficiencies are not

21  merely technicalities, they are critical to define the

22  appropriate path of the case if it were to survive past

23  a motion to dismiss.

24           And in that regard, the Government seeks to

25  allege two product markets.   The first is group health

1    insurance.  The second is individual health insurance.

2              And then they plead 17 different geographic

3    markets.  Those geographic markets, Your Honor, are as

4    disparate as St. Joseph County, which comprises of a 521

5    square mile area, all the way to the Upper Peninsula,

6    the area of which comprises 28,093 miles.

7              And in each of the 17 markets they have

8    tried to plead here, there is a different configuration

9    of size; there is a different configuration of

10   hospitals; there is a different configuration of

11   hospitals with MFNs and without MFNs, et cetera.  Yet,

12   the only fact that the Government pleads to support

13   those different market definitions is that people want

14   health care close to their home or work.  And in a

15   moment, I will go into more detail on that, but I would

16   like to go back to the product market specifically,

17   because as I mentioned at the outset, the conduct that

18   is at issue here is in negotiations between Blue Cross

19   and hospitals.  It is not in markets for the sale of

20   health insurance.

21             And that is critical because on the product

22   market front, the Complaint says nothing about who

23   participates in the market for hospitals buying hospital

24   services and who the competitors are in the various

25   aspects of that.

 1                    And that is not an oversight, Your Honor, I

 2     submit, that the Government is unaware.

 3                    One of the documents that was put up to Your

 4     Honor at the beginning of the hearing is a Complaint

 5     that was filed on February 25th, 2011 by the Department

 6     of Justice.  That Complaint, Your Honor --

 7                    THE COURT:  Is this one of the things that

 8     you added up here?

 9                    MR. STENERSON:  Yes, Your Honor.

10                    THE COURT:  And it is which one?

11                    MR. STENERSON:  United States of America and

12     state of Texas.

13                    THE COURT:  What does it say at the top?

14                    MR. STENERSON:  It is a Complaint, Your

15     Honor.

16                    THE COURT:  It is document 12-13?

17                    MR. STENERSON:   May I approach and pass

18     another one?

19                    THE COURT:  Okay, I have it.  I had it

20     anyway, but it looked like something different.

21                    MR. STENERSON:   Your Honor, in this

22     Complaint, which was filed after the briefing in this

23     case was completed, the Department of Justice, many of

24     these same lawyers, sued a hospital in Texas over its

25     contracting policies with insurers, including the Blue

1    Cross entity in Texas.  And in it, in excruciating

2    detail in paragraph 10 to paragraph 20, it explains how

3    the conduct that they're attacking is in the markets for

4    purchasing hospital services.

5              THE COURT:  This is where, paragraph what?

6              MR. STENERSON:  Paragraphs 10 to 20.

7              THE COURT:  Okay.

8              MR. STENERSON:  The point is the Department

9    of Justice understands the markets at issue, and for

10   whatever reason, they did not plead them here.  That it

11   fatal.  Because without the proper product definition,

12   the Court, as the Sixth Circuit said in Total Benefits,

13   cannot even begin to assess whether or not this conduct

14   is subject to antitrust scrutiny.

15             THE COURT:  What do you mean when you saw it

16   is fatal?

17             MR. STENERSON:  It requires dismissal.

18             THE COURT:  Okay.

19             MR. STENERSON:  And --

20             THE COURT:  Rather than permitting them to

21   amend?

22             MR. STENERSON:  Your Honor, it would be one

23   option would be to dismiss without prejudice under

24   Twombly.  That would be an option, although I don't know

25   that is required given the extensive pre-filing

1   investigation that the Government had.

2            THE COURT:  I'm not sure I understand your

3   answer.  Is your answer no, you don't think they should

4   be allowed to amend?

5            MR. STENERSON:  It would be my preference to

6   not allow --

7            THE COURT:  And why would that be?  Why

8   would I allow them not to amend?

9            MR. STENERSON:  It is certainly within your

10  discretion to allow them to amend, Your Honor.

11           THE COURT:  But what I'm asking you is why

12  do you think I shouldn't do that?  If I should find it

13  is not enough.

14           MR. STENERSON:  I don't think you should not

15  allow them permission to amend, Your Honor, I do believe

16  that if an order is issued without prejudice, it should

17  include instructions to meet the appropriate pleading

18  standards of the Sixth Circuit and the Supreme Court.

19           THE COURT:  Okay.

20           MR. STENERSON:  So the failure to plead a

21  product market sufficiently, Your Honor, will permit

22  dismissal, but furthermore, the failure to plead a

23  geographic market here also leads to dismissal.

24           Your Honor, if I could approach the boards

25  over here?

1               THE COURT:  You may.

2               MR. STENERSON:  Now, Your Honor, as I

3     mentioned, there are 17 different geographic markets

4     alleged in the Complaint, one of the largest of which is

5     the Detroit MSA area, which is on this map here.  And in

6     that area, Your Honor, there are 40 hospitals there in

7     operation.  Only 10 of them have MFN clauses, and the

8     surface area of that geographic location is over 4,000

9     square miles.

10               Now, the Complaint alleges a single fact,

11     and I would submit to you it may not even be a fact

12     itself, and that is the Government attempts to draw the

13     geographic boundary around the Detroit MSA on the simple

14     fact that people want health care by their home or their

15     work.  That is the sole fact upon which each and every

16     geographic market pled rests upon.

17               Yet, there is no attempt to explain why some

18     are big or small, all based on the same single fact.

19               THE COURT:  Why some, meaning some what?

20     Why some are big or small?

21               MR. STENERSON:  Correct, Your Honor.

22               THE COURT:  Some what, though?

23               MR. STENERSON:  Oh, I'm sorry, the outer

24     boundaries of the geographic market.

25               THE COURT:  Of the 17?

 1            MR. STENERSON:  Correct.

 2            So for example, in Metro Detroit it is this

 3  line here (indicating) is the outer boundary.  We drew a

 4  60 mile radius circle to show you that under the

 5  Government's theory, all the hospitals within this area

 6  claim to compete with one another, which means someone

 7  in Farmington Hills would willingly drive 60 miles to a

 8  hospital in Port Huron for care.  Yet, if you go to the

 9  west, somebody from Farmington Hills or for that matter

10  Downtown Detroit here from the courthouse would not be

11  willing to drive to Ann Arbor to one of the most

12  prominent hospitals in the Country to get medical care

13  at the University of Michigan Medical Center in Ann

14  Arbor.

15            THE COURT:  Why isn't it that you just

16  disagree with their 17 areas versus they're not the

17  proper 17 areas?

18            MR. STENERSON:  Because the purpose of

19  pleading is to say if the fact pled is true is the

20  conclusion derived from that pled fact support the

21  boundary of the market.  And the only fact in the

22  Complaint is that people want health care service close

23  to their home or work.

24            So in discovery, if the Government were to

25  prove that that is a true fact, and again, I would

1   submit that is not a fact, that does not inform the

2   Court to draw the boundaries where they are drawn.

3           There is no rational relationship between

4   the fact alleged and the conclusion that the Government

5   is seeking to establish.

6           And therefore, discovery would be

7   meaningless because we would simply try to establish

8   whether that fact is true.   But even if it were, it is

9   both insufficient to draw the boundary and inconsistent

10   with the boundary.

11           For example, Your Honor, if we move to the

12   west, if we move out of Southeastern Michigan and we go

13   to the Grand Rapids area, now, we're using the same 60

14   mile radius here because that's the area that would

15   allow patients to go to hospitals within the Detroit

16   boundaries.

17           In the 60 mile radius on the west side of

18   the State, you have one, two, three, four, five, parts

19   of six different markets, again, the line, the outer

20   boundaries of which the Government tries to establish

21   with a simple proposition that people want health care

22   by their home or work.

23           Yet, it suggests that while somebody in

24   Farmington Hills would drove 60 miles to Port Huron, no

25   one from Kalamazoo would drive 60 miles to Grand Rapids.

1   And nobody from Lansing would drive 60 miles to Grand

2   Rapids.

3              So in other words, under the Government's

4   theory, these hospitals here (indicating) do not compete

5   with the hospitals in Grand Rapids; yet, the hospital in

6   Port Huron competes with Beaumont Hospital in Farmington

7   Hills.

8              And because there is 17 different markets

9   encompassing, in the Government's own words, two

10  different product markets, the Government is trying to

11  establish 34 completely separate and independent

12  antitrust violations that Blue Cross has to defend

13  itself against.  And Blue Cross cannot begin to defend

14  itself about what was wrong with MFNs in these

15  independent markets without adequate pleading.

16             And not to mention, Your Honor, it says

17  nothing about the common sense outcome that if I have

18  the need for cancer treatment or cardiac care or my wife

19  is going to have a baby, where are we going to go for

20  service?

21             A couple of months ago, Your Honor, when my

22  little girl had a heart condition, I didn't look for the

23  hospital that was closest, I looked for the best.

24             There is nothing in the Government's sole

25  allegation where it attempts to draw these arbitrary

1   lines, these arbitrary and unsupportable boundaries that

2   even begin to meet its burden of an antitrust market.

3            There is just simply no relationship between

4   the single fact of people want health care where they

5   work or live and where these boundaries are drawn.

6            Specifically, Your Honor, in Todd versus

7   Exxon, a Second Circuit case that the Government itself

8   relies upon, the Court said cases in which dismissal on

9   the pleadings is appropriate frequently involve failure

10  even to attempt a plausible explanation as to why a

11  market should be limited in a particular way.

12            And we submit, Your Honor, here there is no

13  plausible reason why these lines, these geographic

14  boundaries are to be drawn the way they are.

15            And that is fatal, because when it comes to

16  the question of did the conduct at issue here, again

17  under the Rule of Reason, did the MFNs have some sort of

18  anticompetitive effect, the Court, under Total Benefits,

19  needs to look at a combined analysis of the product

20  market, the conduct at issue and the geographic location

21  in which that conduct occurred in order to determine

22  whether there was harm to competition.

23            You know, the Complaint talks about certain

24  competitors in certain markets, and it says Competitor X

25  paid more at Hospital Y.   That is not harm to

1   competition.  And without the starting point, without

2   the proper allegations, fact allegations, that if true,

3   would establish the boundary, it fails from the outset.

4                 Now, any more questions on the map, Your

5   Honor?

6                 THE COURT:  No, thank you.

7                 MR. STENERSON:  Now, Your Honor, moving to

8   --

9                 THE COURT:  One second.

10                 MR. STENERSON:  Sure.

11                 THE COURT:  I'm sorry, you may proceed,

12   Counsel.

13                 MR. STENERSON:  So I've established that the

14   Government has failed to properly plead a fraud market.

15   That is an independent ground for dismissal.  They've

16   failed to adequately plead a geographic market.  That is

17   an independent ground for dismissal.

18                 And now specifically talking about the MFNs

19   themselves, and as I mentioned, without the first two

20   elements, you can't even begin to judge the MFN conduct

21   and whether or not it is susceptible to an antitrust

22   challenge.

23                 But even apart from that, you have to start

24   this case, we submit, from the backdrop that in a case

25   like this, the Supreme Court in Twombly has established

1    that you need to plead a plausible violation of the

2    antitrust laws.

3              And in this case, MFNs are being attacked

4    directly.  And MFNs on their face are discounts.  They

5    are a way a firm like Blue Cross seeks low prices.

6              Blue Cross wants and seeks the best prices

7    for its insurers, and in its arms-length negotiations

8    with hospitals, it seeks to keep costs down.  That is

9    what it tries to do.

10             The MFN is a mechanism in which it can help

11   seek low prices, and the Supreme Court has repeatedly

12   recognized that the federal court should be especially

13   suspect of challenges to discounting practices and to

14   price competition.  And it is upon that backdrop that

15   the Government needs to meet the plausibility threshold

16   of Twombly, and we submit that here they do not do so.

17             Now, in particular, what the Government

18   tries to say as to why the MFNs are an improper practice

19   is they say, well, they foreclose Blue Cross's

20   competitors from competing with Blue Cross.  And Your

21   Honor, I submit they do not.

22             Foreclosure under antitrust law is a concept

23   where a firm enters into an exclusive dealing contract

24   with the supplier so none of its competitors can also

25   contract with it.

1                    So what would that be an example of here?
2      That would be an example of Blue Cross going to one or
3      several hospitals, but let's just use one as an example,
4      and say to them, I will pay you for reimbursement costs
5      but I want an exclusive.  I want to be the only insurer
6      in the State that has a reimbursement contract with you,
7      and everybody else should be blocked out.
8                    In that situation, the competitors don't
9      have access to that hospital because of the exclusive
10     agreement.
11                   That is not what is alleged here.  And by
12     the way, I would submit to you that even if the
13     exclusion was as stark as I just described, there is
14     nothing inherently wrong with such a contract.  And
15     there is no reason to believe that such a contract would
16     raise rates of insurance to other people.
17                   In other words, it is perfectly plausible if
18     a firm were to do that, they would use their exclusive
19     contract with a particular hospital to go out and market
20     to get insureds to say, look, you want to go to this
21     hospital, you need to come buy insurance from me because
22     I will give you access.  And then the other insurance
23     companies can go and compete and get the deals with
24     whatever hospitals they want.
25                   The point is that MFNs, even when you're

1    looking at a complete exclusive agreement, don't and

2    can't have that effect on their face, because on their

3    face, the most they do is guarantee that Blue Cross gets

4    the lowest price.  That is it.  They don't foreclose any

5    competitor from contracting with a hospital.  Every

6    competing insurer in the State has the ability to go and

7    contract with every hospital in the State, and they can

8    have an arms-length negotiation to do that.

9              And with regard to foreclosure or harm to

10   competitors, the Complaint is replete with conclusory

11   allegations about foreclosure or how competitors can't

12   compete, but they do not allege in any sufficient detail

13   the names of the competitors, who else is in the

14   markets, what is happening in the markets.  And that, we

15   submit, Your Honor, is another basis for --

16             THE COURT:  What do you mean what is

17   happening in the market?

18             MR. STENERSON:  Well, for example, if you

19   look at the map, Your Honor -- if I may approach?

20             THE COURT:  You may.

21             MR. STENERSON:  In Flint, again we dispute

22   the boundary that they try to place, but using their

23   current pleading, there are three hospitals, only one of

24   which has an MFN.  So for example, in Flint, they don't

25   say who all the hospitals are.  They don't say who all

1    the potential insurers are.  They don't say which

2    insurers have reimbursement contracts.  They don't say

3    what is the percentage of HMO patients versus PPO

4    patients.  They don't do any of the things that Total

5    Benefits say is required in a Rule of Reason case.

6              And that is something that they have to do

7    for each and every separate market that they allege.

8    They don't have to do it once.  They can't plead by

9    example.  They need to do it for every claim.

10   Otherwise, the result would be a blunderbuss discovery

11   plan covering the entire State with no specificity.  And

12   more importantly, you know, go back to the pleading

13   requirements, there is no facts in the Complaint that if

14   true would support a violation.

15             So again, it is more than a pleading

16   deficiency, it is about the scope of the entire case,

17   and that's why it is so important.

18             THE COURT:  Well, it is not a pleading

19   deficiency, isn't that what you're alleging that they

20   pled deficiently?

21             MR. STENERSON:  Well, what I meant by that

22   --

23             THE COURT: You don't want me to decide the

24   merits at this point, right?

25             MR. STENERSON:  No, that is correct, Your

1    Honor.

2              So when you step back and look at the

3    conduct, and as I explained, you know, these MFNs don't

4    foreclose anybody, at best it just means that Blue Cross

5    gets the lowest price.

6              THE COURT:  So they foreclose people from

7    getting the lowest price?

8              MR. STENERSON:  No, they do not foreclose

9    people from getting the lowest price.

10             THE COURT:  Well, they can't get the same

11   price as Blue Cross, right?

12             MR. STENERSON:  On the Equal-to MFNs they

13   can get the same price; with the Differentials, Blue

14   Cross gets the best price.

15             But that construct, that allegation really

16   falls into the Supreme Court's decision in Weyerhaeuser,

17   and we briefed this in our opening brief, Your Honor,

18   and said that when the Government alleges that Blue

19   Cross overpaid a hospital; i.e., paid more than it

20   needed to for its reimbursement contract, it cannot

21   survive an antitrust challenge unless it also shows that

22   Blue Cross could recoup the monies that it overpaid.

23             And why is that?  Well, because under

24   antitrust law, if a scheme alleged in a complaint does

25   not make economic sense, the courts dismiss them.  And I

1   would submit to you that it doesn't make economic sense

2   that Blue Cross would knowingly overpay for MFNs unless

3   it also had a scheme to recoup any such overpayments.

4          Now in response to that, the Government

5   says, Blue Cross, you misunderstood, we're not alleging

6   you overpaid for all the MFNs, and because we have not

7   alleged you have overpaid, we don't need to show

8   recoupment.  So they admit that they cannot meet the

9   test in Weyerhaeuser, but the critical point to that is

10  if they are now retreating and withdrawing their

11  allegation that Blue Cross overpaid, that simply means

12  that Blue Cross got the best price.  And seeking the

13  best price, under Ocean State, First Circuit case, which

14  is in our brief, is, as a matter of law, not an

15  antitrust violation.  So they can't have it both ways.

16         Now, in order to overcome this, they rely on

17  two cases primarily.  Delta Dental is the first.  A

18  couple of things about Delta Dental.

19         First, Delta Dental is a District Court in

20  Rhode Island decision.  It was pre-Twombly.  It was

21  pre-Weyerhaeuser, and it was not required to follow

22  Sixth Circuit precedence in Total Benefits.

23         But equally important, Delta Dental was a

24  single count of a single market of the State of Rhode

25  Island, the size of which was a thousand square miles

1    with a million people.  In other words, it was one

2    antitrust count that survived a motion to dismiss

3    pre-Twombly.

4              Here, you have 34 separate and independent

5    counts, only one of which, you know, the Detroit MSA is

6    four times the size of the market that was at issue in

7    Delta Dental.  It simply does not control and does not

8    inform the Court in this case.

9              The last case they rely on is Dentsply.  I

10   submit they miscite Dentsply.  Dentsply is 189, 190 and

11   talks about the exclusive contracts at issue and the

12   complete blocking of competitors.

13             As I have explained, MFNs don't completely

14   block anyone.  That case is inapposite.

15             This case is exactly the type of failure

16   that Twombly teaches against and should not take for

17   discovery because it would potentially create an

18   incorrect effect.  And as the Supreme Court said, given

19   the limited success of judicial supervision in checking

20   discovery abuse, and the threat that discovery expense

21   will push cost-conscious defendants to settle even

22   anemic cases before reaching a proceeding, federal

23   courts have been reasonably aggressive in weeding out

24   meritless antitrust claims at the pleading stage.

25             And as the Sixth Circuit said in Nicsand

1  quoting the Supreme Court, and in Nicsand, Your Honor,

2  if you get a chance to review it, it is an extensive

3  review of contracts, and the Sixth Circuit had no

4  problem affirming dismissal at the pleading stage.

5          THE COURT:  Okay, thank you.

6          MR. WAYLAND:  Good afternoon, Your Honor.

7  May it please the Court, I'm Joseph Wayland, Deputy

8  Assistant Attorney General for the United States.

9          I listened to Mr. Hoffman, and he started by

10  saying our case is a, quote, direct attack of Michigan's

11  health care system.  And he said we were interfering

12  with Michigan's ability to provide health care.

13          THE COURT:  Okay, use the mic so we can all

14  hear you.

15          MR. WAYLAND:  As I said, Your Honor, Mr.

16  Hoffman began by asserting that our case is a, quote,

17  direct attack on Michigan's health care system.   And

18  our case interferes with the provisions of health care

19  in Michigan.

20          And I listened very carefully throughout his

21  entire presentation and his Colleague's presentation,

22  and I heard not one fact that tells us how the

23  Government's prosecution of an MFN clause that we allege

24  results in higher prices could possibly, could possibly

25  be construed by anybody as an attack on any state's

1    health care system.

2            The attack on Michigan's health care system

3    are agreements that artificially raise prices and

4    prevent consumers in this State from getting the best

5    health care they can at the best prices.  That is the

6    attack on health care system.

7            Simply put, Your Honor, the Complaint filed

8    by the United States and the State of Michigan alleges

9    in substantial detail that Blue Cross's Most Favored

10   Nation clauses have the effect of raising prices and

11   reducing competition in local markets throughout

12   Michigan for individual and group commercial health

13   insurance.

14           These allegations state a clear violation of

15   Section 1 of the Sherman Act which forbids agreements

16   that unreasonably restrains trade.

17           Blue Cross never comes to grips with the

18   fundamental allegation that the MFNs at issue here raise

19   prices and reduce competition.  Indeed, Blue Cross

20   never says that an agreement that has the effect of

21   raising prices and reducing competition, as we allege,

22   does not state a claim under Section 1.

23           Instead, Your Honor, Blue Cross, in essence,

24   ignores the allegations regarding anticompetitive effect

25   and offers an alternative world view.  And their world

1   view is that Blue Cross is only acting in the public

2   interest and is attempting to, quote, obtain the best

3   possible prices from hospitals.

4           Blue Cross, of course, will have the

5   opportunity to tell its story and challenge the

6   allegations in the Complaint at trial.  But its

7   assertions about its mission and whether its contracts

8   result in lower prices provide no basis to dismiss this

9   Complaint.

10           Nor does the state action doctrine provide

11   any basis to dismiss this Complaint, and I will address

12   that in more detail, but I want to make that fundamental

13   point at the beginning.

14           Blue Cross claims that Michigan's general

15   regulatory scheme cloaks its contracting practices with

16   state action exemption.  But even if a general

17   regulatory scheme were sufficient to provide such an

18   exemption -- and it is not -- the Michigan regulatory

19   scheme cannot under any rational reading be understood

20   to immunize contracts that have the effect, as alleged

21   in the Complaint, of raising costs.  For one of the

22   principle purposes of the scheme, as even Blue Cross

23   admits in its papers, is to lower costs.

24           Indeed, the State itself, through the

25   Attorney General, has joined this action and has

1    expressly stated that it agrees with the United States

2    that Blue Cross is not entitled to state action

3    exemption.

4              Thus, there is no basis for the assertion

5    that the United States has usurped the state of

6    Michigan's authority.  Michigan is sitting at the table

7    with us, they have alleged the same anticompetitive

8    harm, Your Honor.

9              Your Honor, I handed up a presentation, and

10   I also have it on the board here, and we have

11   distributed it to Counsel as well.

12             Three fundamental points, Your Honor.

13   Michigan's policy favors lower health care costs, and

14   the MFNs, which we allege raise costs, are not

15   consistent with that.

16             Federal courts do not abstain from hearing

17   federal claims brought by the United States.  I'm not

18   going to spend any time on that.  That is the Burford

19   issue, Your Honor.  I don't think there is any basis for

20   it.  It is a radical interpretation and I don't think

21   any court has stopped the United States from asserting

22   federal claims.

23             Next, the Complaint plausibly alleges an

24   antitrust violation.  I think our disagreement with the

25   Defendant at this point, Your Honor, is Twombly is

1    plausibility not indisputability, and that is really

2    what we heard from the Defendants.

3              Let's look, Your Honor, at what these

4    agreements are all about.  They're two kinds of

5    agreements that we allege in the Complaint.  There's

6    MFN Plus agreements, and under MFN Plus agreements, Your

7    Honor, the health care provider agrees that Blue Cross's

8    competitors have to pay more money.  It is as simple as

9    that.  Competitors have to pay more money.  And

10   sometimes it is lot more money.

11             If you look at the Covenant example, it is

12   nearly 40 percent more.  Beaumont, a big Detroit

13   Hospital, more than 20 percent more, on down to

14   Ascension Health.  That is what MFN Plus contracts are

15   about.

16             Let's see how they actually work in practice

17   and find out really where the attack on Michigan's

18   health care system is.

19             So on the chart we put up, Your Honor, on

20   the left axis, that is the percentage charges paid to

21   hospitals by the insurer.

22             Typically, the way this works, Your Honor,

23   the hospital has a charge card that it has and an

24   insured gets a discount off that.  And the number down

25   on the left-hand side represents that discount.

1                  And the first set of bars that we have on

2    the left side of the graph, Your Honor, shows what

3    happens without an MFN.

4                  Blue Cross is free to negotiate whatever

5    rate it wants.  If it can get a lower rate than its

6    competitors, that is terrific.  We're not challenging

7    the ability of Blue Cross to go out and negotiate a rate

8    and it may wind up with a lower rate for whatever reason

9    the competitive market allows.  That's okay.  But what

10   the MFN Plus does, Your Honor, as you will see, and we

11   have assumed here that there is 20 point differential.

12   That is, there is agreement between the provider and

13   Blue Cross that says Blue Cross gets a 20 point spread.

14                  What that means is competitors that were

15   willing to charge less are forced up.  Raising the

16   prices.  And even more perniciously, as we have alleged,

17   Your Honor, Blue Cross is willing to pay more to get

18   that advantage.

19                  So this is not an attack on Blue Cross's

20   health system for us to challenge, which is on the right

21   side of the graph, we want to restore competition, what

22   is on the left side.  The attack is on the right side.

23   That is Blue Cross's attack on free market in Michigan.

24                  Let's talk about the MFN Equal-tos. Same

25   kind of graph.

1          On the left side, it is the discounts that

2    are provided.  Before the MFN clause, Blue Cross says a

3    75 percent discount and some competitors negotiated

4    something lower.  Blue Cross then enters into this

5    Equal-to MFN, which raises its rivals costs up to the

6    same level as Blue Cross.  And that hatch point is harm.

7    That is raised prices, Your Honor.  That is not lower

8    prices for Blue Cross, that is higher prices for its

9    competitors.

10          Then you wonder why does this work?  Why

11   isn't it the fact that Blue Cross can't be forced down

12   to the level of the lowest competitor?  Well, the

13   hospital doesn't want to give up the extra money that

14   Blue Cross is willing to pay.  That is the hatched area

15   on the far right, Your Honor.  That is the premium that

16   the hospital is extracting above what a free market

17   price might set.

18          So those are the two clauses we're talking

19   about.  I think we can almost stop here, Your Honor,

20   because I think it is clear that we have alleged that

21   these clauses cause harm raising prices and excluding

22   competition.

23          Let me turn to the state action argument in

24   a little more detail.

25          The Parties agree on the general analytical

1    framework for assessing state action, the two-part

2    concept.

3              The first part has to do with has the state

4    legislature articulated a clear and affirmative policy?

5    There are two subparts to that.  Whether done expressly;

6    if not, was it the logical and foreseeable result of the

7    legislation.  And you have to get through that.  That is

8    a barrier.  If you can't get through that, you never get

9    to the second test, which is if the policy is clearly

10   articulated, has the state actively supervised the

11   anticompetitive act.

12             As I think we have argued persuasively, Your

13   Honor, Blue Cross can't meet the first test.   They

14   can't show that this is a clear articulated policy;

15   therefore, you should never have to reach the second

16   test.

17             So what we agree on the framework, Blue

18   Cross's application of the framework begins by

19   misstating its burden and then builds its argument on

20   exactly the wrong legal standard.

21             Both Blue Cross's proposed burden and its

22   standards have been rejected by the Supreme Court and

23   the Court of Appeals for the Sixth Circuit.

24             Blue Cross said this is a low hurdle state

25   action doctrine, geez, we will walk in and we will get

1   it.  The Supreme Court said, no, no, disfavor is

2   required, and it is a rigorous application.  The Court

3   doesn't like this doctrine.

4             Sixth Circuit, narrowly construed.  Devaugh.

5   Missing from their brief, Your Honor.  It is the leading

6   case on this point, and it is missing from their opening

7   brief.

8             With respect to applicable legal standard,

9   as I said earlier, Blue Cross alleges essentially that

10  general regulatory system is sufficient.

11            You know, they said we can't point to a case

12  that isn't.  There actually is not a single case that

13  holds that a general regulatory system, as they have

14  alleged here, is sufficient to meet the state action

15  doctrine.  Not one.  Not a single one.

16            And there is a reason for that, because the

17  leading case, which they didn't cite in their opening

18  brief, says grants of general or mutual authority will

19  not satisfy a clear articulation component of the state

20  action exemption.  Will not.  Sixth Circuit.  Right on

21  point.  Not cited in their briefs.

22            And the Supreme Court decision in Ticor,

23  Defendants must show particular anticompetitive

24  mechanisms operate because of a deliberate and intended

25  state policy.  Supreme Court.  This is critical, Your

1    Honor.  This is a critical phrase:  Particular

2    anticompetitive mechanism.

3              And in this case, that's the MFNs operate

4    because of a deliberate and intended state policy.

5    That is the standard.

6              Now, in attempting to meet the standard,

7    Your Honor, Blue Cross points to no specific provision

8    of any law or regulation that clearly articulates the

9    State's intention to exempt MFN clauses from antitrust

10   scrutiny.  Instead, Blue Cross points to a hodge-podge

11   of statutory provisions, court opinions and regulations

12   that provide general policy guidance.  This doesn't

13   satisfy the burden.  They must point to something

14   specific.

15             The cases they cite on their behalf make

16   this clear.  Those cases fall into two categories

17   essentially, Your Honor.  Cases where there is either a

18   specific provision expressly authorizing the conduct in

19   question or an expressed statement of general immunity.

20   That is how the cases break down.

21             An example of the first set are the rate

22   setting cases of Southern Motors that they cite.  That

23   is where a state or federal government sets up an entity

24   to prescribe rates for trucking.  That clearly displaces

25   rate competition.  And that is direct.

1          A second example of or an example of the

2    second approach is Jackson Hospital, which they also

3    cite, and in Jackson Hospital, there is an expressed

4    provision permitting the hospital to act irregardless of

5    the effect on competition.  It is a free pass, and it is

6    expressed.  Free pass.  Expressed.

7          We don't have a free pass here, and we don't

8    have any specific conduct approval by the state.

9          Let's say a word about Hallie, which they

10   rely on substantially, Your Honor.  That is a case

11   involving the authorization by the state for a local

12   municipality to build a sewer system, and with that

13   authorization came the freedom expressed by the state

14   that it would have -- the municipality would have no

15   obligation to provide service beyond its limits.

16   That's expressed.  You can go out and build a sewer, but

17   you don't have to build it for your neighbors.   When

18   neighboring municipalities brought an antitrust claim,

19   the Court said yes, that is the foreseeable result.

20   When you say you don't have to provide this, when

21   somebody shows up,  you don't have to do it.  That is

22   the kind of expressed intent that the court was talking

23   about.

24          So all these cases show that you need to

25   point to a specific provision directed to their practice

1   at issue which specifically permits conduct to occur

2   without regard to a particular fact.  Blue Cross doesn't

3   do that.

4              Okay, so even if they could rely on general

5   provisions, Your Honor, which they can't, the Michigan

6   regulatory scheme simply does not displace competition.

7              That is the word they all use, displace

8   competition.  I can't find that word anywhere in any

9   statute or regulation.

10             To the contrary, the Michigan scheme seeks

11  to encourage competition where possible and to ensure

12  lowest possible costs.

13             At pages 27 and 28 of our brief, we have

14  identified numerous provisions of the Michigan

15  regulatory scheme showing that the Legislature truly did

16  intend to encourage competition.  We have some of them

17  on the board, I am not going to go through with them

18  given the amount of time we have, but what I do want to

19  focus on, Your Honor, is the provision that Blue Cross

20  cites on its behalf that shows that the regulatory

21  scheme that displaces competition and allows

22  anticompetitive agreements that raise costs.

23             Here is what Blue Cross says.  I didn't make

24  this up, this is them.

25             "Blue Cross contracts with providers must

1               have reasonable cost controls."

2               The purpose of the Act, they say, is to

3    check rising health care costs.  The Michigan regulatory

4    scheme combines both free market and government

5    regulatory methods of control.

6               Just that last phrase, which we have

7    highlighted, is not consistent with their claim that the

8    whole scheme displaces the free market.

9               It just doesn't make sense, Your Honor.

10              Also, there is nothing in the scheme, this

11   sort of scheme, that suggests that an MFN would

12   interfere with any of this.  Nothing to suggest that the

13   MFNs at issue here would be the logical result of any of

14   these provisions.

15              So I think that is the end of the inquiry,

16   Your Honor, as to clearly articulated, and I think that

17   should be the end of your inquiry as to this whole state

18   action because I don't think they can make a showing or

19   come close to making a showing of any specific intent.

20              But if we had to go on, Your Honor, the

21   first issue is whether Blue Cross gets the benefit of

22   the Hallie benefit; the Hallie benefit.

23              Hallie is a Supreme Court case involving

24   whether a municipality had to satisfy the actively

25   supervised test, Your Honor, and the only question

1   before the court in that case was whether a municipality

2   had to satisfy the test.

3           Now, Blue Cross is not a municipality.  By

4   its own admission, it is a private entity.  It is a

5   private corporation by its own admission.  And it has

6   its own officers and board of directors.

7           So the controlling authority, Your Honor,

8   for determining whether an entity like this, a private

9   entity, is entitled to the Hallie benefit, is the Sixth

10  Circuit opinion in Riverview Investments versus Ottawa

11  Community.  Again, it is controlling.  It is not cited

12  by the Defendants in their opening brief.  And I think

13  that is glaring and telling.  The claim was similar to

14  what Blue Cross is making here.  There, there was an

15  entity described by the court that appeared to have a

16  private structure and an organization combined with

17  alleged public functions.

18          Just a minute on the facts of that case,

19  Your Honor.  Ottawa Community Improvement Corporation

20  was not-for-profit organization whose sole purpose was

21  to review requests for industrial revenue bonds on

22  behalf of the municipality.  That was its job.  That was

23  its only function.  The bonds couldn't be issued without

24  approval from Ottawa CIC.

25          The Court of Appeals noted that Hallie

1   didn't provide a test for determining whether an entity

2   like that is public or private for the purposes of the

3   state action exemption.

4           The Court in Riverview made a critical

5   distinction -- very important here, Your Honor --

6   between acting pursuant to state policy and performing a

7   government function.  A public act versus acting in

8   accordance with the state plan.

9           Acting in accordance with the state plan,

10  which is what Blue Cross says it is doing here, is not

11  enough.

12          So approving industrial bonds for a

13  municipality according to a plan approved by the

14  municipality wasn't sufficient to get the state action

15  exemption.

16          The Court specifically held that acting

17  within legislative parameters in a plan approved by a

18  municipality is not evidence of a public function.  And

19  that is a holding that even though CIC was not selling a

20  product in the commercial market, as Blue Cross is here,

21  Blue Cross has not and cannot claim that selling

22  commercial insurance in competition with other insurers

23  is a public function.  Instead, it simply claims that it

24  is acting according to a state plan, and as Riverview

25  makes clear that this simply is not good enough.

1           Another way to say this, Your Honor, is the

2    way that you read in Hovencamp, which is a seminal

3    antitrust view where they say questions of state action

4    can't be resolved by discovering a state mandate that

5    the organization serves the public interest.  Which is

6    essentially what Blue Cross is arguing here.  Much more

7    important, though, is the body structure, the

8    membership, decision-making apparatus, et cetera.

9           So in addition to setting out this basic

10   standard, Your Honor, the Riverview Court also noted

11   several specific structural facts about the bond

12   approving unity that it considered in deciding that the

13   entity wasn't -- didn't have the state action defense

14   available to it:  Independent majority board of

15   directors; Pursuing its own economic interest; Ability

16   to control training and orientation of its own

17   personnel; The right to set group rates and charges; Not

18   a political subdivision; Didn't exercise governmental

19   authority; The state specifying competition of the board

20   was insufficient; and, the state power to terminate

21   existence was insufficient.

22           So if you apply that test here as well as

23   the general test, Blue Cross doesn't come close to

24   getting the cloak of Hallie.

25           Let me turn finally on this area, Your

 1   Honor, to the active supervision issue.

 2            The review of standard is whether the

 3   anticompetitive conduct is the state's own.  That is the

 4   Supreme Court's test. Is the anticompetitive conduct the

 5   state's own.  It is a factual issue.  They failed to

 6   raise any issue of fact on any of their arguments, and

 7   they should know since they're the ones that deal with

 8   the State that if they had anything better to say, they

 9   would have come forward with it.

10            Here is their argument.  The Michigan law

11   requires that the Commissioner of the Office of

12   Financial and Insurance Regulation review Blue Cross's

13   provider class plan with health care providers.  The

14   MFNs are included in the contracts with the health care

15   providers issued in accordance with the plan.  The

16   Commissioner reviewed the plan, and therefore, he

17   reviewed and approved the MFNs.  That is their argument.

18            Here is the problem with the argument, among

19   others.  It is apparent on the face of the document and

20   they handed it up to you, Your Honor.  The document is

21   Appendix 2 to their Memo, but Mr. Hoffman, I think,

22   handed it up to you.  He pointed you to page 5 and page

23   15.  Let's start with what the document says it is.

24            It is a report by the Commissioner limited

25   to the following:  Determining whether the plan meets

1    three legislative goals.  Regarding access to health

2    care.  Quality of health care.  And cost goals.

3             When you read the report, that is what it

4    does.  It reviews the plan, doesn't analyze the effect

5    of individual contractural provisions.  It doesn't

6    indicate that the Commissioner otherwise engaged in

7    review of the contracting provisions.  And it certainly

8    doesn't indicate any approval of the contract clauses.

9             That is in contrast, Your Honor, to cases

10   like Jackson, which they cite, or the Southern Transport

11   cases in which the agency reviews the rate and makes a

12   decision on it.

13            And, in fact, if you read the whole report,

14   you will see that the Commissioner concludes that Blue

15   Cross hadn't even met its cost goals.

16            Now, as the Supreme Court made clear in

17   Ticor, theoretical mechanisms for review for minimal

18   scrutiny is not enough.  You have to show that the

19   mechanism operates because of an intended and deliberate

20   state policy, and it is the state's own.

21            Now, the best that they can do is point --

22   well, they say in their brief that the PCP specifically

23   cited the MFN.  If you look at page 5, there is one

24   sentence:  Hospitals must attest that the rates are at

25   least favorable to those as other nongovernmental

1    insurers.  It is a description of a clause, Your Honor.

2              And by the way, it is only the MFN Equal

3    Clause, it is not the MFN Plus Clause.  It doesn't

4    approve the clause.  It doesn't indicate that it was

5    considered in anyway or that it is the state's own.  At

6    most, it is minimal scrutiny, and it is not enough.

7        And every assertion that the Commissioner

8    reviewed the plan and approved the MFN is based on that

9    one sentence in that report.  That is it.

10             Active supervision, they haven't met it.

11             Let's turn quickly to Burford.  I'm not

12   going to say anything about this.  As I said, it is

13   extraordinary circumstances.  No court has ever

14   sustained an antitrust action by the Federal Government.

15   So I don't think I have to say any more on Burford.

16             Let me turn to Twombly.  The Twombly test is

17   plausibility not indisputability as Blue Cross suggests.

18             Blue Cross has two principal Twombly

19   arguments as I understood from the presentation today

20   and from their brief.  One is essentially factual and

21   one is essentially legal as far as I can understand it.

22             The factual arguments focuses on the

23   allegations regarding product and geographic markets.

24   Essentially it is a complaint about lack, we haven't

25   plead enough facts or they disagree with the facts.

1                    With respect to product and geographic

2       markets, let's start with the then Judge Sotomeyer's

3       observation that because market definition is deeply

4       fact intensive, courts rarely grant motions to dismiss

5       on either product or geographic markets.  And I think

6       recognizing this high hurdle, Blue Cross doesn't seem to

7       take its attack on these two seriously.  There is not

8       very much in the reply about the product and geographic

9       markets.  And there is not much that can be reasonably

10      said about foreseeability of the product and geographic

11      market we have alleged.

12                   As to the product market, we have alleged

13      group and individual commercial health insurance.  We

14      allege at paragraphs 20 to 24 why those are relevant

15      markets.  Why they're plausible.  Blue Cross insurance

16      provides access to a provider network which insures, and

17      insures is considered to be very important.  There is no

18      reasonable alternative, and it is much more extensive to

19      go outside of the network.

20                   With respect to the individual, individual

21      commercial insurance, same thing.  No alternative.  If

22      you go outside the insurers, you have to self-fund.  And

23      that is just too extensive.

24                   That is plausible.  That is common sense.  I

25      didn't hear any argument that that wasn't common sense.

1              If they want to test that with facts and say

2    that is not how the markets work, they're free to do

3    that during the proofs, but not on a motion to dismiss.

4              Geography, it is true, we have a major fact

5    that underlies the user markets, Your Honor.  Consumers

6    want health insurance that provides access to local

7    health care providers, doctors and hospitals.  Yes, as

8    the Defendants said, that is what we allege.  That is

9    common sense.  They may disagree.  They may have some

10   proof.  They may find an expert who says that is not

11   true, that people like to get in the car to drive 300

12   miles to find a doctor, they can put that proof on, but

13   there is really no question, Your Honor, that it is

14   plausible that people choose their hospitals and their

15   doctors on proximity to where they live.

16              And that is what we had to allege.

17              But we did more than that.  We did that at

18   paragraphs 25 to 32; general terms at paragraphs 49

19   through 77, we went through individual markets.  And we

20   got much more specific, which we didn't need to do under

21   Twombly.  Icing on the cake, Your Honor.

22              But just take a look at the maps.  We saw

23   some maps.

24              THE COURT:  Are these maps in yours?

25              MR. WAYLAND:  Yes, they're in the

1    presentation, Your Honor.

2             Let me say a word about what the Defendants

3    would have us do.  As I understood it, they're angry at

4    us because some of our markets are geographically small

5    and some of our markets are geographically big.  Can you

6    imagine if we came in with a 20 by 25 mile block and

7    carved up the State of Michigan and said, well, those

8    are all the same size and they're the markets.  They

9    would be in here saying that is crazy.  But now they're

10   saying small geographic market size is wrong.  Well,

11   there is a reason that small geographic markets are

12   there.  Because we looked at individual markets, and we

13   have alleged that there are differences.  So in Lansing,

14   part of the issue is, how far will somebody drive to go

15   to a doctor?  Will they drive to Flint?  Will they drive

16   to Jackson?  Will they drive to Kalamazoo?  And I think

17   our quote plausible market that 80 miles to get to the

18   doctor or 59 minutes is too long if you can go to the

19   hospital in Lansing in 15 minutes.  And there is plenty

20   of court authority that says you can allege a single

21   city, a multi-city, counties or states, whatever.  It is

22   fact specific.

23            We've got a proposition that people would

24   rather drive to the neighborhood hospital than to get in

25   a car and drive to Flint.

1               They can come in and disprove it, but they

2    can't challenge it on a motion to dismiss.

3               Let me draw the Court's attention to a

4    March, 2011 decision by the Fourth Circuit, Dupont v

5    Kolon, 2011 West Law 834658.  We're going to hand it up

6    at the end.  It overturned the district court's decision

7    for failure to state a geographic market.  It is a very

8    thorough and appropriate analysis noting that markets

9    may be as large as the U.S. or as small as a single

10   city.

11              I'm not going to go through it given the

12   time, Your Honor, but --

13              THE COURT:  Wait a minute, tell me what this

14   citation is.  Do you have --

15              MR. WAYLAND:  We handed it up, Your Honor.

16              THE COURT:  Well, hand it to the people who

17   are going to reply so they can look at it while you're

18   arguing, and then if they want to say something about

19   it, they can say something about it, if they don't

20   already know it.  They may already know it.

21              Do you already have that?

22              MR. STENERSON:  No, Your Honor.

23              THE COURT:  So take a look it is.  And it's

24   2011 West Law 834658; is that right?

25              MR. WAYLAND:  Yes, Your Honor.

1            The court deals with similar arguments as to

2    what Blue Cross has made here, and it says really there

3    are two bases you can dismiss on a failure to plead a

4    market, and that is plead no market at all.  And by the

5    way, that is what Total Benefits is, Your Honor, the

6    case they rely on.  That was a case where there was no

7    geographic market alleged at all.  We have the Complaint

8    that we're going to hand up at the end, Your Honor, and

9    what the court said is if you're not going to allege a

10   market, you've got to give us some facts so we can

11   figure it out ourselves.  So that is a case where there

12   is no market alleged at all.

13           Anyway, Twombly says, look --

14           THE COURT:  And it's spelled C O L O N?

15           MR. WAYLAND:  It's K O L O N.

16           If you don't allege a market, you're out.

17   If your market is unreasonably or implausibly narrow,

18   you're out.  And if your market is self-contradictory,

19   you're out.

20           I don't think that test damages us at all,

21   Your Honor.

22           So that is market and product definition.

23   Let me turn to what I sort of understand to be a legal

24   argument, which is that we haven't shown recoupment, we

25   haven't pled recoupment, and we haven't pled foreclosure

1    sufficiently.

2              So Blue Cross claims that the Complaint

3    fails to allege recoupment.  There is a fundamental

4    problem with this, Your Honor.  They have the wrong

5    section of the Sherman Act.

6              This is a Section 1 case, which has to do

7    with agreements that unreasonably retrain trade.

8              Recoupment, Your Honor, is a concept

9    associated with unilateral behavior by a monopolist or a

10   would-be monopolist engaged in predatory pricing or

11   predatory bidding.  These are acts subject to challenge

12   under Section 2 of the Sherman Act, as the cases cited

13   by Blue Cross make clear.  They're Section 2 cases, Your

14   Honor.

15             Specifically, Blue Cross likens this case to

16   a predatory bidding case.  And as the Supreme Court said

17   in Weyerhaeuser, you have to prove two things in a

18   Section 2 predatory bidding case.  That the monopolist

19   or would-be monopolist drives up the price of input

20   above the revenues generated by the sale, and that the

21   monopolist will have the capacity to get that money back

22   at the end.  Takes a loss, gets it back.  That is what

23   recoupment is about.  It is a Section 2 claim.

24             This is a Section 1 case challenging the MFN

25   agreement and its effect on competition.

1                    It is not a case about the specific price

2      that Blue Cross is charging.  It is not a case about the

3      specific price that Blue Cross is charging.

4                    We are not saying that the anticompetitive

5      act is a unilateral act of paying too much, as Plaintiff

6      alleges in Weyerhaeuser, we're saying that the MFN

7      agreement, not the specific price paid by Blue Cross,

8      have the effect of raising the costs that would prevail

9      in a truly competitive market.  That is an unreasonable

10     restraint of trade under Section 1.

11                   It doesn't matter for Section 1 purposes

12     whether Blue Cross is buying above or below the price at

13     which it can make a profit, what matters is the price is

14     higher than it would be in a competitive market because

15     of the agreement.  Not because of the price.

16                   That is the fundamental problem, they have

17     confused Sections of the Antitrust Act.

18                   And Blue Cross pays for the MFNs and passes

19     through those rate increases to its customers.  It is

20     not ensuring short-term losses, so it is paying more.

21     It is not predatory in the Burford or Weyerhaeuser

22     sense, and it results in direct harm to consumers, which

23     wasn't present in Weyerhaeuser.

24                   So that is recoupment, Your Honor.  Wrong

25     Section of the antitrust laws.

1           Foreclosure.  This I had a little more

2    trouble understanding exactly what the complaint seemed

3    to be.  But as far as I can understand it, Your Honor, I

4    think what they're saying is that the Complaint failed

5    to adequately plead foreclosure, and then we had to use

6    those magic words somehow.  But of course, the law

7    doesn't require that.  There are no magic words in the

8    antitrust world.

9           I think essentially what the argument is, it

10   is a claim that the Complaint fails to properly plead

11   anticompetitive effect.  That is what I think they're

12   trying to say.  But in fact, the Complaint pleads much

13   more about the anticompetitive effect than is required

14   under the law.

15          If you look at paragraphs 41 to 49, the

16   anticompetitive effects are alleged in substantial

17   detail.  Effect on prices, restrictions on competition,

18   gives a bunch of markets.  That would be enough under

19   Twombly.  But the Complaint does much more.  Paragraphs

20   49 to 79, Your Honor, those paragraphs are specific

21   illustrative examples of harm.  Thus, the facts alleged

22   in the Complaint show exactly what Blue Cross says the

23   law requires.

24          A competitor is foreclosed in the antitrust

25   sense whenever it is substantially disadvantaged and its

1    access with significant input.

2              The Complaint identifies access to hospital

3    services at discounted rates as a critical input to

4    competition in the health insurance markets.  And that

5    is important because employers and individuals demand

6    that health insurance plans provide access to networks

7    of doctors and hospitals that are close to their homes

8    and work places.

9              The fact that the insurers either accept

10   price increases with hospitals with MFNs rather than

11   drop the hospital from the network or declines to enter

12   markets where important hospitals have MFNs shows the

13   factual linkage between the MFN clauses and the harm to

14   competition and the health insurance market.

15             And we give a particular example, Your

16   Honor, in the Thumb area, there are eight hospitals, all

17   with MFN clauses.  We allege very specifically that the

18   effect of the MFN Clauses drives up the cost of hospital

19   services.  It didn't use the MFN to get a lower price,

20   Your Honor, as we allege, but to insure that prices were

21   raised.  That's all we have to allege.

22             Well, they say maybe we should have done it

23   for all 17 markets, every hospital.  We don't have to do

24   that.  Twombly doesn't require it.  We have stated

25   enough to satisfy our Section 1 pleading requirements.

1            Now, the same issue was before the Court in

2    Delta Dental.  The Defendants don't like it because it

3    is right on point.  The Court sustained a complaint in

4    which the Government alleged that the not-for-profit

5    insurers use of MFN clauses caused higher consumer

6    prices.

7            The anticompetitive analysis there focused

8    on the effects of the clause which were alleged to be

9    excluding rivals, retarding expansion and increasing

10   health care costs.  The Court didn't require the

11   pleading some percentage of proposes.  That is not at

12   stake here, we pled increased costs.

13           So Your Honor, just to sum up, let's go back

14   to the second slide.

15           THE COURT:  I can go back to the second one,

16   what page are you on?   The summary page?

17           MR. WAYLAND:  Yes, the summary page.

18           It doesn't matter, I can just talk through

19   it, Your Honor.

20           THE COURT:  Okay.

21           MR. WAYLAND:  The claim here is that we

22   somehow interfered with the health care system in

23   Michigan.  We haven't done that.  But interferes with

24   the health care system in Michigan is contracts that

25   raise prices above competitive levels.

1          Blue Cross is not entitled to the state

2     action exemption.  It is a self-administered private

3     entity.  And we have satisfied the Twombly requirements

4     which simply require plausible market.  And plausible

5     harm.  Thank you, Your Honor.

6               THE COURT:  Alright, thank you.

7               MR. PASCOE:  The Motion to Dismiss addresses

8     both the federal claims and the Michigan specific claims

9     under Michigan Anti-Reform Act.  I thought this was

10    their Motion to Dismiss argument, but they didn't

11    address that.  So I don't know when --

12              THE COURT:  You want to argue?  That's fine,

13    you can argue.

14              MR PASCOE:  As it relates to Michigan

15    specifically.

16              THE COURT:  You can.  Go right ahead.

17              MR. PASCOE:  Thank you, Your Honor.

18              THE COURT: I assume they were relying on

19    their pleadings for that.

20              MR. HOFFMAN:  Your Honor, if I may, what we

21    actually had suggested was that we address the State

22    issues after all the Federal issues, but we're happy to

23    rely on our pleadings for this, and if I might say a

24    word in response to Counsel?

25              THE COURT:  But your timeframe is like over

1   an hour, almost an hour, so I assumed you were focusing

2   on what you wanted to focus on in oral argument.   I

3   didn't expect that you were going to take another how

4   long?

5             MR. HOFFMAN:  I think for this --

6             THE COURT:  Well, I think I will let him

7   argue and you can reply.

8             MR. PASCOE:  My comments are brief.

9             THE COURT:  You don't have to make your

10  comments brief.  I wasn't intending for the Government

11  or Michigan to make their comments brief.

12            MR. PASCOE:  Thank you, Your Honor.

13            My name is Dee Pascoe with the Michigan

14  Department of Attorney General for the State of

15  Michigan.  And the State of Michigan concurs in the

16  Department of Justice's arguments and briefs opposing

17  their Motion so far, and I'm not going to repeat any of

18  that, I'm just going to address the Michigan specific

19  claim.

20            THE COURT:  Okay.

21            MR. PASCOE:  Because that is what we wrote

22  separately about.

23            THE COURT: Okay.

24            MR. PASCOE:  Blue Cross Blue Shield of

25  Michigan argued that as it relates to the Michigan

1    Antitrust Reform Act that there were three exceptions

2    that would apply and result in their conduct not being

3    reviewable under that Act.  And that comes up under

4    Michigan Compiled Laws 445.774.

5              The first subsection is Subsection 6 which

6    says that the Act shall not apply to a transaction or a

7    conduct of an unauthorized health maintenance

8    corporation when the transaction or conduct is to reduce

9    cost of health care and is permitted by the

10   commissioner.  The list is health maintenance

11   corporations, health insurers, medical care corporations

12   or health service corporations or health care

13   corporation.  When the transaction or conduct is to

14   reduce the cost of health care and is permitted by the

15   Commissioner.

16             So this particular Subsection in the

17   Michigan Antitrust Reform Act clearly refers to Blue

18   Cross by its reference to the health care corporations

19   as we discuss in the brief.

20             And as alleged in the Complaint, the

21   Complaint alleges that these MFNs are used not to reduce

22   the cost of health care but to, in fact, increase them.

23   So this Subsection does not apply.

24             The second issue with that is whether it is

25   permitted by the Commissioner.  And as the Department of

1   Justice has already addressed, it is our position that

2   this particular conduct was not permitted by the

3   Commissioner.

4           And we argued in the brief that this is the

5   Subsection that is most applicable because it refers to

6   the health care corporations specifically.

7           The other two Subsections are Subsection 4

8   of 445.734, and that talks about the Act does not apply

9   to a transaction or conduct that is specifically

10  authorized.  And our position, as you have already been

11  explained, is that this particular conduct has not been

12  specifically authorized.

13          Moreover, Subsection 6 is the specific

14  applicable part.

15          And then, the last Subsection is Subsection

16  5 that we referred to which talks about when a

17  transaction or conduct made unlawful by this Act shall

18  not be construed to violate this Act where it is the

19  subject of a legislatively mandated pervasive regulatory

20  scheme which confers exclusive jurisdiction on a

21  regulatory board or officer to authorize, prohibit or

22  regulate the transaction or conduct.

23          And in this regard, again, the first point

24  is that Subsection 6, which refers specifically to

25  health care corporations, is the specific exclusion that

1    would apply because those requirements are not met.

2              And secondly, this Subsection, Subsection 5,

3    refers to exclusive jurisdiction, and it is our position

4    that there is not exclusive jurisdiction in this case

5    because of the other avenues of redress that are

6    available.

7              So just to wrap it up, the Michigan

8    Antitrust Reform Act applies to the review of these

9    MFNs.  Subsection 6 is the one that could possibly

10   exempt them under MAR, but the allegation in the

11   Complaint is that these MFNs are used in a way that does

12   not reduce costs, and therefore, that Subsection does

13   not apply.

14             And moreover, just generally, the Michigan

15   policy in regard to this issue which is covered and

16   stated in P.A. 350, which is 550.1102, are those three

17   basic things of access for people to quality care and

18   cost containment.  And that dovetails perfectly with the

19   reference in Subsection 6 where the conduct will be okay

20   if it is to reduce cost.

21             But in this particular case, the allegations

22   are that these contractual provisions are being used in

23   a way that does not reduce costs; and therefore, these

24   exceptions don't apply.  Thank you, Your Honor.

25             THE COURT:  Alright, thank you.

1          MR. HOFFMAN:  Thank you, Your Honor.  Bruce

2    Hoffman again for Blue Cross Blue Shield of Michigan.

3          THE COURT:  And I'm sorry that I

4    misunderstood you, but I didn't anticipate that you

5    would want another whole argument.

6          MR. HOFFMAN:  Your Honor, we're going to

7    stand on our briefs after listening to the State.

8          THE COURT:  Okay.

9          MR. HOFFMAN:  Let me turn to responding to

10   the DOJ's argument on state action, and I'm going to

11   simply go, Your Honor, in exactly the order that Mr.

12   Wayland went.

13         THE COURT:  But it is not necessary for you

14   to repeat your beginning argument.

15         MR. HOFFMAN:  I have no intention of doing

16   that, Your Honor.

17         Let me start very quickly by saying that

18   re-pleading does not solve the state action or

19   abstention problems here.

20         After two years of investigation and half a

21   million documents, we would submit that dismissal with

22   prejudice on the regulatory offense is extremely

23   appropriate.

24         Now, let me turn to the arguments Mr.

25   Wayland made.

1           First he said that it is inconceivable that

2    attacking provisions in defense that has the effect of

3    increasing prices could possibly interfere with

4    Michigan's regulatory scheme for health care, how could

5    that be?

6           The answer, and the reason why this case is

7    a flat-out attack on Michigan's health care system is

8    quite obvious and explained in detail in our briefs.  It

9    is because it precludes us to hollow Blue Cross and the

10   Commissioner by depriving Blue Cross of the advantages

11   the State expressly gave it, the ability to use its size

12   to achieve competitive advantages in its hospital

13   contracts over its competitors while leaving Blue Cross,

14   which is the instrument of state policy, the insurer of

15   last resort, the entity that has to, and the only entity

16   that has to provide health care coverage everywhere,

17   this case would leave all of those burdens on Blue

18   Cross's shoulders while taking from it the benefits the

19   State gave it.

20          And Your Honor, in doing that, by virtue of

21   a permanent injunction and an order, which the

22   Department seeks, the Department would turn this Court,

23   an antitrust court, into a super regulator of Blue

24   Cross's contracting policies.  And if you have any doubt

25   about that, Your Honor, read their request for relief.

1    They don't just ask, although this would be far more

2    than enough to overturn Michigan's health care system,

3    but they don't just ask for an injunction against MFNs,

4    they ask for an injunction against any form of contract

5    or arrangement that has the same purpose or effect as an

6    MFN.

7            How is that to be assessed without this

8    Court sitting once a month, once a week, whatever it

9    might take to figure out if every provider contract Blue

10   Cross signs has the same purpose or effect as an MFN?

11           This would Michigan health insurance scheme,

12   health care system upside down.

13           Now, the Department of Justice mentioned

14   that the State has joined the Attorney General in these

15   arguments.  Obviously, we have a response to that in

16   Ocean State, but I would also just note that if you look

17   at the Sixth Circuit decision in Jackson Tennessee

18   Health Care at page 613, the Sixth Circuit was easily

19   dismissive of the fact that State Attorney Generals

20   arguing against state action immunity doesn't deserve

21   any particular weight.

22           The next argument that Mr. Wayland made and

23   a point that was sort of a point he made several times

24   is that the test for a clearly articulated state policy

25   is, as he put it, the state must have a policy to allow

1  the anticompetitive act.  They must be specifically

2  authorized.  They must be specifically and explicitly

3  identified.

4           Your Honor, let me point you back to slide 7

5  in our presentation where we repeatedly quote from the

6  Supreme Court and the Sixth Circuit rejecting over and

7  over and over again the test that the Department of

8  Justice proposes in exactly the words the Department

9  uses.  This is just not the law.

10          The test, Your Honor, is foreseeability.

11  The issue is could the legislature have foreseen that

12  Blue Cross would use its size to obtain advantages.  The

13  answer is not only could it have foreseen it, it did

14  foresee it.  That it perhaps didn't foresee the exact

15  outcome is irrelevant, although it did.

16          As the Second Circuit said in the Omega

17  Owens versus city of Buffalo case, 171 F.3d 755, quote,

18  where the state contemplates a certain type of

19  anticompetitive activity, partner immunity, state action

20  immunity, applies even if that activity is conducted

21  under circumstances that magnify the anticompetitive

22  effects thereof.

23          Once again, the Department cites to Devaugh,

24  and I don't think I need to say any more about that

25  other than if you read that case, Your Honor, you will

1    see it is grossly off point here.  It dealt with an
2    unbelievably narrow state statutory scheme that was
3    nothing like the scheme at issue here.
4            The next point made by the Department of
5    Justice is that Michigan doesn't displace competition
6    because it allows some competition.
7            I think we have dealt with that.  It is
8    absolutely crystal clear that a legislative scheme need
9    not eliminate competition, and in fact, even encourages
10   it so long as the statutory scheme contemplates the kind
11   of conduct at issue, and this one clearly does.
12           They then argue relying entirely on
13   Riverview that Blue Cross is a private entity, and in
14   doing so, Your Honor, they simply get all the facts of
15   Riverview wrong.  All Your Honor needs to do to decide
16   this issue is you can look at our two slides, slides 8
17   and 9, that talk about what the test actually is and
18   what the Riverview court said.  But you can also simply
19   read the Riverview decision, lay it next to the Sixth
20   Circuit's decision in Consolidated Television, and look
21   at the facts of this case.  There is no question that
22   Blue Cross is a Prong One entity.
23           And as the Eleventh Circuit said in the
24   Crosby case, quote, the mere grant of powers which
25   resemble those of a private corporation does not

1    transform an otherwise governmental entity into a

2    private actor of the type you would expect to engage in

3    a private price fixing agreement.  It is quite clear

4    that quality public entities effectuating state policy

5    need only show clear articulation.

6              The next argument the Department made is

7    that there is no active supervision, because, again, it

8    is just rehashing the brief.  And as it said, the

9    Insurance Commissioner simply rubber stamped in their

10   brief and parenthetically mentioned there that MFN

11   provision at issue here.  That is simply not true.  If

12   you read, Your Honor, our Appendix 2 and the rest of the

13   Appendices that we submitted, and if you look at P.A.

14   350, it is absolutely clear that there is intensive

15   supervision.  The fact that the Commissioner's

16   supervision takes place against the backdrop of

17   determining whether Blue Cross's hospital contracts help

18   Blue Cross achieve the three goals of comprehensive

19   universal health care access, of good quality health

20   care for all citizens in Michigan, and of costs control

21   doesn't in any way devalue or demean the Commissioner's

22   review as the Department of Justice suggests.

23             And let me say further, Your Honor, that

24   when Mr. Wayland pointed out that Blue Cross didn't meet

25   its cost goal as the Commissioner found, I don't think

1   you could ask for clearer evidence of active

2   supervision.  Because in that case, the insurance

3   commissioner looking at Blue Cross's provider contracts,

4   looking at the MFN clauses said notwithstanding the fact

5   that Blue Cross's costs increase higher than the

6   statutory formula, Blue Cross's practices met the

7   standard because overall they enable Blue Cross to

8   achieve access and quality.

9           That is far more than necessary for active

10  supervision.

11          On Burford, Your Honor, there is no attempt

12  to refute any of our arguments.  The Sixth Circuit, as I

13  read to Your Honor, has expressly rejected the notion

14  that the presence of the United States in a case

15  prevents abstention.  I think that issue is effectively

16  over.  Thank you, Your Honor.

17          THE COURT:  Okay, thank you.

18          MR. STENERSON:  Briefly, Your Honor.

19          First, on product market, two points.  The

20  DOJ alleges group health insurance and individual

21  insurance.  That is a red herring.  It is a misdirection

22  play.  All of the conduct here that is being challenged

23  occurred in a completely different market, the market

24  for purchasing hospital services.  There is nothing pled

25  about the markets in the Complaint.

1          Without that, you cannot even begin --  the

2     DOJ would have to establish that harm occurred in the

3     hospital services market before it could even begin to

4     suggest that harm then occurred in an adjacent market

5     for the sale of health insurance in the group and

6     individual situations.

7          So they're skipping the entire step.

8     They're complaining about conduct here in hospital

9     services and pleading product markets adjacently over

10    here.  It is insufficient.

11         Geographic markets.  I heard the DOJ concede

12    that, yes, in fact, they are resting on their sole and

13    single allegation to support 17 different markets that

14    people want health care near their home and work.

15         You know, Your Honor, Blue Cross is not

16    angry about the allegations, which is what I heard DOJ

17    say.  What the DOJ wants Blue Cross to do is to litigate

18    against a ghost.  We don't know where the boundaries

19    are.

20         The fact, the single fact pled that people

21    want health care close to their home or work does not

22    even begin to inform where DOJ wants to draw these

23    arbitrary boundaries.   All we want to know is what the

24    markets are and what facts pled, if proven to be true,

25    would, in fact, establish those boundaries.

1               They don't do it.  They can't do it.

2               The Fourth Circuit case that they cite

3    relies upon Todd v Exxon and in fact quotes the citation

4    that I told Your Honor when I first spoke, and that is

5    on a motion to dismiss, cases in which involve dismissal

6    on the pleadings is appropriate frequently when they

7    involve the, quote, failure even to attempt a plausible

8    explanation as to why a market should be limited in a

9    particular way.

10              This Complaint is completely devoid of any

11   explanation of why the market should be delineated in

12   the 17 drastically different ways they attempt to plead

13   them.

14              As to the MFNs themselves, Your Honor, I

15   would like to direct your attention to page 5 of the

16   Government's presentation.  It is the bar chart where

17   they show the purported effect on prices to Blue Cross

18   and rivals.  They get the MFN Option 1, Option two.

19              What does this show?  Well, first off, I

20   don't know what hospital this is.  I don't know what

21   geographic market it is in.  I don't know what product

22   market it is in.  It doesn't even begin to be

23   sufficient.  But just looking at this on its face, if

24   Blue Cross were paying a price that shows that it

25   changes the competitive prices of Blue Cross and the

1    insurers that a hospital gets.  A hospital needs money.

2    There is a whole host of reasons why they might seek

3    additional funds.  Blue Cross is negotiating at

4    arms-length with the hospital.

5              There is no suggestion in this Complaint

6    that Blue Cross knows what the competitors are paying.

7    It doesn't know if it is paying too much or not enough.

8    It is out there everyday bargaining hard to get the

9    lowest price.

10             If it uses the MFN to cause its price to go

11   up lower than it otherwise would to cover the more money

12   that the hospitals need, that means that other

13   competitors may pay more.  It falls under the category

14   that there is no such thing as the free lunch.  But the

15   fact that Blue Cross is trying to keep its costs down

16   does not make its conduct anticompetitive.

17             And to the extent that Blue Cross is seeking

18   low costs and it seeks an MFN to make sure that it

19   doesn't pay for more than its fair share of any

20   increasing costs, that goes directly to the statutory

21   obligations of P.A. 350 that Blue Cross not pay more

22   than its own fair share.

23             And that is all these charts show.  It shows

24   the competitive process at work.  And the Insurance

25   Commissioner, Your Honor, is the appropriate office to

1    determine whether or not Blue Cross is paying its fair

2    share.  And we submit it is.

3              On the Section 1 and Section 2 point, a few

4    observations.

5              First, Dentsply, the case that the

6    Government primarily relies upon to show that it can

7    establish foreclosure, was a Section 2 case.  But the

8    more important point is the Third Circuit in Dentsply on

9    page 197 found that the Government lost the Section 1

10   count in the district court.  The Third Circuit

11   recognized that it was harder for the Government to

12   establish a Section 1 violation rather than a Section 2

13   violation, not easier.  So in other words, in Dentsply,

14   the exact conduct was found not to violate Section 1,

15   the Government did not appeal that to the Third Circuit,

16   and the Third Circuit ruled on Section 2 grounds.

17             So I would submit to you that the test is

18   harder under Section 1 not easier as the Government

19   suggests.

20             In addition to that, the Supreme Court in

21   Matsushita Electric versus Zenith Radio case, 475 US

22   574, and this is at Footnote 8, the court in Footnote 8,

23   the Supreme Court explains that when you're challenging

24   pricing conduct under Section 1, that is at arms-length

25   negotiation, it does not violate Section 1 unless it is

1    alleged that the conduct, the pricing conduct of the

2    defendant is predatory.  In other words, the Supreme

3    Court establishes the same test under Section 1 and

4    Section 2 for the type of conduct that is being alleged

5    here.  And more specifically, the Weyerhaeuser case and

6    the Supreme Court when the sole complaint here is that

7    cost of the competitors are going up establish the

8    elements that must be pled and proven by Plaintiff, and

9    the Government concedes they cannot meet that test here,

10   so therefore, the case should be dismissed.

11            THE COURT:  Thank you for your arguments.

12            We're going to take a five-minute break, but

13   I want to hear the class action Plaintiffs reasons

14   relative to the appointment of different counsel and the

15   Motion to Consolidate next.

16            (Recess taken at 4:45 p.m.)

17              *  *  *  *  *  *  *  *  *

18            (Back in session at 4:55 p.m.)

19            THE COURT: I don't think I need to hear oral

20   argument on the motion to strike or the motion to, what

21   is it, delay discovery?

22            MR. McNEILL:  Your Honor, if I could just --

23            THE COURT:  No, you're going to tell me the

24   reason and that is going to be argument, so I don't

25   think I need to do that.   I really don't.

1          MR. McNEILL:  I am a lawyer, I can't help it

2     if I don't give it a shot.

3          THE COURT:  But now the reason you're going

4     to give me, that will be arguments.  So I will tell you

5     that I pay attention to the submission of Counsel in

6     detail and I will pay attention to that one in detail.

7          Someone else wanted to argue it, too?

8          MR. ETTINGER:  Your Honor, The Hospital

9     Defendants would like to be heard on that issue because

10    --

11         THE COURT:  No, don't because, that is

12    argument, and so the answer is the same answer to Mr.

13    McNeill.

14         MR. McNEILL:  Your Honor, without arguing,

15    honest, would you defer consideration of that issue

16    until you hold the scheduling conference or the Rule 26

17    conference?

18         THE COURT:  That is argument.

19         MR. McNEILL:  Just asking for a deferral.

20         THE COURT:  That is argument.

21         MR. McNEILL:  I understand that, and I will

22    now sit down.  I am going to sit down now.

23         MR. ETTINGER;  Well, I will risk your ire

24    and I will say one sentence.

25         THE COURT:  No, I get to exercise my

1    discretion not to hear oral argument at all.  Are you

2    going to argue?

3              MR. ETTINGER:  Well, I don't think it is

4    arguing.  If you will indulge me with one sentence, I

5    will sit down.

6              The Hospital Defendants' interests are

7    involved with any stay of discovery, and thus it needs

8    to be considered with the various motions in the

9    Hospital Defendants' case.  It can't be looked at

10   alone.

11             I have no desire to argue the merits, I just

12   wanted to make you aware of that concern.

13             THE COURT:  Alright, thank you.

14             I think I should spend my time hearing, and

15   I respect all of your requests, but I really don't think

16   on a motion to stay I need anything further than the

17   pleadings.  If you think there is something not in your

18   pleading, you can ask to supplement and I will allow

19   that as long as you don't say any of the same things

20   over.  But I think it is clear.

21             I would rather, as I indicated, spend my

22   time on hearing the class action Plaintiffs' reasons why

23   they want different counsel and the Motion to

24   Consolidate.

25             Mr. Miller, you're going to argue that?

1              MR. MILLER:  Yes, Your Honor, if I may.

2              THE COURT:  Are you the only one that is

3    going to present argument?  Ms. Oliver?  And who else?

4              Mr. Thompson.

5              MS. OLIVER:  I think once you hear what he

6    has to say, we might be done for today.  I'm not sure.

7              THE COURT:  And does anybody else want to be

8    heard on that?

9              MR. THOMPSON:  Jason Thompson on behalf of

10   the City of Pontiac, Your Honor.

11             MR. HOFFMAN:  Your Honor, do you want to be

12   heard from the Defendants?

13             THE COURT:  If you would like to be heard.

14             MR. HOFFMAN:  I would like to.

15             THE COURT:  You all are limited much, much

16   more than the prior arguments, so I'm sure you all can

17   do this in 10 minutes or less each.  Someone was waiving

18   their fingers saying five minutes.

19             MR. MILLER:  May it please the Court, I'm

20   speaking on behalf of the Shane Group and authorized by

21   Mr. Fred Isquith and Mary Jane Fait from the Wolf

22   Haldenstein firm.

23             THE COURT:  And you're new to the box, I'm

24   sure.

25             MS. FAIT:  I am, Your Honor.  My flight was

1    cancelled from Chicago, and I do apologize for my

2    lateness.

3                    THE COURT:  And what is your last name?

4                    MS. FAIT:  Fait; F A I T:  Mary Jane.

5                    THE COURT:  Anybody else new in the box?

6                    MR. MILLER:  I'm also speaking on behalf of

7    my former partner, David Fink, who just started his own

8    law firm.  We're very good friends, and we're working

9    together on many cases together.

10                    I'm speaking on behalf of the Michigan

11    Regional Carpenters Group as well.

12                    THE COURT:  I don't think you need to go

13    through that unless there is somebody new from your

14    Group.

15                    MR. MILLER:  I just want to make it clear

16    because the original pleadings that we filed were on

17    behalf of the Shane Group and my argument is being

18    supported by the Michigan Regional Carpenters Group as

19    well as the Steele Plaintiffs Group, which is Mr. Dan

20    Gustafson from the Gustafson Gluek firm, and Alyson

21    Oliver from the Kresch Oliver firm.

22                    And what I'm getting to, Your Honor, is one

23    of the things I'm currently doing is serving as a

24    co-chair on the American Bar Associations's subcommittee

25    on MDL and class action procedure, and one problem we're

1    trying to address is disputes between Plaintiffs Counsel

2    over cases.

3              We think that is a bad thing for the

4    profession.  I think it is fortunate that we have had

5    very little of that in the Eastern District of Michigan,

6    and I hope that we don't have that problem in the

7    Eastern District of Michigan.

8              So my point is we have been working very

9    hard over the last couple of weeks and today to try to

10   come up with a private ordering for lead counsel that we

11   would submit to Your Honor, which is encouraged by the

12   Manual on Complex Litigation, and of course, subject to

13   Your Honor's good judgment and discretion.

14             And in that regard, we have had negotiations

15   with Mr. Thompson, who represents the city of Pontiac,

16   an attorney who I like and respect, and I'm pleased to

17   report that we have made progress in that regard,

18   including today, but we're not there yet.  And I'm

19   hopeful that within a few days, we would have a yea or

20   nay on a private ordering.  And that we would be -- and

21   I hope we have the yea -- and that we would be able to

22   present Your Honor with the proposed ordering for the

23   organization of the Plaintiffs attorneys to avoid

24   disputes between attorneys, and most importantly, to

25   assure the effective and efficient prosecution of this

1   case.

2            So my suggestion to Your Honor is to perhaps

3   put this over for a short time and allow us to complete

4   this process.  That's my suggestion to the Court.

5            THE COURT:  And what do you think is a short

6   period of time?

7            MR. MILLER:  I would say a week.  Hopefully

8   less.

9            THE COURT:  Alright.

10           Mr. Thompson, do you want to be heard on

11  this?

12           MR. THOMPSON:  Certainly, Your Honor.

13           Good afternoon, Your Honor, Jason Thompson

14  from Sommer Schwartz on behalf of the city of Pontiac,

15  and I will be even shorter than Mr. Miller.

16           I concur with everything he said.  We are

17  working very hard with this, and I think within one week

18  we will be able to respond to Your Honor with a,

19  hopefully, as he said, a yea in terms of private

20  ordering.  If not, we would be happy to stand on our

21  briefs.  I don't think we need to come back and have

22  additional argument, unless Your Honor has a request for

23  that.

24           THE COURT:  Thank you, Mr. Thompson.

25           MR. ETTINGER:  Your Honor, David Ettinger,

1    and I think I can speak for the Hospital Defendants on

2    this.

3              I'm a little unclear on what Mr. Miller and

4    Mr. Thompson were speaking about.  It is the first we

5    have heard it.

6              If it is about simply choice of counsel, we

7    have no dog in that hunt and we have no position.  If it

8    is also about consolidation, we certainly do, but we

9    don't know what we would be reacting to, so we would

10   have to wait to see what they propose.

11             THE COURT:  I think they were talking about

12   just choice of Counsel.  Were you also talking about

13   consolidation?

14             MR. MILLER:  Choice of Counsel, but they are

15   related, Your Honor, because once we have private

16   ordering, and I hope we do, the logical next step would

17   be for Plaintiffs Counsel to get together and make

18   judgments about what should be in a consolidated amended

19   complaint.  So that we would avoid piecemeal litigation

20   ideally.

21             THE COURT:  Alright.

22             MR. ETTINGER:  I guess the point I don't

23   know what it is we would be responding so.   I don't

24   think we have an objection to waiting and seeing and

25   then we may need to be heard and may not need to be

1   heard.  It is hard to anticipate that.

2            THE COURT:  I agree with you on that.

3            Who wanted to be heard over here further on

4   this issue?

5            Okay, so they think they're ready in a week,

6   and so do you want to give them something to respond to

7   relative to that?  So then in a week they don't say we

8   haven't had a chance to digest this and we would like to

9   have a chance to do that.

10           MR. MILLER:  Your Honor, as soon as we come

11  to an agreement, of course we will disclose that to the

12  Defense and to Your Honor.

13           THE COURT:  So we need a timeframe for doing

14  that.

15           MR. MILLER:  One week, Your Honor.

16           THE COURT:  One week you're going to give us

17  something?

18           MR. MILLER:  Yes.

19           THE COURT:  And then you want us to come

20  back and let them say why they don't like it or they do?

21           MR. MILLER:  Yeah.  Well, what will likely

22  happen is in a week we hope to have a proposal to Your

23  Honor as to organization for the Plaintiffs Attorneys.

24  Once Your Honor accepts that or modifies it, we hope

25  accepts, we would then be in a position to make a

1   judgment about the next step from the Plaintiff's

2   perspective, which is typically to file a consolidated

3   amended complaint.

4           We will promptly communicate with the

5   Defense as we are eager to move our case forward in an

6   efficient manner.  So we're incented to move as quickly

7   as we can.

8           THE COURT:  So you're going to provide a

9   proposed organization to us a week from tomorrow, which

10  would be like the 26th of April.  And you're going to

11  provide that to all the Defendants because some of the

12  Defendants haven't objected, but they might once they

13  see it.  And so then do you want another week for them

14  to say we agree or we don't agree?

15          MR. MILLER:  Sure, that is fair.

16          THE COURT:  Well, I was kind of looking at

17  them.

18          MR. ETTINGER:  Your Honor, I think that is

19  fine.  Obviously, the thing that counts for us is the

20  next stage when the Plaintiffs then go off and come back

21  with a proposal of some kind regarding consolidation

22  which we will want to look at it very closely.

23          THE COURT:  Aren't you proposing to do that

24  within the week?

25          MR. MILLER:  No, within the week would be our

1    structure.  It can take a little bit longer to make a

2    judgment about what would be the next step in the

3    prosecution of the case.

4              THE COURT:  You mean what you would propose

5    to be consolidated?

6              MR. MILLER:  Yes, exactly right.

7              THE COURT:  How long is that going to take?

8              MR. MILLER:  That won't take long, Your

9    Honor.

10             MR. ISQUITH:  I wonder if I could be heard

11   just for a second?

12             THE COURT:  Okay, but put your appearance

13   on.

14             MR. ISQUITH:  I have, but my name is Fred

15   Isquith.

16             THE COURT:  I know you have, but we need it

17   now for the record.

18             MR. ISQUITH:  From the Wolf Haldenstein

19   firm.  It is not to contradict any of this Gentleman's

20   procedure.  In a week, we will have, we hope, a proposed

21   order to present to Your Honor, and of course we will

22   present it the Defendants, with regard merely to the

23   organization of Plaintiffs' Counsel.

24             **THE COURT:**  Okay.

25             MR. ISQUITH:  Then, Plaintiffs' Counsel so

1   organized will deal with the Defendants with respect to

2   consolidation or the coordination issue an the filing of

3   papers and perhaps, you know, the inevitable motions and

4   timing and stuff like that.  And we would then have a

5   second proposal to Your Honor or a pretrial order number

6   two, a second proposed order to Your Honor on the timing

7   of that.

8             Now, usually we can get that done within a

9   few days as well, but it wouldn't be surprising to me if

10  two weeks from today we didn't have all those papers in

11  front of you.

12            MR. ETTINGER:  Your Honor, if we can work it

13  out, of course, that's fine, everybody is happy.  But

14  right now, we have a lot of disputes about

15  consolidation, a motion in opposition.  So if we can't

16  work it out --

17            THE COURT:  I'll rule.

18            MR. ETTINGER:  Well, I think we don't know

19  even know what you would be ruling on at this point.

20            THE COURT:  Your Motion.

21            MR. ETTINGER:  I think what I'm hearing them

22  say, and I don't mean to complicate this, I don't know,

23  they may have a different proposal and a different

24  motion on consolidation than they have offered today.

25            THE COURT:  And that is what I heard, too,

1    and that they would try to get you to agree with that.

2              MR. ETTINGER:  Right.

3              THE COURT:  And if you don't agree with it,

4    I am back to their original Motion to Consolidate, and

5    if they want me to consider a different motion, then

6    they will have to file a motion.

7              MR. ETTINGER:  That's all I was heading

8    towards, Your Honor.

9              THE COURT:  So here is the schedule.  April

10   26th, you give me the proposed private organization of

11   Plaintiffs' Counsel to approve or not.

12             And on May 3rd, the Defendants can, and I

13   suppose it should be couched as an objection, right.

14   What are you going to entitle it?  You don't know yet.

15             So if it is just a proposed something and it

16   is not a motion, you should caption yours an objection

17   to that if you object.  And if you don't object, you

18   should file something saying you don't object.

19             And then on consolidation, what do you want,

20   another week after that?

21             MR. MILLER:  Yes, that's plenty, Your Honor.

22             THE COURT:  So that would then be May 11.

23   And if you object to that, I suppose you object by the

24   19th.

25             Does the Government think they're going to

1   want to be involved in that?

2          MR. WAYLAND:  I can't imagine so at this

3   point, Your Honor, but we will watch.

4          THE COURT:  If you do, and by the Government

5   I also meant Michigan, so if you do, the same guidelines

6   apply to you, okay?

7          MR. WAYLAND:  Yes, Your Honor.

8          MR. PASCOE:  Yes, Your Honor.

9          THE COURT:  And then you've lost your

10  opportunity to have a hearing for the rest of the month

11  following that.  So we will be in June, at which time we

12  can hear those other motions.  So what day are we going

13  to hear those motions, Ms. Daley?  Do you already have

14  that date.

15         June 7th at 2:00.  Is that satisfactory to

16  everyone?

17         MR. STENERSON:  May I ask one question?

18  Will we also have the status conference on June 7th?

19         THE COURT:  Relative to the status?

20         MR. STENERSON:  Relative to the same subject

21  matters that I thought was initially a status conference

22  was scheduled for today.

23         THE COURT:  Right, but I assumed that you

24  all are going to address that; is that right?  I heard

25  the Plaintiffs, maybe I broaden my interpretation of

1  what they was saying, but what I heard from the

2  Plaintiffs was also a schedule; am I mistaken?

3          MR. MILLER:  Yes, Your Honor, you are

4  correct.

5          THE COURT:  And then the Government may want

6  to be involved in that, right?

7          MR. WAYLAND:  With respect to scheduling,

8  yes, Your Honor, we certainly would want to be.

9          THE COURT:  So you should make sure you

10  include the Government in the conversations on

11  scheduling.

12          MR. MILLER:  Yes, Your Honor, we will.

13          THE COURT:  So there are like four different

14  schedules that I have, right?

15          MR. McNEILL:  Your Honor, what motions will

16  you be hearing on June 7th?

17          THE COURT:  The two motions filed yesterday

18  at 6 p.m.

19          MR. McNEILL:  Thank you.

20          THE COURT: And I don't know when I will

21  decide your Motion that you're concerned about.

22          MR. McNEILL:  The one that I'm not arguing?

23          THE COURT:  But I would say that I reserve

24  the right to rule on it at any time.  And until then,

25  you're not taking discovery now, right?  Are you?

1           MR. WAYLAND:  Well, there were two motions,

2    Your Honor.  There was a Motion to Stay and --

3           THE COURT:  And the Motion to Compel.

4           MR. WAYLAND:  The Motion to Compel because

5    they didn't respond to any discovery while their motion

6    is pending, so we would like them to respond.

7           MR. McNEILL:  Your Honor, under Rule 34, we

8    did respond.  We file objections, so that brings us to

9    the procedural point we're at now.  Without arguing.

10          THE COURT:  I reserve the right to rule on

11   that at a time that I see fit.

12          Taking seriously your submissions.

13          Anything else we need to take up?

14          I need to see the schedule.  Whatever

15   schedule you're going to propose, I guess I don't see

16   that until the 19th?  Or the 11th.  May 11th is when

17   you think you will have that, too?

18          MR. MILLER:  Yes, we will present it to Your

19   Honor.

20          THE COURT:  Anything further today?

21          MR. WAYLAND:  Not from the Government, Your

22   Honor.

23          MS. OLIVER:  Just on one issue.  I have an

24   out of state attorney who still needs to be sworn.

25          THE COURT:  I'm not going to make everyone

1   stay on that.

2               MR. WAYLAND:  Your Honor, I'm sorry, I

3   misspoke, I did have one other piece of business before

4   the Court.

5               During my argument, I made reference to two

6   pieces of paper, and I said I would hand them up the end

7   and I failed to do that.

8               THE COURT:  That's alright, I will take them

9   now.

10              The other side has them as well, right?

11              MR. WAYLAND:  They will right now.

12              THE COURT:  Okay, good.

13              MR. WAYLAND:  This is the Complaint that we

14  referred to.

15              THE COURT:  Okay, thank you very much.

16              In the Southern District of Ohio, Western

17  District, the Total Benefits Complaint?

18              MR. WAYLAND:  Yes, Your Honor.

19              And the Kolon case, Your Honor, which we had

20  a copy of, and now we can't seem to find it.

21              Here it is, I have it, Your Honor.

22              May I approach again?

23              THE COURT: Yes, you may.

24              And your Motion that you argued today is

25  under advisement.

1              And the Court, unless anyone has anything

2    further, in recess, except Ms. Oliver, you can step to

3    the sidebar with your attorney.

4              (Proceedings concluded at 5:26 p.m.)

5              *  *  *  *  *  *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            C E R T I F I C A T E

 2            I, CHERYL E. DANIEL, OFFICIAL COURT

 3   REPORTER, after being first duly sworn, say that I

 4   stenographically recorded the foregoing proceedings

 5   held on the day and date hereinbefore recorded; that

 6   upon order of the Court or counsel, I caused those

 7   stenotype notes to be reduced to typewritten form via

 8   computer-assisted technology, and that this transcript

 9   constitutes a true, full and complete transcript of

10   those proceedings so ordered.

11            I further certify that I am not related to

12   any party to these proceedings nor have any interest in

13   the outcome of said proceedings.

14

15                      S/Cheryl E. Daniel

16                      FEDERAL OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25
```